**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re OMEGA HEALTHCARE INVESTORS, INC. SECURITIES LITIGATION | **1:17-cv-08983-NRB**<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Royce Setzer and additional plaintiff Earl Holtzman (collectively, "Plaintiffs"), individually and behalf of all other persons similarly situated, by and through their attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public statements and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Omega Healthcare Investors, Inc. ("Omega" or the "Company"), securities analysts' reports, news stories, witness interviews, bankruptcy court filings, and review of other publicly available information. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.       This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Omega's securities between May 3, 2017 and October 31, 2017, both dates inclusive (the "Class Period"), seeking to recover damages

caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Omega is a self-administered real estate investment trust (REIT) that invests in healthcare facilities such as skilled nursing facilities and assisted living facilities.  Omega provides lease or mortgage financing to these healthcare facilities and earns money for its stockholders largely by collecting rent and/or mortgage payments from the operators of those facilities.  Omega's largest operators each manage dozens of facilities.

3.      As such, Omega's ability to pay dividends to its stockholders depends heavily on the financial health of its operators, as those operators' ability to make regular rent payments directly affects Omega's bottom line. Further, finding a new operator for one or more troubled or failing facilities is a cumbersome and expensive process. The financial health and quality of Omega's operators, in addition to the need to replace one, is a matter on which investors focus intently. As a result, it is critical that Omega disclose to the market when one or more of its operators – particularly its largest operators – face problems that could materially impact Omega's reported earnings.

4.      Orianna Health Systems ("Orianna") was, as of December 31, 2016, Omega's second largest operator, operating 59 facilities across the country.  Omega's investment in the Orianna facilities represents nearly 7% of its overall investment portfolio, with a gross investment of over $619 million. Due to a variety of factors, Orianna experienced a number of operational pressures in 2016 and early 2017 that dramatically affected its profitability and, critically, disabled it timely from paying its rent to Omega. In 2016, Omega knew, but did not disclose, that Orianna's difficulties caused it to change its management, wholesale, implement material operational and

cultural changes, and to attempt to sell off seven Orianna facilities in the northwest United States.  By March, 2017, Omega and Orianna had succeeded in selling six of seven of those facilities.

5.      It was not until Omega's May 4, 2017 earnings conference call that Defendants disclosed to the market, in general terms, the struggles Orianna faced in 2016 as well as the measures Orianna and Omega took to return Orianna to stability. The picture Defendants painted during that May 4, 2017 call portrayed Orianna as traveling down the road to recovery, including generating cash flow enough to cure any rent delinquencies and return Orianna to current status on its payments to Omega.

6.      Omega concealed from the market, however, that by the spring of 2017 Orianna's financial situation was so dire that it was delinquent on both material rent payments to Omega as well as its own real estate taxes.  Omega further concealed that in response to Orianna's struggles, on May 2, 2018, pursuant to a Working Capital Agreement it lent Orianna $18.8 million, *just two days before the May 4, 2017 earnings conference call*, which Orianna used mainly to pay delinquent real property taxes and *to use Omega's own cash to make rent payments to Omega,* reducing Orianna's delinquencies.

7.      Omega's surreptitious loan to Orianna allowed Omega to misrepresent that the money it loaned to Orianna (either from its cash on hand, or drawn from its revolving line of credit) was actually revenue from rent, leading to a material misstatement of Omega's Funds from Operations ("FFO") and Adjusted Funds from Operations ("AFFO") in the first and second quarters of 2017.  Indeed, when Orianna's financial condition deteriorated to such a degree that Omega could no longer hide it from the market, and in its reported earnings for the third quarter of 2017, Omega recorded a $194.7 million impairment on its direct financing leases with Orianna,

along with $9.5 million in provision for uncollectible accounts related to Orianna. Further, Orianna reported a $46.8 million loss in FFO for the third quarter of 2017.

8.      As a result of this news, the price of the Company's shares fell $2.11 per share, or 6.8%, from an October 30, 2017 close of $30.97 to an October 31, 2017 close of $28.86 per share on relatively enormous volume of 16.2 million shares traded, directly and proximately causing Plaintiffs and other Class members to suffer damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.     Plaintiff Royce Setzer purchased Omega securities during the Class Period. and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. Plaintiff Setzer's PSLRA certification is appended hereto as Exhibit A and incorporated in its entirety herein.

14.     Plaintiff Earl Holtzman purchased Omega securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  Mr. Holtzman's PSLRA certification is attached hereto as Exhibit B and incorporated in its entirety herein.

15.     Defendant Omega Healthcare Investors, Inc. is incorporated in Maryland. Omega's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "OHI."

16.     Defendant C. Taylor Pickett ("Pickett") has served at all relevant times as the Chief Executive Officer ("CEO") of Omega.

17.     In both the Quarterly Reports on Forms 10-Q for the Quarters ended March 31, 2017 and June 30, 2017, as Omega's CEO, Defendant Pickett certified as follows:

### RULE 13a-14(a)/15d-14(a) CERTIFICATION OF CHIEF EXECUTIVE OFFICER

#### Certification

I, C. Taylor Pickett, certify that:

1.     I have reviewed this Quarterly Report on Form 10-Q of Omega Healthcare Investors, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

5

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

18.     In addition, in those Forms 10-Q, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Defendant Pickett certified that the Forms 10-Q "fully compl[y] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "the information contained in the Report[s] fairly presents, in all material respects, the financial condition and results of operations of the Company."

19.     Defendant Robert O. Stephenson ("Stephenson") has served at all relevant times as the Chief Financial Officer ("CFO") of Omega.

20.     In both the Quarterly Reports on Forms 10-Q for the Quarters ended March 31, 2017 and June 30, 2017, as Omega's CFO, Defendants Stephenson certified as follows:

### RULE 13a-14(a)/15d-14(a) CERTIFICATION OF CHIEF FINANCIAL OFFICER

#### Certifications

I, Robert O. Stephenson, certify that:

1.     I have reviewed this Quarterly Report on Form 10-Q of Omega Healthcare Investors, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and

cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

21.    In addition, in those Forms 10-Q, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Defendant Stephenson certified that the Forms 10-Q "fully compl[y] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "the information contained in the Report[s] fairly presents, in all material respects, the financial condition and results of operations of the Company."

22.    Defendant Daniel J. Booth ("Booth") has served at all relevant times as the Chief Operating Officer ("COO") of Omega.

23.    Defendants Pickett, Stephenson, and Booth (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Omega's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Omega is a self-administered REIT that invests in income producing healthcare facilities, including long-term care facilities located in the United States and the United Kingdom.

25.     Omega provides lease or mortgage financing to operators of healthcare facilities, the majority of which are skilled nursing facilities ("SNF's"). Omega also provides lease and mortgage financing to assisted living facilities ("ALF's"), independent living facilities and rehabilitation and acute care facilities

26.     According to Omega's 2016 10-K, Omega's typical relationship with its operators is through triple-net operating leases, ranging from 5-15 years in duration, pursuant to which the operators are responsible for all expenses related to the leased facilities. Omega also accounts for certain of its leases as direct financing leases.

27.     As of December 31, 2016, Omega's real estate investments included properties managed by 79 different operators. Omega refers to operators as "our tenants and mortgagors and their affiliates who manage and or operate our properties."  Two of Omega's top lessees are Orianna Health Systems ("Orianna"), identified in Omega's public filings through its affiliate New ARK Investments, Inc., and Signature Healthcare ("Signature"), identified in Omega's public filings through its affiliate Signature Holdings II, LLC.

28.     As of December 31, 2016, Orianna operated 59 of Omega's facilities in several regions of the country, under a combination of operating leases and direct financing leases. Omega reported the gross real estate investment in the Orianna facilities as $619,281,496.  Omega's investment in Orianna facilities represents nearly 7% of its overall investment portfolio.  Omega's public filings identify only one operator in which it has a larger total investment – Ciena Healthcare, with a total investment of $910,430,967.   Another large operator, Signature Healthcare, has a larger number of facilities than Orianna (63 to 59), but a smaller overall

investment than Omega's investment in Orianna. As of December 31, 2016, Omega reported a total investment of $557,985,685.  In terms of total investment, then, Orianna is Omega's second largest operator.

29.     Orianna operated SNF facilities in several regions of the country. Several master lease agreements governed its relationship with Omega, each of which set forth the lease obligations of a number of Orianna facilities.  As of March 2018 when Orianna sought bankruptcy protection for its restructuring,[1] Omega (through its affiliates), was a party to multiple active master leases with Orianna facilities.

30.     Omega does not directly operate the medical facilities in which it invests. Rather, it owns the property on which those facilities operate, or provides financing to the entities that operate those facilities.  Omega delivers returns to its stockholders by collecting rent and mortgage payments from its operators, and, as such, relies upon those operators to run their facilities profitably and in compliance with the vast legal and regulatory obligations faced by medical facilities.  Due to the legal and operational complexity of running large numbers of skilled nursing facilities, and the limited number of large operators in the industry, Omega must be sensitive to the problems of its operators, as finding new operators for its facilities is time-consuming and expensive.  Reflecting this complexity, Omega's leases with its operators, including Orianna, do far more than set forth the term of the lease and the operator's rental obligations. As Omega describes in its 2016 annual report on Form 10-K ("2016 10-K"), filed with the SEC on February 24, 2017:

---

[1] 4 West Holdings, Inc., along with 134 other entities (collectively doing business as Orianna Health Systems), filed petitions for Chapter 11 bankruptcy protection on March 6, 2018 in the United States Bankruptcy Court for the Northern District of Texas, Case No. 18-30777 (the "Orianna Bankruptcy").

> We seek to obtain (i) contractual rent escalations under long-term, non-cancelable, "triple-net" leases and (ii) fixed-rate mortgage loans. We typically obtain substantial liquidity deposits, covenants regarding minimum working capital and net worth, liens on accounts receivable and other operating assets, and various provisions for cross-default, cross-collateralization and corporate and or personal guarantees, when appropriate.

In other words, Omega protects its investments by ensuring it is well-informed about its operators' financial condition, and that its investments are secured by multiple forms of collateral.

31.     Investors understood the importance of healthy operators and were concerned about the risk to Omega's losing operators. For example, on May 4, 2017, Hilliard Lyons analyst John Roberts issued a generally positive report on Omega, noting that management had "retained its FFO guidance for 2017 at $3.40-$3.44 a share. . . ."  With respect to certain justice department investigations and the potential "headline risk" to which this exposed Omega, Roberts dismissed it as constituting a "fundamental risk" to Omega. He did note, however, that "[i]nvestors always worry about a REIT's ability to find a new tenant when one leaves, and we believe that OHI management is very capable of doing just that, replacing a problem tenant with a new one, if any investigation were to result in such an issue."

32.     On March 6, 2018, in its motion seeking to obtain post-petition financing from Omega during its restructuring ("DIP Financing Motion"), Orianna identified five master leases between its affiliates and Omega: the SE Master Lease governing facilities in the southeast region; the IN Master Lease, governing facilities in Indiana; the SC/GA Master Lease, governing facilities in South Carolina and Georgia; the NW Master Lease, governing facilities in the northwest region; and the TX Master Lease, governing facilities in Texas.

33.      In late 2016 and early 2017, Orianna faced severe issues with cash flow and liquidity. As a result it experienced difficulty both paying vendors and meeting its rent obligations

to Omega.[2] Prior to the Class Period, Omega was well aware of Orianna's financial situation. In

its 2016 10-K, Omega described its process for reviewing collectability of accounts receivable:

> On a quarterly basis, we review our accounts receivable to determine their collectability. The determination of collectability of these assets requires significant judgment and is affected by several factors relating to the credit quality of our operators that we regularly monitor, including (i) payment history, (ii) the age of the contractual receivables, (iii) the current economic conditions and reimbursement environment, (iv) the ability of the tenant to perform under the terms of their lease and/or contractual loan agreements and (v) the value of the underlying collateral of the agreement.  If we determine collectability of any of our contractual receivables is at risk, we estimate the potential uncollectible amounts and provide an allowance. In the case of a lease recognized on a straight-line basis, a mortgage recognized on an effective yield basis or the existence of lease inducements, we generally provide an allowance for straight-line, effective interest, and/or lease inducement accounts receivable when certain conditions or indicators of adverse collectability are present. If the accounts receivable balance is subsequently deemed uncollectible, the receivable and allowance for doubtful account balance are written off.

Additionally, Omega disclosed in its 10-Q for the quarter ending March 31, 2017, filed with the

SEC on May 5, 2017 (the "May 5 10-Q") that in March 2017 it had executed sales agreements to

sell Orianna's 7 northwest facilities to new operators.  Thus, by March 2017 at the latest, Omega

knew that Orianna's dire financial condition required that it take drastic steps to protect its

investment.

34.     In other words, Omega claimed to be constantly vigilant about the ability of its

operators to meet their rent and/or mortgage obligations. In addition, both before and throughout

---

[2] In the DIP Financing Motion, Orianna identifies the following aggregate amounts of back rent owed to Omega under the Master Leases as of March 6, 2018: $43,747,162.69 under the SE Master Lease; $297,871.91 under the IN Master Lease; $5,043,835.29 under the SC/GA Master Lease; $668,933.76 under the NW Master Lease; and $1,250,000 under the TX Master Lease. In total, at the time it filed for bankruptcy protection, Orianna owed Omega more than $52,000,000 in unpaid rent.

13

the Class Period, Omega was focused on the pressures faced by a number of its operators that had

the potential to affect those operators' liquidity. In its conference call to discuss the First Quarter

2017 financial results, held on May 4, 2017, Defendant Booth described the state of Omega's asset

portfolio, as follows:

> As of March 31, 2017, Omega had an operating asset portfolio of 972 facilities, with approximately 99,000 operating beds.
>
> These facilities were spread across 77 third-party operators and located within 41 states and the United Kingdom. Trailing 12-month operator EBITDARM and EBITDAR coverage for our portfolio increased slightly during the fourth quarter of 2016 to 1.69x and 1.33x, respectively versus 1.68x and 1.31x, respectively for the trailing 12-month period ended September 30, 2016. The pressures on portfolio performance experienced in 2016, such as increased labor costs and decreased lengths of stay have begun to show some signs of stability in the fourth quarter results, as well as year-to-date results in the first quarter.

35.     Booth went on to discuss the operational struggles Orianna faced (without

mentioning Orianna by name) in 2016, describing positively Omega's hands-on approach to

correcting Orianna's problems:

> One private top 10 operator, of note, however, felt the performance pressure more than most. This was exacerbated in 2016 by complete replacement of senior management early in the year.
>
> The new management team well known and respected by Omega worked throughout 2016 to transform the culture of the company, which included changing out many facility-level management teams. During this transition period, the company's operational performance suffered such that the portfolio dipped below 1x EBITDAR coverage for the trailing 12 months ended December 31, 2016.
>
> In an effort to assist the company during this transitional period, Omega embarked on an effort to sell off the company's northwest region, which consisted of 7 facilities. This region has struggled of late and given its geographical remoteness, has been difficult to oversee.

> We anticipate the sale of all 7 facilities in that region to be completed by the second quarter of 2017, with 3 facilities having already been sold.

36.    Far from cruising down the road to stability, however, by the May 4, 2017 Earnings Call, Defendants knew or recklessly disregarded that Orianna's financial situation was already dire. Not only did Omega embark on a plan that included a replacement of Orianna's executive team and an effort to sell off certain regional facilities, but on May 2, 2017 *it secretly provided Orianna with a "Working Capital Loan," disclosing nothing about that loan to the market*. Omega surreptitiously extended the Working Capital Loan through a subsidiary, OHI Asset RO, LLC, lending Orianna $18.8 million for working capital.  In the DIP Financing Motion, Oriana describes the loan agreement as follows:

> Pursuant to the Working Capital Loan Agreement, dated May 2, 2017 (the "Working Capital Loan Agreement" and together with all related agreements, documents, and instruments, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Working Capital Documents" and, together with the Master Lease Documents, the "Prepetition Documents"), OHI Asset RO, LLC, as lender (the "Working Capital Lender" and collectively with the Master Lease Parties, the "Prepetition Secured Parties"), which is an Omega Party, provided an $18.8 million line of credit to the Debtors listed as "Borrowers" on Schedule 2 thereto (the "Working Capital Debtors") for working capital expenses (the "Working Capital Loan"). ***Most of the proceeds of the Working Capital Loan were used by the Debtors to pay rent and real property taxes*** with the remainder used for other Debtor operating expenses. ***As of the Petition Date, the outstanding principal balance under the Working Capital Loan Agreement is approximately $15 million*** (together with all other amounts incurred or accrued prior to the Petition Date, the "Working Capital Obligations"). (Emphasis added).[3]

---

[3] As set forth in the DIP Financing Motion, as well as Orianna's reorganization plan submitted to the Bankruptcy Court, the $15 million balance outstanding on the Working Capital Loan is separate from the approximately $52 million that Orianna acknowledges as owing in back rent. Therefore, on information and belief, the total amount of rent payments on which Orianna was delinquent is over $60 million.

37.     In other words, while telling the market that Orianna had stabilized somewhat creating the impression that the investment was under control, Omega hid from the market that it had just lent Orianna $18.8 million to ***pay rent back to Omega***.  That Omega lent $18.8 million to Orianna indicates that Omega was sufficiently concerned about Orianna's financial state that two days before it had taken steps to protect its interests in its Orianna investments by making the Working Capital Loan. Upon information and belief, Omega made this loan to Orianna either from its cash on hand, or by drawing on Omega's own revolving line of credit.[4] According to Omega's public filings, the Company reported $40,349,000 in cash or cash equivalents as of March 31, 2017, and reported an outstanding balance of $123,000,000 on its revolving line of credit.  As of June 30, 2017, the Company reported $21,031,000 in cash or cash equivalents, and an outstanding balance of $155,000,000 on the Company's revolving line of credit.  Thus, on May 2, 2017, Omega made a surreptitious loan to one of its largest operators that amounted to 46.6% of its available cash, or 12% of the outstanding balance of its revolving credit facility. It disclosed nothing to the market.

38.     Even as they failed to disclose the Working Capital Loan to Orianna, Defendants understood the materiality of that information. For example, in its 2017 10-K Annual Report, filed February 23, 2018, Omega disclosed the following concerning the mere negotiations surrounding a working capital loan to another struggling top-ten operator, Signature Healthcare:

> A second operator, Signature Healthcare ("Signature") has also fallen more than 90 days past due on rent, we believe primarily as a result of restrictions on their borrowing capacity and significant professional and general liability claims. A large majority of Signature's past due rent is covered by a letter of credit in excess of $9.0 million and guarantees from the principals of Signature. Despite their current liquidity concerns, we believe we have a path

---

[4] Omega lists OHI Asset RO LLC as a direct or indirect wholly owned subsidiary and claims to eliminate intra-company transactions in consolidating its financial statements.

to continue our long standing relationship with Signature under a long term consensual restructure outside of a court-involved restructuring that involves multiple third-party constituents (i.e., Sabra Heath Care REIT, Inc., the United States Department of Justice, and other third-party claimants). ***We are working towards finalizing a comprehensive settlement agreement amongst Signature and their three primary landlords which will effectively bifurcate each of the three portfolios into three distinct legal silos and separate virtually all legal obligations. As part of this agreement, Omega has agreed to defer certain rent payment obligations and provide for a working capital loan.*** While we cannot predict the final outcome with these third-party constituents, we are optimistic that an out of court restructure can be realized. (Emphasis added).

In the case of Signature, Omega disclosed that it had agreed to provide Signature with a working capital loan, before that loan had even closed and funded. In the case of Orianna, however, Omega did not disclose the $18.8 million working capital loan to the market. At the time Orianna filed for bankruptcy protection in March 2018, Orianna reported the outstanding balance on the Working Capital Loan to be approximately $15 million.

39.    Thus, by the beginning of the Class Period, Defendants knew or recklessly disregarded that Orianna was in a grave financial condition, was unable to pay real estate taxes on its facilities, and was unable to make material rent payments to Omega. Defendants knowingly and surreptitiously lent Orianna over $18 million to avoid disclosing to the market both the gravity of Orianna's financial woes and the likely impact on Omega's financial results.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

40.     The Class Period begins on May 3, 2017. On that day, the Company issued a

press release ("May 3 Press Release") titled "Omega Announces First Quarter 2017 Financial

Results; Increased Dividend Rate for 19th Consecutive Quarter." Therein, the Company stated, in

relevant part:

### 2017 ADJUSTED FFO GUIDANCE AFFIRMED

The Company affirmed its 2017 annual Adjusted FFO available to
common stockholders to be between $3.40 and $3.44 per diluted
share. The Company's 2017 FAD guidance and reconciliation to
projected net income can be found in the Company's First Quarter
2017 Financial Supplement located on the Company's website. The
following table presents a reconciliation of Omega's guidance
regarding Adjusted FFO to projected GAAP earnings.

|  | 2017 Annual Adjusted FFO Guidance Range (per diluted common share) |
| --- | --- |
|  | Full Year |
| Net Income | $1.86 - $1.90 |
| Depreciation | 1.40 |
| Gain on assets sold | (0.04) |
| Real estate impairment | 0.04 |
| FFO | $3.26 - $3.30 |
| Adjustments: |  |
| Contractual settlement | (0.05) |
| Provision for uncollectible accounts | 0.01 |
| Transaction costs | 0.00 |
| Interest – refinancing costs | 0.11 |
| Stock-based compensation expense | 0.07 |
| Adjusted FFO | $3.40 - $3.44 |

41.     The May 3 Press Release was false and misleading because Defendants knew that

Orianna, its second largest operator, could neither pay real estate taxes nor pay its rent to Omega.

18

Indeed, they knew that Orianna's circumstances were so dire that Omega lent Orianna $18.8 million on May 2, 2017, so that Orianna could pay rent back to Omega. Defendants knew, therefore, that Orianna was in such dire condition that it could not contribute to Omega's FFO, and that at the time of the May 3 Press Release, its 2017 guidance was materially false.

42.    On the next day, May 4, 2017, the Company held a conference call to discuss its first quarter results ("May 4 Earnings Call"). On the call, Defendant Booth stated the following with respect to Orianna:

> As of March 31, 2017, Omega had an operating asset portfolio of 972 facilities, with approximately 99,000 operating beds.
>
> These facilities were spread across 77 third-party operators and located within 41 states and the United Kingdom. Trailing 12-month operator EBITDARM and EBITDAR coverage for our portfolio increased slightly during the fourth quarter of 2016 to 1.69x and 1.33x, respectively versus 1.68x and 1.31x, respectively for the trailing 12-month period ended September 30, 2016. The pressures on portfolio performance experienced in 2016, such as increased labor costs and decreased lengths of stay have begun to show some signs of stability in the fourth quarter results, as well as year-to-date results in the first quarter.
>
> ***One private top 10 operator, of note, however, felt the performance pressure more than most. This was exacerbated in 2016 by complete replacement of senior management early in the year.***
>
> ***The new management team well known and respected by Omega worked throughout 2016 to transform the culture of the company, which included changing out many facility-level management teams. During this transition period, the company's operational performance suffered such that the portfolio dipped below 1x EBITDAR coverage for the trailing 12 months ended December 31, 2016.***
>
> In an effort to assist the company during this transitional period, Omega embarked on an effort to sell off the company's northwest region, which consisted of 7 facilities. This region has struggled of late and given its geographical remoteness, has been difficult to oversee.

> We anticipate the sale of all 7 facilities in that region to be completed by the second quarter of 2017, with 3 facilities having already been sold.

43.     The foregoing statement was false or misleading because Defendants knew or recklessly disregarded that Orianna, its second largest operator, could neither pay real estate taxes nor pay its rent to Omega, and that Orianna's circumstances were so dire that Omega lent Orianna $18.8 million on May 2, 2017, so that Orianna could pay rent back to Omega.

44.     Later in the call, Defendant Pickett engaged in the following colloquy concerning Omega's guidance for 2017:

> **Nicholas Yulico** - UBS Investment Bank, Research Division - Executive Director and Equity Research Analyst- REIT's:  Okay. And so going back to this tenant who is not current on rent, sounds like they missed a rent payment in the first quarter. I'm confused as to why then your guidance for the year doesn't get reflected? Why wasn't the guidance reduced if you have a tenant that's not paying rent? And still
> hasn't paid rent?

> **Pickett:** Well, it's -- well, they're 45 days past due, so it's a month and a half. We spent an enormous amount of time understanding the plan, and we look at Q1 with 1.09 coverage. Once the Northwest sale is executed, which we're halfway through, and we look at their plan going out throughout the rest of the year, and it's pretty clear if they hit their plan that we're going to be back to current. *But frankly, at 45 days past due, to start fiddling around with guidance, just doesn't make any sense, we feel pretty comfortable that they're going to come back with coverages at their previous level, which is* (inaudible). (Emphasis added)

45.     The foregoing statement was false and misleading. Defendants' discussion of Orianna's condition rendered them duty bound not to mislead investors. Defendants, however, knew or recklessly disregarded, but omitted to disclose, that Orianna's situation was materially more adverse than they disclosed. Indeed, Defendants knew or recklessly disregarded that Omega had lent Orianna $18 million through the Working Capital Loan, enabling Orianna to cover real

estate taxes and to pay rent back to Omega.  Omega knew no later than May 2, 2017, that Orianna was delinquent in their rent payments to Omega, and further, that they were delinquent with rent and real estate tax payments to such an extent that Omega was compelled to lend Orianna $18.8 million to make tax and rent payments.  Omega also knew that if they were forced to find a new operator for the Orianna facilities, that they would face a loss on those facilities, in that transitioning such facilities to a new operator involves significant costs in terms of obtaining regulatory approval and potential interruption of services, as well as the risk that a new operator would be able to extract more favorable lease terms from Omega.  At the time of the above-referenced statements, then, Omega should have disclosed the existence of the $18.8 million working capital loan, and the possibility that its direct financing leases with Orianna could be impaired.

46.     On May 5, 2017, the Company filed the May 5 10-Q. The May 5 10-Q reaffirmed the Company's statements about its financial results contained in the press release issued on May 3, 2017. In addition, the 10-Q contained the following Note concerning the Company's direct financing leases, including the leases it held with Orianna:

> On November 27, 2013, we closed an aggregate $529 million purchase/leaseback transaction in connection with the acquisition of Ark Holding Company, Inc. ("Ark Holding") by 4 West Holdings Inc. At closing, we acquired 55 SNFs and 1 ALF operated by Ark Holding and leased the facilities back to Ark Holding, now known as New Ark Investment Inc. ("New Ark"), pursuant to four 50-year master leases with rental payments yielding 10.6% per annum over the term of the leases. The purchase/leaseback transaction is being accounted for as a direct financing lease.
>
> The lease agreements allow the tenant the right to purchase the facilities for a bargain purchase price plus closing costs at the end of the lease term. In addition, commencing in the 41st year of each lease, the tenant will have the right to prepay the remainder of its obligations thereunder for an amount equal to the sum of the unamortized portion of the original aggregate $529 million

investment plus the net present value of the remaining payments under the lease and closing costs. In the event the tenant exercises either of these options, we have the right to purchase the properties for fair value at the time.

The 56 facilities represent 5,623 licensed beds located in 12 states, predominantly in the southeastern U.S. The 56 facilities are separated by region and divided amongst four cross-defaulted master leases. The four regions include the Southeast (39 facilities), the Northwest (7 facilities), Texas (9 facilities) and Indiana (1 facility).

Additionally, we own four facilities and lease them to New Ark under a master lease which expires in 2026. The four facility lease is being accounted for as an operating lease.

***In March 2017, we executed sale agreements with two unrelated third parties to sell the 7 Northwest facilities with a carrying value of approximately \$36.4 million for \$34.0 million. As a result, we recorded an allowance for loss of approximately \$2.4 million. For the three months ended March 31, 2017, we recognized approximately \$0.8 million of direct financing lease income on a cash basis related to the Northwest facilities lease. The sale of these facilities is expected to close in the second quarter of 2017.*** (Emphasis added).

47.     The foregoing statements concerning Omega's actions in March 2017 were false and misleading. Defendants' discussion of Orianna's condition rendered them duty bound not to mislead investors. Defendants, however, knew or recklessly disregarded, but omitted to disclose, that Orianna's situation was materially more adverse than they disclosed. Indeed, Defendants knew or recklessly disregarded that Omega had lent Orianna \$18 million through the Working Capital Loan, enabling Orianna to cover real estate taxes and to pay rent back to Omega. Omega knew no later than May 2, 2017, that Orianna was delinquent in their rent payments to Omega, and further, that they were delinquent with rent and real estate tax payments to such an extent that Omega was compelled to lend Orianna \$18.8 million to make tax and rent payments. Omega also knew that if they were forced to find a new operator for the Orianna facilities other than the northwest facilities

discussed in the May 5 10-Q, that they would face a loss on those facilities, in that transitioning

such facilities to a new operator involves significant costs in terms of obtaining regulatory approval

and potential interruption of services, as well as the risk that a new operator would be able to

extract more favorable lease terms from Omega.  At the time of the above-referenced statements,

then, Omega should have disclosed the existence of the $18.8 million working capital loan, and

the possibility that its direct financing leases with Orianna could be impaired.

     48.    Also in the May 5 10-Q, the Company also described its evaluation process for

determining the impairment of an asset, in relevant part, as follows:

> Management evaluates our real estate investments for impairment indicators at each reporting period, including the evaluation of our assets' useful lives. The judgment regarding the existence of impairment indicators is based on factors such as, but not limited to, market conditions, operator performance, legal structure, as well as our intent with respect to holding or disposing of the asset. If indicators of impairment are present, management evaluates the carrying value of the related real estate investments in relation to the future undiscounted cash flows of the underlying facilities. Provisions for impairment losses related to long-lived assets are recognized when expected future undiscounted cash flows based on our intended use of the property are determined to be less than the carrying values of the assets. An adjustment is made to the net carrying value of the real estate investments for the excess of carrying value over fair value. The fair value of the real estate investment is determined by market research, which includes valuing the property as a nursing home as well as other alternative uses. All impairments are taken as a period cost at that time, and depreciation is adjusted going forward to reflect the new value assigned to the asset. Management's impairment evaluation process, and when applicable, impairment calculations involve estimation of the future cash flows from management's intended use of the property. Changes in the facts and circumstances that drive management's assumptions may result in an impairment of the Company's assets in a future period that could be material to the Company's results of operations.

Defendants omitted from the May 5 10-Q, however, that the Company had engaged in this evaluation process with respect to the Orianna leases, nor does it indicate that as of the date of the 10-Q there existed the possibility of impairment.

49.     The May 5 10-Q also contains, in the notes to the financial statements, an entry titled "Note 18 – Subsequent Events," which states as follows:

> On April 4, 2017, we issued (i) $550 million aggregate principal amount of our 4.75% Senior Notes due 2028 (the "2028 Notes") and (ii) an additional $150 million aggregate principal amount of our existing 4.50% Senior Notes due 2025 (the "2025 Notes", and together with the 2028 Notes collectively, the "Notes"). The 2028 Notes mature on January 15, 2028 and the 2025 Notes mature on January 15, 2025.
>
> The 2028 Notes were sold at an issue price of 98.978% of their face value before the underwriters' discount and the 2025 Notes were sold at an issue price of 99.540% of their face value before the underwriters' discount. Our net proceeds from the Notes offering, after deducting underwriting discounts and expenses, were approximately $690.7 million. The net proceeds from the Notes offering were used to (i) redeem all of our outstanding $400 million aggregate principal amount of 5.875% Senior Notes due 2024 (the "2024 Notes") on April 28, 2017, (ii) prepay the $200 million Tranche A-2 Term Loan Facility on April 5, 2017 that otherwise would have become due on June 27, 2017, and (iii) repay outstanding borrowings under our revolving credit facility. As a result of the redemption of the 2024 Notes, during the second quarter of 2017, the Company will record approximately $16.5 million in redemption related costs and write-offs, including $11.8 million for the call premium and $4.7 million in net write-offs associated with unamortized deferred financing costs.

50.     The foregoing statements concerning subsequent events were false and misleading because Defendants knew or recklessly disregarded that Orianna, its second largest operator, could neither pay real estate taxes nor pay its rent to Omega, and that Orianna's circumstances were so dire that Omega lent Orianna $18.8 million on May 2, 2017, so that Orianna could pay rent back to Omega.

51. The May 5 10-Q also states, under Item 1A – Risk Factors, that "[t]here have been no material changes to our risk factors as previously disclosed in Item 1A contained in Part I of our Annual Report on Form 10-K for the fiscal year ended December 31, 2016 and filed with the Securities and Exchange Commission ("SEC") on February 24, 2017."

52. In its 2016 10-K, Omega disclosed the following risk factors, in relevant part:

> Our financial position could be weakened and our ability to make distributions and fulfill our obligations with respect to our indebtedness could be limited if our operators, or a portion thereof, become unable to meet their obligations to us or fail to renew or extend their relationship with us as their lease terms expire or their mortgages mature, or if we become unable to lease or re-lease our facilities or make mortgage loans on economically favorable terms. We have no operational control over our operators. Adverse developments concerning our operators could arise due to a number of factors, including those listed below.
>
> **_The bankruptcy or insolvency of our operators could limit or delay our ability to recover on our investments._**
>
> We are exposed to the risk that a distressed or insolvent operator may not be able to meet its lease, loan, mortgage or other obligations to us or other third parties. This risk is heightened during a period of economic or political instability. Although each of our lease and loan agreements typically provides us with the right to terminate, evict an operator, foreclose on our collateral, demand immediate payment and exercise other remedies upon the bankruptcy or insolvency of an operator, title 11 of the United States Code (the "Bankruptcy Code") would limit or, at a minimum, delay our ability to collect unpaid pre-bankruptcy rents and mortgage payments and to pursue other remedies against a bankrupt operator. While we sometimes have third party guarantees of an operator's lease or loan obligations, such guarantees can be expensive to enforce, and have their own risks of collection as against the guarantors.
>
> …
>
> **_We may be unable to find a replacement operator for one or more of our leased properties._**
>
> From time to time, we may need to find a replacement operator for one or more of our leased properties for a variety of reasons,

including upon the expiration of the lease term or the occurrence of an operator default. During any period in which we are attempting to locate one or more replacement operators, there could be a decrease or cessation of rental payments on the applicable property or properties. We cannot assure you that any of our current or future operators will elect to renew their respective leases with us upon expiration of the terms thereof. Similarly, we cannot assure you that we will be able to locate a suitable replacement operator or, if we are successful in locating a replacement operator, that the rental payments from the new operator would not be significantly less than the existing rental payments. Our ability to locate a suitable replacement operator may be significantly delayed or limited by various state licensing, receivership, certificate of need or other laws, as well as by Medicare and Medicaid change-of-ownership rules. We also may incur substantial additional expenses in connection with any such licensing, receivership or change-of-ownership proceedings. Any such delays, limitations and expenses could materially delay or impact our ability to collect rent, obtain possession of leased properties or otherwise exercise remedies for default.

53.     These risk factors were false and misleading because the risk had materialized with respect to Orianna, Omega's second largest operator. By making the $18.8 million Working Capital Loan to Orianna to allow Orianna to make rent payments to Omega, Defendants were able to report their own cash (or their own borrowing under their own revolving line of credit) as FFO. Thus, Defendants knew as of May 2, 2017 that Orianna could not pay either its rent payments to Orianna or its real estate taxes on its facilities.  Therefore, not only had the risk materialized, but only by lending Orianna money was Omega able to immunize its FFO from a material decline.

54.     In anticipation of Defendants' July 27, 2017 conference call to discuss second quarter results, in a July 26, 2017 report, UBS analyst Nick Yulico focused on the Orianna issue. In a report sub-titled "Top 10 Tenant Still Behind on Rent,", Yulico wrote that among the issues that he expected Defendants to address were "top operators New Ark [(Orianna)] and Signature, among others."  Yulico wrote further:

**Q: What do 2Q results mean for the stock?**

Tenant operating metrics looked similar for 2Q vs. 1Q; however, one top tenant (New Ark, 6.4% of rent) remains under 1x EBITDAR coverage and late on rent (beyond 30 days). We look to hear more about what payments (if any) were recouped from New Ark after 1Q shortfall. A smaller portion of rent (0.2), an add'l SNF w/ coverage below 1x, is also now behind in rent. OHI removed its cash flow statement from the supplemental; this comes after 1Q when operating cash flow growth underperformed EBITDA and FFO/FAD because of missed rent payments. We note ytd accounts receivable growth (+30% y/y) is meaningfully outpacing revenue growth ytd (6% y/y), which may signal increased mismatch on rent collections. We continue to think the skilled nursing industry is facing meaningful headwinds from bundling programs, CJR, and shifts to Medicare Advantage. OHI has the highest SNF exposure (~90% of NOI) in our coverage.

55.     Also on July 26, 2017, BTIG analyst Michael Gorman wrote a report, titled "Omega Healthcare Investors Reports Adjusted FFO of $0.84, But Tenant Health Remains the Focus; Maintain Neutral." In his report, Gorman wrote:

Omega reported 2Q17 FFO/sh of $0.84 after adjusting for one-time refinancing expenses during the quarter. The result compares to our estimate of $0.85 and the consensus of $0.83. Management narrowed its 2017 adjusted FFO guide to $3.42-$3.44 from $3.40-$3.44 previously. However, tenant health within the portfolio remains an issue as tenants representing more than 10% of revenue have an EBITDAR coverage below 1.0x, and tenants representing 6.6% of revenue are more than 30-days delinquent on rent. We maintain our Neutral rating.

- Omega's adjusted FFO of $0.84 missed our estimate by $0.01. Relative to our model NOI, mortgage interest income, and provisions for uncollectible accounts all drove the lower result.

- Management adjusted its 2017 FFO/sh guidance range to $3.42-$3.44, raising the midpoint $0.01 from the prior range. The new $3.43 midpoint compares to our estimate of $3.41 and the consensus of $3.39. However, we would note that management's guidance includes certain add-backs that we exclude from our estimates.

- Tenant health remains an issue for the portfolio. While EBITDARM coverage levels were flat sequentially at 1.69x, they were down from 1.75x in the prior-year period. Moreover, 11 tenants representing 10.3% of revenue carry an EBITDAR coverage ratio of less than 1.0x. While this is roughly in line with the 10.4% from 1Q17, we would note that two of those tenants, representing 6.6% of rents, are now more than 30-days late on their rental payments. We believe this highlights potential material risks to the near-term income stream.

56.   Thus, analysts following Omega recognized that the financial condition of its tenants, and particularly Orianna, was critical to Omega's FFO.

**OMEGA'S PARTIAL DISCLOSURE TO THE MARKET**

57.   On July 26, 2017, after the market closed, the Company issued a press release entitled "Omega Announces Second Quarter 2017 Financial Results; Increased Dividend Rate for 20th Consecutive Quarter." Therein, the Company stated, in relevant part:

> ***Funds From Operations*** – For the three-month period ended June 30, 2017, FFO was $150.9 million, or $0.73 per common share on 207 million weighted-average common shares outstanding, compared to $172.3 million, or $0.87 per common share on 199 million weighted-average common shares outstanding, for the same period in 2016.
>
> The $150.9 million of FFO for the three-month period ended June 30, 2017 includes the impact of $23.5 million of one-time interest refinancing costs, $3.7 million of non-cash stock-based compensation expense and $2.7 million in provision for uncollectible accounts, offset by $1.9 million of one-time revenue.
>
> The $172.3 million of FFO for the three-month period ended June 30, 2016 includes the impact of a $5.4 million cash receipt related to early termination of mortgages, $3.7 million of non-cash stock-based compensation expense, $3.5 million of acquisition costs and a $1.2 million adjustment (recovery) related to the provision for uncollectible accounts.
>
> Adjusted FFO was $179.0 million, or $0.87 per common share, for the three months ended June 30, 2017, compared to $173.0 million,

or $0.87 per common share, for the same period in 2016. For further
information see the "Funds From Operations" schedule.

58.     The foregoing statements concerning FFO and Adjusted FFO were false and
misleading because Defendants knew or recklessly disregarded that Orianna, its second largest
operator, could neither pay real estate taxes nor pay its rent to Omega, and that Orianna's
circumstances were so dire that Omega lent Orianna $18.8 million on May 2, 2017, so that Orianna
could pay rent back to Omega.  As a result, Defendants knew or recklessly disregarded that by
making the $18.8 million Working Capital Loan to Orianna to allow Orianna to make rent
payments to Omega, Defendants were able to report their own cash (or their own borrowing under
their own revolving line of credit) as FFO and AFFO.

59.     In their July 26th Press Release, the Company revised its 2017 guidance on FFO
*upwards* as follows:

### 2017 ADJUSTED FFO GUIDANCE REVISED

The Company has revised its 2017 annual Adjusted FFO available
to common stockholders to be between $3.42 and $3.44 per diluted
share. The Company's 2017 FAD guidance and reconciliation to
projected net income can be found in the Company's Second Quarter
2017 Financial Supplement located on the Company's website. The
following table presents a reconciliation of Omega's guidance
regarding Adjusted FFO to projected GAAP earnings.

| | 2017 Annual Adjusted FFO Guidance Range (per diluted common share) |
|---|---|
| | Full Year |
| Net Income | $1.82 - $1.84 |
| Depreciation | 1.40 |
| Gain on assets sold | (0.03) |
| Real estate impairment | 0.09 |
| FFO | $3.28 - $3.30 |
| Adjustments: | |
| Contractual settlement | (0.05) |
| Provision for uncollectible accounts | 0.02 |
| Transaction costs | 0.00 |
| Interest – refinancing costs | 0.11 |
| One-time revenue | (0.01) |
| Stock-based compensation expense | 0.07 |
| Adjusted FFO | $3.42 - $3.44 |

60.     The foregoing statements concerning Omega's 2017 guidance were false and misleading because Defendants knew that Orianna, its second largest operator, could neither pay real estate taxes nor pay its rent to Omega, and that Orianna's circumstances were so dire that Omega lent Orianna $18.8 million on May 2, 2017, so that Orianna could pay rent back to Omega. The foregoing was further false and misleading because Defendants knew that Orianna was in such dire condition that it could not contribute to Omega's FFO, and as such, Defendants knew at the time of the July 26th Press Release that a material portion of its revised 2017 guidance was false and misleading.

61.     On July 27, 2017, the Company held a conference call to discuss its second quarter, 2017 results. On the call, Booth stated, in relevant part:

> While we're cautiously optimistic that portfolio-wide coverages have stabilized, we continue to see certain regional operators

struggle with various operational pressures, including a tightened labor market, length of stay compression and an increase in PL/GL claims. Two our top ten private operators in particular have seen margins and coverages decline and as a result created liquidity concerns.

The first of these private operators, and one which we discussed on our last earnings call, has continued to experience [quarterly pressures], despite finally showing signs of operational improvements. Coverage for the trailing 12-months ended March 31, 2017 remained slightly below 1 times. However, results for the standalone first quarter was 1.12 times and year-to-date results through May remained consistent.

Efforts to manage through these operational pressures have included the following initiatives: replacing the entire executive management team, including a very recent and significant downsizing of both corporate and regional staff; establishing a new disciplined corporate culture which involve replacing a majority of facility-level management; rebranding its corporate identity; revising its mission statement; and implementing new business practices; negotiating numerous vendor contracts; and lastly, establishing a centralized reform network. Additionally, Omega has helped concentrate this operator's geographic footprint by selling off six of its seven Northwest facilities to third-party operators. One remaining facility in the Northwest is expected to be sold on August 1, pending regulatory approval. Omega has also transitioned this operator's entire Texas region which consisted of nine facilities to another existing Omega tenant.

We are consciously optimistic that the combination of these efforts will result in steadily improving margins and eventually return to its former profitability. However, in the meantime, our past due rent has reached nearly ninety days in arrears. As such, any further deterioration and/or the failure of the tenant to achieve its budgeted plan may result in cash basis accounting and a potential review of the value of these capital lease assets.

62.    The foregoing statements concerning Orianna's financial condition were false and misleading. Defendants' discussion of Orianna's condition rendered them duty bound not to mislead investors. Defendants, however, knew or recklessly disregarded, but omitted to disclose, that Orianna's situation was materially more adverse than they disclosed. Indeed, Defendants knew

or recklessly disregarded that Omega had lent Orianna $18 million through the Working Capital

Loan, enabling Orianna to cover real estate taxes and to pay rent back to Omega.  Omega knew no

later than May 2, 2017, that Orianna was delinquent in their rent payments to Omega, and further,

that they were delinquent with rent and real estate tax payments to such an extent that Omega was

compelled to lend Orianna $18.8 million to make tax and rent payments.  Omega also knew that if

they were forced to find a new operator for the Orianna facilities other than the northwest facilities,

that they would face a loss on those facilities, in that transitioning such facilities to a new operator

involves significant costs in terms of obtaining regulatory approval and potential interruption of

services, as well as the risk that a new operator would be able to extract more favorable lease terms

from Omega.  At the time of the above-referenced statements, then, Omega should have disclosed

the existence of the $18.8 million working capital loan, and the possibility that its direct financing

leases with Orianna could be impaired.

      63.     In response to this partial disclosure, the Company's stock price fell $1.35 per

share, or 4%, to close at $32.10 per share on July 27, 2017, on unusually heavy volume of 6.33

million shares traded.

      64.     On August 9, 2017, the Company filed its 10-Q for the quarter ending June 30,

2017. The 10-Q reaffirmed the Company's statements about its financial results contained in the

July 26th press release, and also contained the following statements concerning the struggles faced

by two of its top operators, Orianna and Signature, respectively:

> At June 30, 2017, two of our top 10 operators were approximately
> 90 days past due on rent payments to the Company. One of these
> operators has been facing liquidity pressures following a
> management transition, but has been showing signs of operational
> improvement and is currently making partial monthly rent
> payments. The current management of this operator is pursuing
> operational improvements, such as replacing executive management
> and senior level management, renegotiating vendor contracts and

establishing a centralized referral network. The Company is working with this operator to concentrate its geographic footprint by selling certain facilities, of which five were sold prior to June 30, 2017. The Company expects to sell two other facilities and transition its existing Texas portfolio to another operator during the third quarter of 2017. The Company is optimistic that the combination of these efforts will result in improving margins and performance by this operator. The Company is currently recording rental revenue from this operator on an accrual basis. The Company continues to monitor the operator's operating plan and in the event its performance deteriorates, the Company will reassess the carrying value of the portfolio and consider recording future rental revenue on a cash basis.

The other operator with approximately 90 days rent past due has been adversely affected by an adverse general and professional liability environment in Kentucky and is in ongoing discussions to settle matters arising from a U.S. Department of Justice investigation. The Company has negotiated a proposed restructuring plan with this operator, subject to the operator's resolution of its obligations with other landlords and lenders and the Department of Justice investigation. Receivables from this operator are backed by a security deposit and guarantees from the principals of the operator.

The Company believes the current performance of these two operators primarily reflects specific operator-related or localized issues rather than issues generally impacting the industry. The Company continues to closely monitor the performance of these two operators specifically, as well as industry trends and developments generally.

65.    The foregoing statements concerning Orianna's financial condition were false and misleading. Defendants' discussion of Orianna's condition rendered them duty bound not to mislead investors. Defendants, however, knew or recklessly disregarded, but omitted to disclose, that Orianna's situation was materially more adverse than they disclosed. Indeed, Defendants knew or recklessly disregarded that Omega had lent Orianna $18 million through the Working Capital Loan, enabling Orianna to cover real estate taxes and to pay rent back to Omega.  Omega knew no later than May 2, 2017, that Orianna was delinquent in their rent payments to Omega, and further, that they were delinquent with rent and real estate tax payments to such an extent that Omega was

33

compelled to lend Orianna $18.8 million to make tax and rent payments.  Omega also knew that if they were forced to find a new operator for the Orianna facilities other than the northwest and Texas facilities, that they would face a loss on those facilities, in that transitioning such facilities to a new operator involves significant costs in terms of obtaining regulatory approval and potential interruption of services, as well as the risk that a new operator would be able to extract more favorable lease terms from Omega.  At the time of the above-referenced statements, then, Omega should have disclosed the existence of the $18.8 million working capital loan, and the possibility that its direct financing leases with Orianna could be impaired.

66.   In response to Defendants' late July disclosures, analysts continued to focus on "tenant health," even in the context of a positive second quarter. Analysts were unaware that the only way Omega "beat their 2Q17 AFFO/sh guidance" was by means of the Working Capital Loan to Orianna. For example, in an August 3, 2017, Jeffries analyst Omotayo Okusanya wrote:

> **Key Takeaway**
>
> **Although OHI beat their 2Q17 AFFO/sh guidance and revised their FY AFFO/sh outlook to $3.42-$3.44 from $3.40-$3.44, investors were more concerned with the health of two top ten tenants (Signature Healthcare and Ark) who continue to not be current on their rents. We are increasingly relying on scenario analysis (see below) to assess tenant credit risk and lowering our PT to $32 to reflect our updated base case scenario.**
>
> **Our Base Case ($32 PT, 2017/2018 AFFO/sh $3.37/$3.31, 2017/2018 FAD $3.01/ $2.93):** Our base case scenario has OHI not recouping the $20M of outstanding rents from Ark & Signature. In addition, this scenario includes our view that OHI recognizes just cash rents received going forward given the challenges that these two tenants face. Rent received was $35M in 1H17, which we model as $17.5M per quarter going forward.
>
> **Our Downside Case ($27 PT, 2017/2018 AFFO/sh $3.37/$3.30, 2017/2018 FAD: $3.01/$2.92):** Under this case, both Signature and Ark's financial health deteriorates, causing them both to go bankrupt. We also assume a third tenant (Consulate Healthcare)

defaults under this scenario given the recent $347M fraud judgment against it. In the event that this occurs, we see low risk of leases being rejected given current rent coverage (~0.96x at Ark and ~1.3x at Signature). We believe OHI would be able to either renegotiate their leases with Signature & Ark or find new tenants to operate the facilities, where they would be paying rents similar if not more than what Signature & Ark were currently paying. The downside risk comes from bankruptcies driving heightened tenant credit risk, which would cause valuation multiple compression. Our $27 valuation under this scenario implies a compressed 8.0x P/AFFO multiple, which is warranted as we note SNF focused Healthcare REITs hit historical lows of 4-5x P/AFFO in the late-1990's when several SNF operators were going bankrupt due to a major change in reimbursement policy. Should all three tenants enter bankruptcy, we expect dividend growth would be suspended and the quarterly dividend held at its current rate of $0.64. (Emphasis in original).

67.     Indeed, Defendants ruse was complete. Notwithstanding that Orianna only paid second quarter rent by means of Omega's cash infusion, Defendants' omission of that fact convinced the market that Orianna continued to pay rent. As Jeffries analyst Okusanya parroted in his August 3, 2017 report, "Signature & Ark (two top ten tenants) continue to partially pay rents resulting in OHI moving to cash basis to recognize revenues."

## THE FULL TRUTH EMERGES

68.     On October 30, 2017, after the market closed, the Company issued a press release entitled "Omega Announces Third Quarter 2017 Financial Results; Increased Dividend Rate for 21st Consecutive Quarter." Therein, the Company stated, in relevant part:

### CEO COMMENTS

Taylor Pickett, Omega's Chief Executive Officer stated, "We are in active discussions with Orianna regarding the transition of some or all of their remaining portfolio to new operators. Since 2014, occupancy in the Orianna portfolio has declined from 92% to 89%. Revenue has grown by 2%, while operating expenses have grown by 6%. We believe that for some of the Orianna facilities new operators may be able to improve occupancy and reduce expenses; however, based on current facility performance, we anticipate that the current annual contractual rent of $46 million will likely be

reduced to a range of $32 million to $38 million once the transition process is complete." Mr. Pickett, continued, "The transition timing is expected to take approximately six months."

. . .

## THIRD QUARTER 2017 RESULTS

***Operating Revenues and Expenses*** – Operating revenues for the three-month period ended September 30, 2017 totaled $219.6 million which included $13.3 million of non-cash revenue. Operating expenses for the three-month period ended September 30, 2017 totaled $307.9 million and consisted of $194.7 million in impairment on direct financing leases related to the Orianna portfolio, $11.9 million in provision for uncollectible accounts ($9.5 million related to Orianna), 71.9 million of depreciation and amortization expense, $17.8 million of impairment on real estate properties, $7.7 million of general and administrative expense, and $3.9 million of stock-based compensation expense.

***Other Income and Expense*** – Other income and expense for the three-month period ended September 30, 2017 was a net expense of $49.5 million, primarily consisting of $47.4 million of interest expense and $2.2 million of amortized deferred financing costs.

***Funds From Operations*** – For the three-month period ended September 30, 2017, FFO was a loss of ($46.8) million, or a loss of ($0.24) per common share on 207 million weighted-average common shares outstanding, compared to $162.6 million, or $0.80 per common share on 204 million weighted-average common shares outstanding, for the same period in 2016.

The $46.8 million loss of FFO for the three-month period ended September 30, 2017 includes the impact of $194.7 million in impairment on direct financing leases, $11.9 million in provision for uncollectible accounts and $3.9 million of non-cash stock-based compensation expense.

The $162.6 million of FFO for the three-month period ended September 30, 2016 includes the impact of $3.7 million of non-cash stock-based compensation expense, $2.3 million of acquisition and merger related costs, $1.8 million of interest refinancing costs and $0.5 million of noncash revenue.

Adjusted FFO was $163.6 million, or $0.79 per common share, for the three-month period ended September 30, 2017, compared to

$169.9 million, or $0.83 per common share, for the same period in 2016. For further information see the "Funds From Operations" schedule.

## CFO COMMENTS

Bob Stephenson, Omega's Chief Financial Officer commented, "During our second quarter earnings call, we stated we were closely monitoring one of our operators and may have to place them on a cash basis for revenue recognition if their performance did not improve. Since Orianna did not achieve their revised operating plan and pay their full contractual rent, we placed them on a cash basis and therefore our third quarter results, including AFFO and FAD, do not include any revenue related to Orianna." Mr. Stephenson continued, "Since 93% of our Orianna portfolio was classified as a direct financing lease, placing them on a cash basis and initiating the process to transition some or all of their portfolio to new operators also required us to record several large provisions related to the direct financing leases during the quarter."

. . .

## 2017 ADJUSTED FFO GUIDANCE REVISED

Bob Stephenson, Omega's CFO commented, "We are lowering our 2017 guidance to reflect the temporary loss of third and fourth quarter 2017 revenue primarily related to placing Orianna and a non-top ten operator on a cash basis."

The Company's revised guidance for 2017 Adjusted FFO is now $3.27 to $3.28 per diluted share. The following table presents a reconciliation of Omega's guidance regarding Adjusted FFO to projected GAAP earnings.

|  | 2017 Annual Adjusted FFO Guidance Range (per diluted common share) |
| --- | --- |
|  | Full Year |
| Net Income | $0.62 - $0.63 |
| Depreciation | 1.37 |
| Gain on assets sold | (0.04) |
| Real estate impairment | 0.17 |
| FFO | $2.12 - $2.13 |
| Adjustments: |  |
| Provision for impairment on direct financing leases | 0.96 |
| Provision for uncollectible accounts | 0.07 |
| Contractual settlement | (0.05) |
| Acquisition/transaction costs | 0.00 |
| Interest – refinancing costs | 0.11 |
| Other revenue | (0.01) |
| Stock-based compensation expense | 0.07 |
| Adjusted FFO | $3.27 - $3.28 |

69.     On the next day, October 31, 2017 at 10:00 a.m., the Company held a conference call to discuss its third quarter results. On the call, Pickett, Stephenson, and Booth stated, in relevant part:

**Pickett**

Adjusted FFO for the third quarter is $0.79 per share. Funds available for distribution, FAD, for the quarter is $0.73 per share. ***The reduction in adjusted FFO and FAD is primarily related to converting the Orianna portfolio to cash basis accounting with no adjusted FFO or FAD recognized for Orianna in the third quarter***.

. . .

**Stephenson**

Operating revenue for the quarter was approximately $220 million versus $225 million for the third quarter of 2016. The decrease was primarily a result of placing Orianna on a cash basis, and therefore, we recorded no Orianna revenue for the quarter.

38

. . .

We have lowered our 2017 adjusted FFO guidance to $3.27 to $3.28 per share. The reduction is primarily a result of two items: first, it reflects the temporary loss of Orianna revenue for both the third and fourth quarters; and second, we placed a non-top ten operator on a cash basis effective September 1st, as our outstanding contractual receivable exceeded our revenue recognition test.

. . .

**Booth**

In addition to Orianna, we continue to experience specific operator performance issues as discussed on our last several calls, including Signature Healthcare, another top 10 operator. In both cases, liquidity issues are impacting the ability of these operators to pay rent on a timely basis.

The first operator, Orianna, has fallen significantly behind on rent and as a result has been placed on a cash basis accounting as previously discussed by both Taylor and Bob. While we have endeavored to assist Orianna in streamlining operations by transitioning both their Northwest and Texas regions, the overall portfolio continues to struggle in past due rent headwind.

Our next step, hopefully, is to consensually transition of the remaining portfolio of 42 facilities by virtue of either asset sales or re-leasing to other operators. While we believe the remaining states are considered very attractive within our industry. We expect our contractual rent to decline by a range of between 8 million and 14 million per annum. This will result in a pro forma EBITDAR coverage ratio, assuming all the facilities are released of between 1.2 times and 1.5 times given current performance.

Our second top 10 operator, Signature Healthcare, has also fallen further behind on rent in the third quarter, predominantly as a result of anticipated tightening restrictions upon their borrowing base by their working capital lender thus reducing availability. At this time, it is important to note that the vast majority of Signature's past due rent
balance is covered by a letter of credit in excess of $9 million.

Despite the current liquidity situation, we believe we have a path to continue our longstanding relationship with Signature, under a long-term consensual restructure that involves multiple constituents and

then keep Signature out of a formal court-involved reorganization. This out of court restructuring may involve the following components of consideration: a certain amount of deferred rent, CapEx funds and working capital line of

credit. This scenario would involve the approval of other third-party constituents, including Signature's other significant landlord; Signature's working capital lender, the Department of Justice and certain other third-party claimants. While we cannot predict the ultimate outcome of these third-party constituent discussions, we feel that we have made significant progress and are optimistic that an out of court resolution can be realized.

In addition to the Orianna and Signature ongoing restructure efforts, we have one other non-top 10 operator that has fallen behind on rent and that has required future rent payments to be placed on cash basis accounting. Over the last several months, we have negotiated a settlement and forbearance agreement with this operator, which will result in rent payments in the fourth quarter to be about approximately 23% less than our current contractual rent. Beginning in January, we expect rent to return to the full contractual amount and the past-due rents will begin to be repaid in the latter half of 2018.

70.     On this news, the Company's stock price fell $2.11 per share, or 6.8%, from an October 30, 2017 close of $$30.97 to an October 31, 2017 close of $28.86 per share on relatively enormous volume of 16.2 million shares traded.

71.     On November 7, 2017, the Company filed its quarterly report on Form 10-Q for the quarter ending September 30, 2017. In the 3Q 10-Q, Defendants elaborated on the Company's statements about its financial results contained in the press release and earnings call.  The 3Q 10-Q contained the following discussion of the impairment of its direct financing leases with Orianna:

In July 2017, we transitioned nine SNFs, representing all of the facilities subject to another direct financing lease with Orianna in the Texas region, to an existing operator of the Company pursuant to an operating lease. In connection with this transaction, we recorded the real estate properties at our original cost basis of approximately $19.0 million, eliminated our investment in the direct financing lease and recorded an impairment of approximately $1.8 million. In conjunction with this transaction, we also amended our Orianna Southeast region master lease in July 2017 to reduce the

40

outstanding balance by $19.3 million. As a result of the amendment, we recorded an impairment of approximately $20.8 million in the third quarter of 2017.

Orianna has not satisfied the contractual payments due under the terms of the remaining two direct financing leases or the separate operating lease with the Company and the collectability of future amounts due is uncertain. The Company is in preliminary discussions with Orianna regarding future actions. Such actions may include a) the sale of some or all of the facilities, b) transitioning some or all of the facilities from Orianna to other operators and c) pursuing legal action to enforce the terms of the existing agreements.

During the third quarter of 2017, the Company recorded an allowance for loss of $171.9 million with Orianna covering 38 facilities in the Southeast region of the U.S. The amount of the allowance was determined based on the fair value of the facilities subject to the direct financing lease. To estimate the fair value of the underlying collateral, the Company utilized an income approach and Level 3 inputs. The Company considered current and projected operating performance of the facilities, projected rent, prevailing capitalization rates and coverages and bed values. Such assumptions are subject to change based on changes in market conditions and the ultimate resolution of this matter. Such changes could be significantly different than the currently estimated fair value and such differences could have a material impact on the Company's financial statements.

The 39 facilities under our direct financing master leases with Orianna as of September 30, 2017 are located in seven states, predominantly in the southeastern U.S. (38 facilities) and Indiana (1 facility). Our recorded investment in these direct financing leases, net of the $171.9 million allowance, amounted to $337.7 million, as of September 30, 2017. For the three months ended September 30, 2017, we did not recognize any direct financing lease income from Orianna. We recognized total impairments on direct financing leases for the three and nine months ended September 30, 2017 of $194.7 million and $198.0 million, respectively.

72.   Analysts focused their analysis on the Orianna issue. For example, on October 30, 2017, Jeffries analyst Omotayo Okusanya wrote a report titled "Omega Healthcare Investors (OHI) 3Q17 Big Miss, Guidance Lowered." In that report, Okusanya stated:

**Bottom Line:** It was a challenging quarter for OHI given one of its struggling tenants, Orianna (Ark), did not achieve their revised operating plan and pay its full contractual rent. This caused OHI to place the tenant on cash basis accounting and not recognize any revenue from the tenant in the quarter. The disparity between reported AFFO/sh and our estimates is attributable to the nearly $12M a quarter in rents the company is not recording from Orianna (we had estimated closer to a $10M hit for the entire tenant watch list), as well as higher than expected interest expense ($0.01) and lower interest income ($0.01). OHI has initiated the process to transition some or the entire Orianna portfolio to new operators (see below for further details). After previously raising FY2017 AFFO/sh guidance last quarter to $3.42- $3.44, OHI rolled back its estimates and lowered FY2017 guidance to $3.27-$3.28 in 3Q17. While the tenant issues in the OHI portfolio were made evident to investors in 2Q17, the magnitude of the impairment from Orianna, the lowered full year guidance, and continued concerns about tenant credit risk will likely weigh heavily on the stock tomorrow.

**Orianna Creates Ugly 3Q17 Results:** Given the challenges at Orianna, OHI took a $198M impairment against their $618M investment. As part of the ongoing process of transitioning the portfolio to a new operator, OHI expects annual rents to be reduced from $46M to a range of $32M-$38M, with a six month transition period. This suggests at least a $30M impact ~($0.15 AFFO/sh) to 2018 AFFO/sh. To date, OHI has already transitioned 9 Texas facilities to an existing operator in the OHI portfolio. Lastly, management notes that OHI recorded an $11.9M provision for uncollectible accounts during 3Q17 mainly in relation to Orianna.

Thus, had Omega not lent Orianna money in May, 2017, Orianna would not have paid its quarterly rent. The undisclosed loan, therefore, enabled Omega to stave off alerting the market to a $12 million hole it is FFO guidance.

73.    On October 31, 2017, Hilliard Lyons analyst John Roberts, in response to Defendants' disclosures, wrote in relevant part:

On the company's conference call, management obviously spent most of its time discussing concerns around the issues with tenants. Three tenants are currently having issues, with one (Orianna) being of immediate issue, as they are currently not paying rent, one other likely subject to a restructuring (Signature) and a third being a near term issue that management anticipates being cured by the

beginning of next year. Management anticipates replacing Orianna with a new tenant(s) over the coming six months with an eventual loss of rental income of around $10 million (about 1% of gross rent). In the meantime, no rent will be received on the properties, although Orianna essentially continues to be running the properties. The company has fully reserved for these non-paid rents. We have worked these expectations into our earnings model and adjusted our estimates accordingly. Management had hoped to work with Orianna to restructure this lease, but came to the conclusion that this was the best course of action for these properties. Management noted that they expect a coverage ratio range of 1.2-1.5 times on the new rental rates once the new leases are in place. This compares with the current ratio of under 1.0 times.

As far as Signature goes, they are about a month behind in rent, although they continue to pay a portion of the contractual rent due ($11 million of the $14.5 million contractual amount). OHI has a letter of credit on this lease that covers all of the past due rent. We anticipate a restructuring of this lease, with OHI forgiving some near term rent but receiving higher rental bumps or some other similar advantages. We have worked this assumption into our model as well. As far as the other tenant goes, we are not assuming any loss here beyond the current year (adjusted) due to this being a liquidity issue, rather than an operating issue. While OHI placed the lease on a cash basis, they expect the coverage ratio on the lease to approach a very solid 1.5 times by the start of 2018, which should allow for the tenant to begin paying the contractual rent at that point. There may be some near term reduction of cash flow paid to the company in Q4, however. We anticipate that this amount will be made up to OHI at a later date.

In discussing the issues regarding Orianna, we questioned management on whether the issues that led to the tenant's nonpayment of rent were specific to that tenant or an industry-wide concern. While there are two other tenants currently having issues, all three of these instances are believed to be tenant-specific events, in a challenging industry environment. Management pointed to the occupancy decline between 2014 and the present from 92% to 89% in the Orianna portfolio as a major catalyst behind Orianna's issues. Orianna generated 2% revenue growth over this period while expenses increased at a 6% pace. OHI management does not believe it is appropriate at this time to adjust their underwriting requirements and believes 1.4x coverage remains conservative. Management also feels that their strength is in investing in regional portfolios and partnering with regional operators, while Orianna had a wide geographic dispersion of properties. Moving forward, they expect to

stick with separating portfolios by region amongst their operators in an attempt to avoid situations like this in the future. On the cap rate front, management expects to make acquisitions in the 9% to 9.5% range, which will help to offset lost rent from dispositions.

On the operator front, the overall portfolio improved, although that is more a function of the Orianna portfolio moving out of the group due to the lease going to cash accrual. Portfolio coverage in the most recent trailing twelve months was 1.71 times on a gross cash flow basis compared to the previous number of 1.69 times. That number would be around 1.68 were the Orianna portfolio included, so there was a very slight deterioration. We believe that most of the deterioration was a function of labor costs. Management noted that operating costs were up 6% for Orianna, and that most of these costs are likely labor. We would expect other operators to see pressure on this front as well, although higher coverage ratios should allow them to better absorb these costs.

74.     Thus, their failing to disclose the true state of Orianna in May, 2017 enabled Defendants to convey to the market a falsely positive view of Omega's "overall portfolio."

## **DEFENDANTS' OBLIGATIONS UNDER ITEM 303**

75.     The SEC has created specific rules governing the content of disclosures made by public companies in their filings with the SEC. SEC Regulation S-K requires that every Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

76.     Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (i.e., Forms 10-Q and 10-K), among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition,

44

describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

77.     Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

78.     As set forth above, Defendants violated the affirmative duties imposed by Regulation S-K, and thus Sections 10(b) of the Exchange Act, by failing to disclose the following material information in the May 5th 10-Q during the Class Period: that the risk set forth in Omega's stated "Risk Factors" had materialized with respect to Orianna, Omega's second largest operator. By making the $18.8 million Working Capital Loan to Orianna to allow Orianna to make rent payments to Omega, Defendants were able to report their own cash (or their own borrowing under their own revolving line of credit) as FFO.  Thus, Defendants knew as of May 2, 2017 that Orianna could not pay either its rent payments to Orianna or its real estate taxes on its facilities.  Therefore, not only had the risk materialized, but only by lending Orianna money was Omega able to immunize its FFO from a material decline.

79.     The foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of

future financial condition;" (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

## CLASS ACTION ALLEGATIONS

80.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Omega securities between May 3, 2017, and October 31, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

81.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Omega's common stock actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Omega shares were traded publicly during the Class Period on the NYSE. As of October 27, 2017, Omega had 198,073,305 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Omega or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

82.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

83.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

84.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Omega; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

85.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### APPLICATION OF PRESUMPTION OF RELIANCE; <u>FRAUD ON THE MARKET</u>

86.     Plaintiffs will rely on the presumption of reliance established by the fraud on the market doctrine. At all relevant times, the market for Omega's securities was open, well-

developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Omega's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Omega's securities and market information relating to Omega, and have been damaged thereby.

87.     During the Class Period, the artificial inflation of Omega's stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Omega's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Omega and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

88.     At all relevant times, the market for Omega's securities was an efficient market for the following reasons, among others:

> (a) Omega stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

> (b) As a regulated issuer, Omega filed periodic public reports with the SEC and/or the NYSE;

(c) Omega regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Omega was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

89.     As a result of the foregoing, the market for Omega's securities promptly digested current information regarding Omega from all publicly available sources and reflected such information in Omega's stock price. Under these circumstances, all purchasers of Omega's securities during the Class Period suffered similar injury through their purchase of Omega's securities at artificially inflated prices and a presumption of reliance applies.

90.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

91.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Omega who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

92.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

93.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs

and other members of the Class to purchase Omega's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

94.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Omega's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

95.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Omega's financial well-being and prospects, as specified herein.

96.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Omega's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Omega and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

97.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

98.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Omega's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

99.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Omega's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Omega's securities during the Class Period at artificially high prices and were damaged thereby.

100.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Omega was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Omega securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

101.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

102.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

103.     Individual Defendants acted as controlling persons of Omega within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

105.     As set forth above, Omega and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 25, 2018

**THE ROSEN LAW FIRM, P.A.**

/s/ *Phillip Kim*
Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

Jacob A. Goldberg
Gonen Haklay
David P. Dean
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com
Email: ddean@rosenlegal.com

*Lead Counsel for Plaintiffs and Putative Class*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 25, 2018, I electronically filed the foregoing ***Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: <u>/s/ *Jacob A. Goldberg*</u>
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
E-M: jgoldberg@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Class***