UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
In re OMEGA HEALTHCARE INVESTORS, INC.
SECURITIES LITIGATION                    **MEMORANDUM AND ORDER**
-------------------------------------X
This Document Relates To:                 17 Civ. 8983 (NRB)

    ALL ACTIONS
-------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Lead plaintiff Royce Setzer brings this class action under §
§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule
10b-5 against Omega Healthcare Investors, Inc. ("Omega") and the
company's chief executives ("individual defendants," and, together
with Omega, "defendants"), on behalf of a putative class of
investors who purchased or otherwise acquired Omega's securities
between May 3, 2017 and October 31, 2017, both dates inclusive
("class period").  Specifically, plaintiffs bring claims under:
(1) § 10(b) of the Exchange Act and Rule 10b-5 against all
defendants; and (2) § 20(a) of the Exchange Act against the
individual defendants.  Defendants have moved to dismiss the
Consolidated Amended Class Action Complaint ("Amended Complaint"
or "AC") under Federal Rule of Civil Procedure 12(b)(6) and the
Private Securities Litigation Reform Act ("PSLRA") for failure to
state a claim.  For the following reasons, defendants' motion to
dismiss is granted.

## BACKGROUND[1]

### I. Parties

Omega, a publically traded Maryland corporation, AC ¶ 15, is a self-administered real estate investment trust ("REIT") that invests in healthcare facilities, such as skilled nursing facilities and assisted living facilities, id. ¶ 2. Omega provides lease or mortgage financing to these healthcare facilities and earns money for its stockholders largely by collecting rent and/or mortgage payments from the operators of the facilities. Id. ¶ 2. At all relevant times, defendant C. Taylor Pickett ("Pickett") served as Omega's chief executive officer ("CEO"), id. ¶ 16; defendant Robert O. Stephenson ("Stephenson") as the chief financial officer ("CFO"), id. ¶ 19; and defendant Daniel J. Booth ("Booth") as the chief operating officer ("COO"), id. ¶ 22. Plaintiffs are individuals who purchased or otherwise acquired Omega's securities during the class period. Id. ¶ 1.

### II. Omega's First Quarter 2017 Communications and Activities

Non-party Orianna Health Systems ("Orianna")[2] was Omega's second largest operator as of December 31, 2016. Id. ¶ 4. In 2016 and 2017, Orianna faced operational pressures due to a variety

---

[1] The following facts are largely drawn from the Amended Complaint, ECF No. 46, and are assumed to be true for purposes of this motion. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

[2] Orianna is identified in Omega's public filings by the name of its affiliate, "New ARK Investments, Inc." AC ¶ 27.

of factors.  Id.  Because of these pressures, Orianna failed to pay rent to Omega during the first quarter of 2017, reaching 45 days past-due by the end of the quarter.  On May 2, after the end of the first quarter but prior to the earnings press release and conference call for that quarter, Omega provided an $18.8 million working capital loan to Orianna.  Id. ¶ 36.  The loan was not publicly disclosed.  Id.  The next day, May 3, Omega issued a press release that included annual adjusted funds from operations ("FFO") estimates of $3.40 to $3.44 per diluted share.  Id. ¶ 40. On May 4, Omega held a conference call to discuss earnings and address portfolio issues of increased labor costs and decreased lengths of stay in Omega-owned properties. Id. ¶¶ 34-35.  On that call, defendant Booth stated that "[o]ne private top 10 operator, of note, however, felt the performance pressure more than most." Id.  And that "[t]his was exacerbated in 2016 by complete replacement of senior management early in the year."  Id. ¶ 35. Omega also disclosed that the operator had dipped below 1x EBITDAR[3] for the trailing 12 months.  Id.  The complaint alleges that this operator was Orianna.  Id. ¶ 35.  Booth further disclosed: "Omega embarked on an effort to sell off the company's northwest region, which consisted of 7 facilities. ... We anticipate the sale of all

---

[3]     Earnings before interest, taxes, depreciation, amortization, and restructuring or rent cost.  ("EBITDAR").  EBITDAR is a measurement of profitability, and an EBITDAR below 1x represents significant cash flow issues.

7 facilities in that region to be completed by the second quarter of 2017, with 3 facilities having already been sold." <u>Id.</u> ¶¶ 34-35.  In response to an analyst who questioned why Omega's guidance did not reflect that the tenant [i.e., Orianna] was no longer paying rent, defendant Pickett stated "...at 45 days past due, to start fiddling around with guidance, just doesn't make any sense, we feel pretty comfortable that they're going to come back with coverages at their previous level... ." <u>Id.</u> ¶ 44.

Following the earnings call, on May 5, Omega filed a 10-Q report for the quarter ended on March 31, 2017, which disclosed that it had executed sales agreements to sell Orianna's seven northwest facilities to new operators. <u>Id.</u> ¶ 33.  The 10-Q further stated "[t]here have been no material changes to our risk factors as previously disclosed ... in Part 1 of our Annual Report on Form 10-K[4] for the fiscal year ended December 31, 2016." <u>Id.</u> ¶ 51.

## III.  Omega's Second Quarter 2017 Communications and Activities

Orianna reached 90 days past-due on rent during the second quarter of 2017.  At the end of the quarter, on July 26, 2017, Omega issued a press release that revised Omega's 2017 guidance on FFO upwards to between $3.42 and $3.44 per common share.  <u>Id.</u> ¶

---

[4]    The 2016 10-K stated: "We have no operational control over our operators. Adverse developments concerning our operators could arise due to a number of factors, including ... [t]he bankruptcy or insolvency of our operators... ." AC ¶ 52.  The 10-K listed the additional risk factor that "[w]e may be unable to find a replacement operator for one or more of our leased properties." <u>Id.</u>

59. The day after the press release, Omega held a conference call to discuss earnings.  Id. ¶ 61.  Omega stock fell 4% by the close of the day of the conference call.  Id. ¶ 63.  On that call, defendant Booth said:

> While we're cautiously optimistic that portfolio-wide coverages have stabilized, we continue to see certain regional operators struggle with various operational pressures ... The first of these private operators, and one which we discussed on our last earnings call, has continued to experience [quarterly pressures], despite finally showing signs of operational improvements. ... We are consciously (sic) optimistic that the combination of these efforts will result in steadily improving margins and eventually return to its former profitability. However ... our past due rent has reached nearly ninety days in arrears. As such, any further deterioration and/or the failure of the tenant to achieve its budgeted plan may result in cash basis accounting and a potential review of the value of these capital lease assets.

Id.

On August 9, 2017, Omega filed its 10-Q for the quarter ending June 30, 2017.  Id. ¶ 64.  The 10-Q made the following statement regarding Orianna[5]:

> One of these operators has been facing liquidity pressures following a management transition, but has been showing signs of operational improvement and is making partial monthly rent payments. The current management of this operator is pursuing operational improvements, such as replacing executive management and senior level management, renegotiating vendor contracts and establishing a centralized referral network. The Company expects to sell two other facilities and transition its existing Texas portfolio to another operator during the third quarter of 2017. The Company is optimistic that the combination of these efforts will

---

[5]     Though Orianna is not mentioned in the statement, the Amended Complaint alleges that the 10-Q is referencing Orianna.  AC ¶ 64.

result in improving margins and performance by this
operator. The company is currently recording rental
revenue from this provider on an accrual basis. The
company continues to monitor the operator's operating
plan and in the event its performance deteriorates, the
company will reassess the carrying value of the
portfolio and consider recording future rental revenue
on a cash basis.

Id.

## IV. Omega's Third Quarter 2017 Communications & Activities

Orianna's continued failure to pay rent resulted in Omega

placing them on a cash basis for revenue recognition during the

third quarter of 2017. On October 30, 2017, Omega issued a press

release, in which defendant Stephenson stated:

During our second quarter earnings call, we stated we
were closely monitoring one of our operators and may
have to place them on a cash basis for revenue
recognition if their performance did not improve. Since
Orianna did not achieve their revised operating plan and
pay their full contractual rent, we placed them on a
cash basis and therefore our third quarter results,
including AFFO ["Adjusted Funds From Operation"] and FAD
["Funds Available For Distribution"], do not include any
revenue related to Oriana. ... Since 93% of our Orianna
portfolio was classified as a direct financing lease,
placing them on a cash basis and initiating the process
to transition some or all of their portfolio to new
operators also required us to record several large
provisions related to the direct financing leases during
the quarter. ... We are lowering our 2017 guidance to
reflect the temporary loss of third and fourth quarter
2017 revenue primarily related to placing Orianna ... on
a cash basis.

Id. ¶ 68.

Also on October 30, 2017, in response to the press release,

Jeffries analyst Omotayo Okusanya wrote:

> Orianna ... did not achieve their revised operating plan
> and pay its full contractual rent. ... The disparity
> between reported AFFO/sh and our estimates is
> attributable to the nearly $12M a quarter in rents the
> company is not recording from Orianna ... While the
> tenant issues in the [Omega] portfolio were made evident
> to investors in 2Q17, the magnitude of the impairment
> from Orianna, the lowered full year guidance, and
> continued concerns about tenant credit risk will likely
> weigh heavily on the stock market.

Id. ¶ 72.

On October 31, 2017, Omega held a conference call to discuss its third quarter results. Id. ¶ 69. Subsequent to the October 31 conference call, Omega stock fell 6.8%. Id. ¶ 70. On the call, defendant Pickett stated "[t]he reduction in adjusted FFO and FAD is primarily related to converting the Orianna portfolio to cash basis accounting ... ." Id. Defendant Stephenson stated, "[w]e have lowered our 2017 adjusted FFO guidance to $3.27 to $3.28 per share. The reduction is primarily a result of two items: first, it reflects the temporary loss of Orianna revenue for both the third and fourth quarters ... ." Id. Defendant Booth stated "Orianna ... has fallen significantly behind on rent and as a result has been placed on a cash basis accounting ... While we have endeavored to assist Orianna in streamlining operations by transitioning both their Northwest and Texas regions, the overall portfolio continues to struggle in past due rent headwinds." Id.

On November 7, 2017, Omega filed its 10-Q for the quarter ending September 30, 2017. Id. ¶ 71. The 10-Q stated:

> Orianna has not satisfied the contractual payments due under the terms of the remaining two direct financing leases or the separate operating lease with the Company and the collectability of future amounts due is uncertain. The company is in preliminary discussions with Orianna regarding future actions. Such actions may include a) the sale of some or all of the facilities, b) transitioning some or all of the facilities from Orianna to other operators and c) pursuing legal action to enforce the terms of the existing agreements.

Id.

## PROCEDURAL HISTORY

The initial complaint in this action was filed with Dror Gronich as a named plaintiff, represented by Glancy Prongay & Murray LLP, on November 16, 2017. See ECF No. 1. The Court received timely motions to be appointed lead plaintiff from: (1) the Hannah Rosa Trust, represented by Brower Piven (ECF Nos. 11-14); (2) the Carpenters Pension Fund of Illinois ("Carpenters Pension Fund"), represented by Robins Geller Rudman & Dowd LLP (ECF Nos. 15-18); (3) Patricia Zaborowski, Hong Jun, Cynthia Peterson, Simona Vacchieri, and Glenn Fausz, represented by Pomerantz LLP, with Glancy Prongay & Murray LLP listed as additional counsel (ECF Nos. 19-21); (4) Glenn Fausz, represented by Faruqi & Faruqi LLP (ECF Nos. 22-24); and (5) Royce Setzer, represented by the Rosen Law Firm, P.A. (ECF Nos. 9-10).

After reviewing all timely filed lead plaintiff applications as required by the PSLRA, see 15 U.S.C. § 78u-4(a)(3)(B)(iii), we appointed Royce Setzer as lead plaintiff, approved his counsel -

the Rosen Law Firm - as lead counsel, and consolidated the actions under this caption.  See Mar. 27, 2018 Order, ECF No. 44. Plaintiffs then filed the Amended Complaint on May 25, 2018.  See AC, ECF No. 46.  On July 17, 2018, defendants filed the motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and the PSLRA.  ECF No. 51.  Oral argument was held on February 13, 2019.  See Feb. 13, 2019 Tr., ECF No. 58.

## DISCUSSION

### I.  Pleading Standards

On a motion to dismiss under Rule 12(b)(6), we must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor.  City of Providence v. BATS Glob. Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017).  To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"[A] complaint alleging securities fraud must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure."  Ganino v. Citizens Utilities Co., 228 F.3d 154, 168 (2d Cir. 2000).  Rule 9(b) requires that "the circumstances

9

constituting fraud ... be stated with particularity."  However, "malice, intent, knowledge, and other condition of mind of a person may be averred generally."  <u>Chill v. Gen. Elec. Co.</u>, 101 F.3d 263, 267 (2d Cir. 1996).  "Rule 9(b) serves to ... prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis."  <u>In re Stac Elecs. Sec. Litig.</u>, 89 F.3d 1399, 1405 (9th Cir. 1996).

Relatedly, "[t]he PSLRA ... requires that the complaint specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  <u>In re Lions Gate Entm't Corp. Sec. Litig.</u>, 165 F. Supp. 3d 1, 5-6 (S.D.N.Y. 2016) (citations and internal quotation marks omitted).  "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); <u>see also</u> <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007).

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ, in connection with the purchase or sale of any security ..., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b); <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 318

(2007).   SEC Rule 10b-5 implements § 10(b) by declaring it
unlawful:

> "(a) To employ any device, scheme, or artifice to
> defraud, (b) To make any untrue statement of a material
> fact or to omit to state a material fact necessary in
> order to make the statements made ... not misleading, or
> (c) To engage in any act, practice, or course of business
> which operates or would operate as a fraud or deceit
> upon any person, in connection with the purchase or sale
> of any security."

17 CFR § 240.10b-5; Tellabs, 551 U.S. at 318.

To establish liability under § 10(b) and Rule 10b-5, a private
plaintiff "must show (i) a material misrepresentation or omission;
(ii) scienter; (iii) a connection with the purchase or sale of a
security[;] (iv) reliance by the plaintiff(s); (v) economic loss;
and (vi) loss causation."   In re Omnicom Grp., Inc. Sec. Litig.,
597 F.3d 501, 509 (2d Cir. 2010) (internal quotation marks
omitted).   "A statement that was believed to be true when made,
but was later shown to be false, is insufficient" to establish
falsity.   In re Magnum Hunter Res. Corp. Sec. Litig., 26 F. Supp.
3d 278, 290 (S.D.N.Y. 2014), aff'd, 616 F. App'x 442 (2d Cir. 2015)
(internal citation omitted).   A statement is not false if it is
merely a "misapprehension, misunderstanding, or mistake of fact."
Id.

## II.   Section 10(b) and Rule 10b-5 Claims

### A. Summary

Plaintiffs argue a two-pronged theory of liability under §
10(b) of the Exchange Act.  First, plaintiffs assert that Omega
used both the fact and the non-disclosure of the working capital
loan to make various material misrepresentations of its FFO and
AFFO.  In other words, plaintiffs argue that characterizing rent
payments from Orianna as income – when Orianna was using funds
loaned from Omega to pay rent – is a false representation of
Omega's FFO and AFFO.  Second, plaintiffs argue that defendants'
failure to disclose the working capital loan was a material
omission that independently establishes liability under § 10(b).
In response, defendants assert that the working capital loan did
not make their FFO and AFFO figures misstatements, as the complaint
does not contain "well-pleaded facts" that support the proposition
"that Omega's treatment of the Working Capital Loan proceeds
violated GAAP."  Omega's Reply Br., ECF No. 56, at 7.  Defendants
further argue that 10(b) claims related to omission of the working
capital loan fail for: 1) lack of materiality; 2) lack of scienter;
and 3) failure to plead loss causation.  We first address
plaintiffs' material misstatement allegations before turning to
the alleged omission of the working capital loan.

**B. Materiality**

Determining materiality is a fact-specific inquiry. <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 240 (1988). The materiality of an omission turns on whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." <u>Id.</u> at 231–32. For an omission to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." <u>Id.</u> Because materiality is a mixed question of fact and law, on a 12(b)(6) motion, "a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." <u>Id.</u>

**i. Material Misstatements (AC ¶¶ 41, 48, 58, 53, 60, 78)**

Plaintiffs allege that defendants made material misstatements by: 1) using the working capital loan to artificially inflate its FFO and AFFO (AC ¶ 41, 58, 60); 2) failing to disclose materialization of risks related to operator bankruptcy on its May 5, 2017 10-Q report (<u>id.</u> ¶ 53, 78); and 3) failing to disclose that it had engaged in an evaluation process for determining the impairment of assets related to the Orianna leases on its May 5, 2017 10-Q (<u>id.</u> ¶ 48). Neither the alleged misstatements nor the

alleged omission reflect a material falsity, and plaintiffs consequently fail to state a § 10(b) claim.

We first address the claim that Omega's FFO and AFFO figures were materially false because the working capital loan was used to make Orianna's rent payments to Omega.  AC ¶ 41, 58, 60.  This allegation fails to state a § 10(b) claim because, as defendants point out, "[u]nderlying this conclusory assertion is the unsupported premise that rent paid with funds obtained by Orianna from the Working Capital Loan is not actually payment of rent. ... [N]either the Complaint nor the Opposition includes even a conclusory assertion – much less alleges well-pleaded facts – that Omega's treatment of the Working Capital Loan proceeds violated GAAP."  Omega's Reply Br., at 7.  Thus, this claim fails for lack of material falsity.[6]  See Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp., 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013) (dismissing § 10(b) claims where plaintiffs failed to adequately plead GAAP violations); see also Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 409 (S.D.N.Y. 2007) (dismissing § 10(b) claims for failing to plead with the requisite

---

[6]    Plaintiffs, neither in this context nor in the context of loss causation, come to grips with (or even discuss) the logical inconsistency between their argument that Omega allegedly "partially disclosed" its omission to investors in the second quarter of 2017, and Omega's upward adjustment of its FFO in the same quarter.

specificity "how the statements were false or misleading" (internal citation omitted)).

Next, plaintiffs allege that Omega failed to disclose materialization of risks related to operator bankruptcy and tenant replacement in its May 5, 2017 10-Q report. AC ¶ 53. There are two problems with this theory. First, at the time the May 10-Q was filed, Orianna had not yet become bankrupt or insolvent. Second, there are no allegations that Omega was unable to find a replacement operator for any of the properties leased by Orianna.[7] Thus, allegations that the 10-Q risk factors were false and misleading because Orianna eventually filed for bankruptcy, and Omega eventually struggled to find replacement operators, are "archetypical" examples "of impermissible allegations of fraud by hindsight." Meridian Horizon Fund, LP v. KPMG (Cayman), 487 F. App'x 636, 640 (2d Cir. 2012) (citations and internal quotation marks omitted).[8]

Additionally, plaintiffs' Amended Complaint alleges that Omega failed to disclose in its May 5, 2017 10-Q report that it had engaged in an evaluation process for determining the impairment of assets related to the Orianna leases. AC ¶ 48. But the fact

---

[7]    Indeed, the Amended Complaint states that Omega "executed sale agreements ... to sell the 7 [Orianna] Northwest facilities... ."  AC ¶ 46.

[8]    For the reasons discussed infra, these allegations are also insufficient to show that defendants violated affirmative duties under Item 303 of Regulation S-K.

that Omega engaged in its evaluation process does not require Omega to alter the description of its impairment evaluation process. Indeed, plaintiffs cite no case law or SEC guidance to support the proposition that descriptions of risk evaluation processes are misstatements unless they include a specific disclosure each time the company has engaged in that risk evaluation process. Thus, this allegation is also insufficient to establish a material misrepresentation under the Exchange Act.

### ii. Materiality of Omission of the Working Capital Loan (AC ¶¶ 43, 45, 47, 50, 53, 62, 65)

The remainder of plaintiffs' allegations relate to the omission of the working capital loan in press releases and earnings calls. ¶¶ 43, 45, 47, 50, 53, 62, 65. Plaintiffs argue that "[t]he working capital loan is material because it was a clandestine effort by Omega to prop up Orianna, Omega's second largest operator, whose success or failure would materially impact Omega." Pls.' Opp. Br., ECF No. 55, at 20. Plaintiffs further assert that the loan was material because Omega made the loan using either 46.6% of its cash on hand or 12% of its revolving credit line. Id. Lastly, plaintiffs argue that materiality should be assessed on the basis of the value of properties leased to Orianna, and that "[t]he relevant number ... is ... the threat to Omega's $619 million investment in Orianna that Orianna's financial condition had placed in jeopardy." Id.

In response, defendants' argue that we assess materiality by using quantitative factors. See Defs.' Br., ECF No. 52, at 21 ("the Working Capital Loan amounted to only 0.21% or 0.17% of Omega's total assets."). However, "a court must consider both quantitativ' and qualitative factors in assessing an item's materiality... ." Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 717–18 (2d Cir. 2011) (quoting SAB No. 99, 64 Fed.Reg. at 45, 151) (internal quotation marks omitted); see also SAB No. 99, 64 Fed.Reg. at 45, 152 ("Qualitative factors may cause misstatements of quantitatively small amounts to be material... ."). One factor "affecting qualitative materiality is whether the misstatement or omission relates to a segment that plays a 'significant role' in the registrant's business." Litwin, 634 F.3d at 720 (quoting SAB No. 99, 64 Fed.Reg. at 45, 152). "These qualitative factors are intended to allow for a finding of materiality if the quantitative size of the misstatement is small, but the effect of the misstatement is large." ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 205 (2d Cir. 2009).

The qualitative factors relevant to the materiality analysis highlight the significance of Omega's issuance of the working capital loan to Orianna. Here, Omega refers to Orianna as a "top 10" operator when discussing the tenant with investors and analysts. AC ¶ 35. Further, as a REIT, Omega "earns money for its stockholders largely by collecting rent and/or mortgage

17

payments from the operators of those facilities." Id. ¶ 2. Thus, considering all of the allegations in the light most favorable to plaintiffs while keeping in mind that materiality is a "mixed question of fact and law," we find that the inability of one of Omega's self-described "top 10" operators to pay its rent in the absence of loan from Omega can be construed as playing a "significant role" in Omega's business, such that the issuance of the loan "significantly altered the total mix of information made available." Ganino, 228 F.3d at 162 (quoting Levinson, 485 U.S. at 231-32). Therefore, at the motion to dismiss stage, plaintiffs have sufficiently alleged materiality with respect to the omission of the working capital loan.

## C. Scienter

Although plaintiffs have sufficiently alleged the materiality of the omission of the working capital loan, their failure to plead a strong inference of scienter is fatal to their remaining claims.

In a Rule 10b-5 action, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u-4 (West). The requisite state of mind in a Rule 10b-5 action is "an intent to deceive, manipulate or defraud." Ganino, 228 F.3d at 168. "Such intent can be established either (a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. at 168–69.

"Motive ... [entails] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000). Motives "generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001). "Opportunity ... [entails] the means and likely prospect of achieving concrete benefits by the means alleged." Novak, 216 F.3d at 307. Courts typically assume "corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired." In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 281 (S.D.N.Y. 2006).

When plaintiffs fail to plead scienter via motive and opportunity, they may raise a strong inference of scienter by showing circumstantial evidence of conscious misbehavior or recklessness, although "the strength of the circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 142. "For an inference of scienter to be strong, a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." ATSI,

493 F.3d at 99 (internal citations and quotation marks omitted).

"[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, 551 U.S. at 310. Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information ... or knowing sale of a company's stock at an unwarranted discount." Novak, 216 F.3d at 308. A plaintiff sufficiently pleads recklessness when, inter alia, they make "[p]lausible allegations that a defendant had facts at his disposal contradicting material public statements, but then [ignored] such facts or proceedings despite them." In re Lululemon Sec. Litig., 14 F. Supp. 3d at 574. Alleging "that a defendant merely ought to have known is not sufficient to allege recklessness. Rather, to withstand a motion to dismiss, plaintiffs must detail specific contemporaneous data or information known to the defendants that was inconsistent with the representation in question." Hart v. Internet Wire, Inc., 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (citations and internal quotation marks omitted). Allegations of scienter regarding a reckless material omission require a plaintiff to "present facts indicating a clear duty to disclose." In re SunEdison, Inc. Sec. Litig., 300 F. Supp. 3d 444, 491 (S.D.N.Y. 2018) (citations and internal quotation marks omitted). Such a clear duty can arise "from the need to correct or update

prior statements." Id. Where a duty is "not so clear," failure to disclose is insufficient to establish conscious misbehavior or recklessness. Id. (internal citation omitted).

In order to establish the scienter of a defendant corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008). "[S]cienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 516 (S.D.N.Y. 2009). Because the individual defendants are all C-level executives of Omega who communicated to investors in that capacity, we assess scienter under the assumption that the individual defendants' scienter can be imputed to Omega.

Here, plaintiffs fail to establish scienter via motive and opportunity. Plaintiffs plead that Omega was forced to lend Orianna money to prevent its FFO from suffering a material decline. AC ¶ 53. But this is tantamount to pleading a corporate profit motive and is insufficient to establish scienter. See Lululemon, 14 F. Supp. 3d at 573 ("Motive and opportunity require plausible allegations that the maker of a statement could, and had the likely prospect of, realizing concrete benefits by the misstatement," and "[a]llegations limited to the type of 'corporate profit' motive

21

possessed by most corporate directors and officers do not suffice.").

Plaintiffs also rely on the second prong of scienter, i.e., conscious misbehavior or recklessness. Plaintiffs assert that "Omega was only able to report that Orianna was not seriously delinquent in its obligations by essentially paying itself." Pls.' Opp. Br., at 14. Plaintiffs further allege that "[d]efendants knew that Orianna's condition was materially more dire than they disclosed to the market." Id. Thus, the argument goes, "defendants knowingly or recklessly failed to provide investors with material information of which they were aware that disabled investors from understanding the risks that Omega faced with respect to its second largest operator." Id. at 17. Noting Omega's disclosure of a working capital loan that Omega considered providing to another struggling tenant, plaintiffs contend that the decision to disclose that loan makes their non-disclosure of the loan to Orianna reckless. Id. at 16. Additionally, plaintiffs allege that defendants recklessly downplayed Orianna's risk of bankruptcy or insolvency.[9] Id. at 16-17.

_____

[9]    In support of this proposition, plaintiffs discuss In re Complete Management Inc. Securities Litigation., 153 F. Supp. 2d 314, 325 (S.D.N.Y. 2001).   In that case, the Court found scienter via recklessness when: "Plaintiffs [alleged] that defendants were well aware that GMMS was constructing phony medical files, that GMMS doctors were egregiously issuing unwarranted self-referrals to run up fees, and that these claims, when arbitrated, would yield mere cents on the dollar." Id. For reasons discussed infra, plaintiffs' allegations against Omega do not even begin to approach this level of recklessness.

Though not dispositive, we again note plaintiffs' failure to allege a GAAP violation or other accounting irregularity. Plaintiffs cite no authority to support the proposition either: a) that Omega's failure to disclose the loan as an itemized line on its SEC filings violated GAAP; or b) that treating rent received from Orianna as revenue violated GAAP because the rent payments were made using funds from the working capital loan. To be clear, misstatements and omissions can be actionable under § 10(b) in the absence of an accounting irregularity, but GAAP is relevant to the recklessness assessment. See Reilly v. U.S. Physical Therapy, Inc., No. 17 CIV. 2347 (NRB), 2018 WL 3559089, at *17 (S.D.N.Y. July 23, 2018)(dismissing § 10(b) claims for lack of scienter where - despite allegations of GAAP violations - "accounting issues at the heart of [the] dispute [were] neither simple nor easily applied."); see also In re Turquoise Hill Res. Ltd. Sec. Litig., No. 13 CIV. 8846 (LGS), 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014) ("It is noteworthy that the outside auditors did not question the corporate defendant's accounting practices.") (internal citation and modifications omitted). Thus, at a minimum, plaintiffs fail to plead that GAAP establishes a "clear duty to disclose" that was allegedly violated by defendants. SunEdison, 300 F. Supp. 3d at 491.

Plaintiffs also allege that defendants were reckless in omitting the working capital loan because, once they chose to speak

on the topic of Orianna's financial health, there was a "duty to tell the whole truth." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 258 (2d Cir. 2016). Of course, Omega would have acted with scienter had they chosen to discuss the positive aspects of Orianna's predicament (e.g., the replacement of senior management) while omitting negative aspects (e.g., Orianna's inability to pay rent). But that is not what happened here. In fact, Omega disclosed Orianna's financial predicament repeatedly to investors, first on the May conference call, and again in July, when they forewarned "any further deterioration and/or the failure of [Orianna] to achieve its budgeted plan may result in cash basis accounting." Defs.' Ex. 6, ECF No. 52-6, at 7. And while Omega does have a "duty to tell the whole truth" once they speak on a matter, "[t]he requirement to be complete and accurate ... does not mean that by revealing one fact ... one must reveal all others that, too, would be interesting ... ." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) (citations and internal quotation marks omitted). Indeed, such a requirement would "paralyze corporate spokespersons and likely yield less, rather than more, information for investors." In re Rockwell Med., Inc. Sec. Litig., No. 16 CIV. 1691 (RJS), 2018 WL 1725553, at *11 (S.D.N.Y. Mar. 30, 2018). Consequently, we decline "[t]o infer scienter from an arguably material omission, in the face of allegations that cut against such an inference, and in the

absence of valid motive allegations," because such an inference would "expand the anti-fraud provisions of the securities laws beyond their intended scope." In re GeoPharma, Inc. Sec. Litig., 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006).

Even further, plaintiffs fail to establish that the inference of scienter[10] is not "at least as compelling as any opposing inference one could draw ... ." ATSI, 493 F.3d at 99 (citations and internal quotation marks omitted). The more compelling inference is that Omega provided investors with the information they believed was sufficient to make the market aware of Orianna's deteriorating financial situation.[11] See In re Hi-Crush Partners L.P. Sec. Litig., No. 12 CIV. 8557 (CM), 2013 WL 6233561, at *22 (S.D.N.Y. Dec. 2, 2013) ("Where a company has already disclosed

---

[10] As defendants point out, it is difficult to comprehend why Omega would disclose Orianna's deteriorating financial situation to investors and lend millions of dollars to Orianna if Omega did not see the potential for Orianna to recover. See Defs' Reply Br., at 18; see also In re GeoPharma, Inc. Sec. Litig., 411 F. Supp. 2d 434, 446 n.83 (S.D.N.Y. 2006) ("Courts often refuse to infer scienter, even on a recklessness theory, when confronted with illogical allegations.").

[11] While we do not reach plaintiffs' loss causation arguments, we note the issues plaintiffs would face establishing loss causation in light of Omega's various disclosures regarding Orianna's financial difficulties. Plaintiffs would likely struggle to plead loss causation under a foreseeable loss theory because they do not adequately plead that the significance of the working capital loan is such that, absent the alleged omission of the existence of the loan, reasonable investors would not "consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud." Castellano, 257 F.3d at 188. Indeed, defendants' disclosure, first in May 2017 that Orianna "felt the performance pressure more than most," and then in July 2017 that "any further deterioration and/or the failure of [Orianna] to achieve its budgeted plan "may result in cash basis accounting..." clearly places Orianna's failure to recover economically within the "zone of risk" already contemplated by reasonable investors prior to Omega's Q2 and Q3 2017 disclosures. AC ¶¶ 35, 61.

substantially similar information, however, its duty to disclose a particular fact may be less clear.").

At most, Omega's failure to disclose the working capital loan constitutes non-actionable fraud by hindsight. "Plaintiffs may not sustain causes of action based on fraud by hindsight, relying on allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did." Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp., No. 14 CIV. 3876 (LTS), 2016 WL 1261135, at *9 (S.D.N.Y. Mar. 30, 2016) (internal citations and quotation marks omitted). Thus, while omission of the working capital loan arguably became more significant once Orianna's financial situation deteriorated to the point Omega transitioned them to cash basis accounting, "corporate managers are not obligated to portray their business' performance and prospects in unduly cautious or gloomy terms in public pronouncements." In re Livent, Inc. Sec. Litig., 148 F. Supp. 2d 331, 350 (S.D.N.Y. 2001) (internal citations omitted). Accordingly, plaintiffs fail to allege scienter, and their remaining § 10(b) claims are dismissed.[12]

---

[12] Because all of plaintiffs' allegations related to material misstatements have failed for lack of material falsity, the safe harbor protections are inapplicable to the remaining material omission claims. See Complete Management, 153 F. Supp. 2d at 340 (noting that safe-harbor provisions "apply to forward-looking statements only, and not to material omissions or misstatements of historical fact").

**III.  Item 303 of Regulation S-K (AC ¶ 78)**

Plaintiffs allege that defendants violated the affirmative duties imposed by Item 303 of Regulation S-K by failing to disclose in the May 5th 10-Q that the risk set forth in Omega's stated "Risk Factors" – tenant bankruptcy or difficulty replacing a tenant - had materialized with respect to Orianna.  AC ¶ 78.  Item 303 of Regulation S-K requires SEC filings to:

> [d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues ... the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii).

The SEC's release interpreting "[i]tem 303 clarifies that the Regulation imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716 (2d Cir. 2011) (internal citations and quotation marks omitted).  To determine whether a trend is reasonably likely to have a material effect on the registrant's financial condition, courts ask: (1) whether the known trend is "likely to come to fruition"; and (2) whether the trend is likely to have a "material effect" on the registrant's financial condition.  Stratte-McClure v. Morgan Stanley, 776 F.3d

94, 103 (2d Cir. 2015) (quoting Exchange Act Release No. 6835, 1989 WL 1092885, at *6).

Plaintiffs suggest the working capital loan prevented the May 5 10-Q Risk Factors of tenant bankruptcy and difficulty replacing a tenant from materializing. But this does not change the fact that, as of May 5, 2017, the risk factors had not in fact materialized. Moreover, there is no affirmative Item 303 disclosure duty when "management determines that [a trend] is not reasonably likely to come to fruition." Stratte-McClure, 776 F.3d at 103. Omega's $18.8 million loan to Orianna mere days earlier is sufficient proof that Omega's management did not believe that Orianna was "reasonably likely" to go bankrupt. See Lopez v. Ctpartners Exec. Search Inc., 173 F. Supp. 3d 12, 34 (S.D.N.Y. 2016) (dismissing Item 303 claim where management did not believe the scenario that ultimately occurred was "reasonably likely" to occur, because "[e]xcept with the benefit of hindsight, that scenario was speculative and conjectural."). Accordingly, we dismiss plaintiffs' Item 303 claim.

## IV. Section 20(a) Claims

To make out a prima facie case under § 20(a) of the Exchange Act, plaintiffs "must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated

by the controlled person." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). Because plaintiffs have failed to plead a primary violation by Omega, their § 20(a) claims also fail. See Slayton v. Am. Express Co., 604 F.3d 758, 778 (2d Cir. 2010).

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss is granted in its entirety. To summarize, plaintiffs' § 10(b) claims related to material misstatements are dismissed with prejudice for lack of material falsity. Plaintiffs' § 10(b) claims related to omission of the working capital loan are dismissed with prejudice for lack of scienter. Plaintiffs' § 20(a) claims are dismissed with prejudice for failure to plead a primary § 10(b) violation. The Clerk of Court is respectfully directed to enter judgment for defendants and terminate this case and any motions pending therein.

**SO ORDERED.**

Dated:    New York, New York
          March 25, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE