**19-1095**

*In re Omega Healthcare Inv'rs, Inc. Sec. Litig.*

1:17-cv-08983-NRB

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————

August Term 2019

(Argued: November 13, 2019 | Decided: August 3, 2020)

Docket No. 19-1095

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/3/2020

ROYCE SETZER,

*Lead Plaintiff-Appellant,*

EARL HOLTZMAN,

*Plaintiff-Appellant,*

DROR GRONICH, Individually and on behalf of all others similarly situated,

*Plaintiff,*

STEVEN KLEIN, Individually and on behalf of all others similarly situated,

*Consolidated Plaintiff,*

v.

OMEGA HEALTHCARE INVESTORS, INC., C. TAYLOR PICKETT, ROBERT O. STEPHENSON, DANIEL J. BOOTH,

*Defendants-Appellees.*

————————————

Before:

        LEVAL, WESLEY, and LIVINGSTON, *Circuit Judges.*

1

CERTIFIED COPY ISSUED ON 08/03/2020

Plaintiffs-Appellants brought this putative class action against Omega Healthcare Investors, Inc., a publicly traded real estate investment trust that invests in healthcare facilities, and against Omega's chief executives, asserting claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b–5. Plaintiffs claim that Omega misled investors by failing to disclose a $15 million working capital loan it made to one of its major tenants, Orianna Health Systems. According to Plaintiffs, this omission hid from investors the true magnitude of Orianna's solvency problems. The district court dismissed Plaintiffs' claims for, among other reasons, insufficiently alleging scienter.

Because we find that the complaint adequately alleges that Omega acted with the requisite scienter in failing to disclose the loan, we **REVERSE** and **REMAND** for proceedings consistent with this opinion.

———————————————

JACOB A. GOLDBERG, (David Dean, *on the brief*) The Rosen Law Firm, P.A., Jenkintown, PA, *for Plaintiffs-Appellants*.

ERIC RIEDER, (Heather S. Goldman, *on the brief*), Bryan Cave Leighton Paisner, LLP, New York, NY, *for Defendants-Appellees*.

———————————————

WESLEY, *Circuit Judge*:

Plaintiffs-Appellants, Royce Setzer, Earl Holtzman, Dror Gronich, and Steven Klein, brought this putative class action against Omega Healthcare Investors, Inc., a publicly traded Maryland corporation that invests in healthcare facilities, and against Omega's chief executives. Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5, on behalf of a putative class of investors who purchased or otherwise acquired Omega's securities between May 3, 2017 and October 31, 2017 (the "Class Period"). Plaintiffs claim that Omega misled investors by failing to disclose a $15 million working capital loan it made to one of its major tenants, Orianna Health Systems. According to Plaintiffs, this omission hid from investors an accurate picture of Orianna's financial difficulties. The district court dismissed the complaint, holding, *inter alia*, that although the non-disclosure of the loan amounted to a material omission, Plaintiffs failed to plead a strong inference that Omega acted with the requisite scienter.

Because we find that the complaint adequately alleges that Omega acted with scienter in failing to disclose the loan, we reverse the district court's decision and remand for proceedings consistent with this opinion.

# BACKGROUND

## I.     Facts[1]

Omega is a self-administered real estate investment trust that invests in healthcare facilities, such as skilled nursing and assisted living facilities. Omega either owns the properties and leases them to the facility operators, or it provides operators with mortgage financing. Omega reports its financial performance to the market through its Funds from Operations ("FFO") and Adjusted Funds from Operations ("AFFO") metrics. Thus, Omega's FFO and AFFO primarily reflect rents paid by its operators.[2]

---

[1] Because we review *de novo* a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), we largely take the facts from Plaintiffs' complaint and assume them to be true. *See Kalnit v. Eichler*, 264 F.3d 131, 137–38 (2d Cir. 2001).

[2] According to Omega's 2017 10-K:

> NAREIT [National Association of Real Estate Investment Trusts] FFO is a non-GAAP financial measure. We use NAREIT FFO as one of several criteria to measure the operating performance of our business. We further believe that by excluding the effect of depreciation, amortization, impairment on real estate assets and gains or losses from sales of real estate, all of which are based on historical costs and which may be of limited relevance in evaluating current performance, NAREIT FFO can facilitate comparisons of operating performance between periods and between other REITs.

J.A. 138.

4

At all relevant times, Defendant C. Taylor Pickett served as Omega's chief executive officer; Defendant Robert O. Stephenson served as the chief financial officer; and Defendant Daniel J. Booth served as the chief operating officer (together, with Omega, "Defendants").

By late 2016 and early 2017, Omega's second largest operator, Orianna,[3] began experiencing severe financial difficulties and became delinquent on its rent. Orianna operated 59 skilled nursing facilities across the country, representing seven percent of Omega's investment portfolio at that time (roughly $619 million in gross investment).  In response to Orianna's financial troubles, on May 2, 2017, Omega provided a $15 million working capital loan to the company (the "Loan").[4]

## A.    First Quarter: January 1, 2017 through March 31, 2017

Two days after it made the Loan, Omega held a conference call with analysts to discuss its results for the first quarter of 2017.  On the call, Defendant Booth described Orianna's "performance pressure," which he claimed was

---

[3] Orianna is also identified in Omega's public filings as "New ARK Investments, Inc.," the name of its affiliate.

[4] The parties sometimes refer to the Loan as an $18.8 million line of credit.  That figure includes half of the accumulated interest on the Loan.  The amount disbursed, however, was $15 million.

"exacerbated" by "complete replacement of senior management" in 2016.  J.A. 25
¶ 35.  Booth indicated that "[t]he new management team well known and
respected by Omega worked throughout 2016 to transform the culture of the
company, which included changing out many facility-level management teams."
*Id.*  Booth acknowledged that during this "transition period" Orianna's
operational performance dipped below 1x EBITDAR[5] coverage for 2016.  *Id.*
However, in an effort to help Orianna during the transition period, Omega had
"embarked on an effort to sell off [Orianna's] northwest region, which consisted
of 7 facilities," and that "3 facilities [had] already been sold."  *Id.* at 25–26 ¶ 35.
Defendant Pickett added that Orianna was rebranding, moving its corporate
headquarters, and making significant business changes in an attempt to recover.[6]

---

[5] EBITDAR stands for earnings before interest, taxes, depreciation, amortization, and restructuring or rent cost; it measures profitability.  As the district court noted, an EBITDAR below 1x "represents significant cash flow issues."  SPA-3 n.3.

[6] Omega's Form 10-Q for the first quarter of 2017, filed with the SEC on May 5, 2017, described the following loss regarding Orianna's recovery plan:

> In March 2017, we executed sale agreements with two unrelated third parties to sell the 7 Northwest facilities with a carrying value of approximately $36.4 million for $34.0 million.  As a result, we recorded an allowance for loss of approximately $2.4 million.  For the three months ended March 31, 2017, we recognized approximately $0.8 million of direct financing lease income on a cash basis related to the Northwest facilities

Defendants Stephenson and Pickett also stated that Orianna was 45 days past due on its rent payments.[7]  An analyst asked why Omega's 2017 adjusted FFO guidance, which had been estimated at $3.40 to $3.44 per diluted share, did not reflect that Orianna was no longer paying rent.  *Id.* at 31 ¶ 44.  Defendant Pickett responded that "at 45 days past due, to start fiddling around with guidance, just doesn't make any sense," and reassured the analyst that Omega "feel[s] pretty comfortable that [Orianna is] going to come back with coverages at [its] previous

lease.  The sale of these facilities is expected to close in the second quarter of 2017.

J.A. 327.  The 10-Q also stated that there had been "no material changes to [Omega's] risk factors as previously disclosed . . . in Part 1 of our Annual Report on Form 10-K for the fiscal year ended December 31, 2016," and incorporated by reference the risk disclosures in that document.  *Id.* at 36 ¶ 51.  Notably, the "risk factors" disclosure in Omega's 2016 10-K stated that the company was "exposed to the risk that a distressed or insolvent operator may not be able to meet its lease, loan, mortgage, or other obligations," but did not mention any risks specific to Orianna.  *Id.* at 756.

[7] Stephenson and Pickett's statements do not clearly indicate whether Orianna was 45 days past due as of the end of the first quarter, *i.e.*, on March 31, 2017, or whether Orianna was 45 days past due as of the date of the conference call, *i.e.*, May 4, 2017.  Because both parties and the district court assume that the 45-day disclosure described Orianna's arrears for the first quarter, we assume that Stephenson and Pickett's disclosure communicated that Orianna was 45 days past due on its rental payments as of March 31, 2017.

7

level." *Id.* Omega did not mention the Loan in the conference call or in any of its first quarter filings.

## B.    Second Quarter: April 1, 2017 through June 30, 2017

Orianna continued to experience problems during the second quarter of 2017. Nevertheless, on July 26, 2017, Omega issued a press release revising Omega's guidance on FFO upwards to between $3.42 and $3.44 "per diluted share." J.A. 40 ¶ 59.

Prior to Omega's July 27, 2017 second quarter conference call, analysts following Omega raised concerns regarding Orianna's ability to pay rent. One analyst issued a report focusing on Orianna's rent delinquency, indicating that he was "look[ing] to hear more about what [rent] payments (if any) were recouped from [Orianna] after [the first quarter] shortfall." J.A. 37–38 ¶ 54. Another analyst report emphasized that "[t]enant health remains an issue for [Omega's] portfolio" such that two tenants "are now more than 30-days late on their rental payments . . . highlight[ing] potential material risks to the near-term income stream." *Id.* at 38–39 ¶ 55. Plaintiffs allege that one of the two tenants referred to in this report is Orianna. *Id.* at 39 ¶ 56.

During Omega's conference call, Booth reported that while Omega was "optimistic" that coverages had stabilized, Omega "continue[d] to see certain regional operators struggle with various operational pressures," including Orianna.  *Id.* at 41–42 ¶ 61.

Booth then explained that while Omega was "consciously [sic] optimistic that the combination of . . . [Orianna's] efforts will result in steadily improving margins and eventually return to its former profitability," the "past due rent has reached nearly ninety days in arrears."  *Id.*  He suggested that "any further deterioration and/or failure of [Orianna] to achieve its budgeted plan may result in cash basis accounting and a potential review of the value of these capital lease assets."[8]  *Id.* at 42 ¶ 61.  Booth emphasized, however, that efforts were being taken to "manage through [certain] operational pressures," including a "very recent and significant downsizing of both corporate and regional staff."  *Id.*  Omega did not disclose the Loan.  Following the conference call, Omega's stock fell four percent.

---

[8] Under the "accrual basis" method of accounting, "revenue is recognized when earned." *See Ironworkers Local 580—Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 408 n.3 (S.D.N.Y. 2014) (citing Joel G. Siegel, DICTIONARY OF ACCOUNTING TERMS 65 (3d ed. 2000)). Under the "cash basis" method of accounting, "revenues are recognized when cash is received (as opposed to earned)." *Id.* at 410 n.5.

Omega's 10-Q for the second quarter made similar statements, including that Orianna "has been facing liquidity pressures following a management transition, but has been showing signs of operational improvement and *is currently making partial monthly rent payments*." *Id.* at 43 ¶ 64 (emphasis added). The Complaint alleges that this statement and the statements made by Booth during the July 27, 2017 conference call were "false and misleading" because those statements implied that Orianna had been making rent payments from its own operating income, when at least part of those rent payments was funded by the undisclosed loan Omega had extended to Orianna several months earlier. *Id.* at 26 ¶ 36, 42–44 ¶¶ 62, 64, 65. Plaintiffs assert that Omega's repeated failure to disclose the existence of the Loan was part of a "surreptitious[]" scheme "to avoid disclosing to the market both the gravity of Orianna's financial woes and the likely impact on Omega's financial results." *Id.* at 28 ¶ 39.

The 10-Q also explained that "[t]he current management of [Orianna] is pursuing operational improvements," including "replacing executive management and senior level management, renegotiating vendor contracts and establishing a centralized referral network." *Id.* at 43–44 ¶ 64. Moreover, Omega "expect[ed] to sell two other facilities and transition its existing Texas portfolio to

another operator during the third quarter of 2017" and was "optimistic that the combination of these efforts will result in improving margins and performance by this operator." *Id.* at 44 ¶ 64. The 10-Q specifically noted, however, that while Omega "is currently recording rental revenue from this provider on an accrual basis," it will "continue[] to monitor [Orianna's] operating plan and in the event its performance deteriorates, [it] will reassess the carrying value of the portfolio and consider recording future rental revenue on a cash basis." *Id.* Omega did not disclose the Loan during the second quarter.

Following these statements, another analyst emphasized the general concern over Orianna's ability to pay rent. *Id.* at 45 ¶ 66 ("[I]nvestors were more concerned with the health of two [of Omega's] top ten tenants [including Orianna] . . . who continue to not be current on their rents.").

## C. Third Quarter: July 1, 2017 through October 31, 2017

By the end of the third quarter, Orianna had not achieved its recovery goals. Omega placed Orianna on a cash basis, recognizing no revenue for Orianna for the quarter. On October 30, 2017, Omega issued a press release, disclosing impairments of $194.7 million on direct financing leases and $9.5 million in provisions for uncollectible accounts related to Orianna, contributing to an overall

11

$46.8 million loss of FFO.  J.A. 46–48, 613–17.  Omega described the financial losses as follows:

> During our second quarter earnings call, we stated we were closely monitoring one of our operators and may have to place them on a cash basis for revenue recognition if their performance did not improve.  *Since Orianna did not achieve their revised operating plan and pay their full contractual rent, we placed them on a cash basis and therefore our third quarter results, including AFFO ["Adjusted Funds From Operation"] and FAD ["Funds Available For Distribution"], do not include any revenue related to Orianna . . . .*  Since 93% of our Orianna portfolio was classified as a direct financing lease, placing them on a cash basis and initiating the process to transition some or all of their portfolio to new operators also required us to record several *large provisions related to the direct financing leases during the quarter . . . .  We are lowering our 2017 guidance to reflect the temporary loss of third and fourth quarter 2017 revenue primarily related to placing Orianna . . . on a cash basis.*

*Id.* at 48 (emphasis added).

The next day, Omega held a conference call to discuss its third quarter results.  On the call, Defendant Pickett, Omega's CEO acknowledged "[t]he reduction in adjusted FFO . . . is primarily related to converting the Orianna portfolio to cash basis accounting."  *Id.* at 49 ¶ 69.  Similarly, Defendant Stephenson indicated, "[w]e have lowered our 2017 adjusted FFO guidance to $3.27 to $3.28 per share.  The reduction . . . reflects the temporary loss of Orianna revenue for both the third and fourth quarters."  *Id.* at 50.  Defendant Booth added

12

that while Omega "ha[s] endeavored to assist Orianna in streamlining operations by transitioning both their Northwest and Texas regions, the overall portfolio continues to struggle in past due rent headwind" and "has fallen significantly behind on rent." *Id.* Following the conference call, Omega's stock fell 6.8 percent.

On November 7, 2017, Omega filed its 10-Q for the third quarter, which noted that it had restructured two of Orianna's direct financing leases, resulting in impairments totaling $20.8 million, that "Orianna ha[d] not satisfied the contractual payments due under the terms of the remaining two direct financing leases or the separate operating lease with [Omega] and the collectability of future amounts due is uncertain," and that Omega was "in preliminary discussions with Orianna regarding future actions." *Id.* at 52 ¶ 71.

In March 2018, Orianna filed for bankruptcy. *Id.* at 22 ¶ 29.

## II.     Litigation History

Following numerous procedural matters not relevant here,[9] Plaintiffs filed their Consolidated Amended Class Action Complaint (the "Complaint") on behalf

---

[9] Plaintiff Dror Gronich filed his action on November 16, 2017.  Steve Klein filed a similar complaint on November 17, 2017.  On March 27, 2018, the district court (Buchwald, *J.*) appointed Royce Setzer as lead plaintiff, consolidated this action with *Klein v. Omega Healthcare Plaintiffs, Inc.*, No. 17-cv-09024-NRB, and approved Setzer's selection of lead counsel.

of themselves and all persons who purchased or otherwise acquired Omega's securities during the Class Period.  Several months thereafter, Defendants filed a motion to dismiss the Complaint.

The district court granted Defendants' motion, determining that although "plaintiffs ha[d] sufficiently alleged materiality with respect to the omission of the [Loan,]" the "failure to plead a strong inference of scienter [was] fatal" to their claim.  SPA-18.[10]  The district court found that Plaintiffs failed to allege that Omega acted recklessly because the Complaint failed to allege any GAAP violation and because Omega had "disclosed Orianna's financial predicament repeatedly to investors" in the May and July 2017 disclosures.  SPA-23–24.  Because Plaintiffs failed to plead a primary Section 10(b) violation, the court also dismissed Plaintiffs' Section 20(a) claims.

The district court entered judgment and this appeal followed.

## DISCUSSION

Under Section 10(b) of the Exchange Act, it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or

---

[10] Citations to the SPA refer to the Special Appendix.

deceptive device or contrivance in contravention of [the] rules and regulations"

that the SEC prescribes.  15 U.S.C. § 78j(b).  Rule 10b–5 implements Section 10(b),

and makes it unlawful

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state
> a material fact necessary in order to make the statements made, in the
> light of the circumstances under which they were made, not
> misleading, or
> (c) To engage in any act, practice, or course of business which operates
> or would operate as a fraud or deceit upon any person, in connection
> with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim under Section 10(b) and Rule 10b–5, "a plaintiff must allege

that the defendant (1) made misstatements or omissions of material fact, (2) with

scienter, (3) in connection with the purchase or sale of securities, (4) upon which

the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of

its injury."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007)

(citation omitted).  A complaint alleging securities fraud must also satisfy the

heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which

requires that the "circumstances constituting fraud" be "state[d] with

15

particularity." Fed. R. Civ. P. 9(b). "Malice, intent, [and] knowledge," however, "may be alleged generally." *Id.*

The principal issue before us is whether the district court erred in finding that the Complaint failed to adequately plead scienter. To adequately plead scienter under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Pub. L. No. 104–67, 109 Stat. 737 (1995), a plaintiff must allege facts giving rise to a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The requisite state of mind in a Rule 10b–5 action is "an intent to deceive, manipulate or defraud." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (citation omitted). In this Circuit, plaintiffs can satisfy this requirement by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99 (citation omitted). A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

16

## I.     Plaintiffs Adequately Allege Defendants' Duty to Disclose the Loan

Plaintiffs' theory of scienter is based primarily in recklessness.[11]    In securities fraud cases alleging a material omission, our recklessness standard requires that Plaintiffs allege a clear duty to disclose, *see Kalnit v. Eichler*, 264 F.3d 131, 144 (2d Cir. 2001), and further allege facts supporting a strong inference of "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence," *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015); *see also In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (to plead recklessness, a plaintiff must allege "conduct which is highly unreasonable and which represents an extreme departure from the

---

[11] The district court also found that Plaintiffs failed to establish scienter via motive and opportunity.  *See* SPA-21.  On appeal, Plaintiffs concede that "the Complaint's allegations of motive on their own may not suffice to plead a strong inference of scienter." Appellants' Br. 39.  Plaintiffs argue, however, that the district court erred in disregarding Omega's motive to protect the performance of its portfolio in analyzing scienter holistically.  *See* Appellants' Br. 39–41.  Accordingly, while we agree that we must assess Plaintiffs' scienter claim holistically, we will not consider whether the Complaint sufficiently alleged scienter under this Circuit's "motive and opportunity" theory of liability.

standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it").[12]

Plaintiffs argue that Defendants were duty-bound to disclose the Loan because the failure to do so rendered statements about Orianna's performance actionably misleading.  *See* Appellants' Br. 29–31, 41–51; Appellants' Reply Br. 13–16.  We agree.

---

[12] Although the materiality of Defendants' omission is not at issue here, the distinction between materiality analysis and the recklessness prong of scienter warrants some attention.  A defendant's duty to disclose often depends on the importance of the omitted information under the circumstances.  Thus, at times, recklessness analysis resembles materiality analysis, which asks whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (citation omitted).  However, recklessness in the context of scienter ultimately turns on the extent of the defendant's departure from "the standards of ordinary care."  *See, e.g.*, *In re Carter-Wallace*, 220 F.3d at 39, 41.  Moreover, materiality is a mixed question of law and fact, rarely resolved at the motion to dismiss stage.  *See ECA, Local 134 IBEW Joint Pension Trusts of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  In contrast, adequately pleading scienter requires a "strong inference" which is at least as "cogent and compelling" as any opposing inference.  *Tellabs*, 551 U.S. at 314, 324.  As such, where, as here, the duty to disclose is based on a requirement to disclose "material fact[s] necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," 17 C.F.R. § 240.10b–5(b), and the recklessness inquiry requires assessing the seriousness of the defendant's departure from its duty to disclose, *see infra* Part II, the seriousness required to adequately allege recklessness must typically go beyond the materiality showing required to allege a duty to disclose.  In a phrase, the allegations must be sufficiently serious as to create "a strong inference" of scienter.  *Tellabs*, 551 U.S. at 314.  As we explain below, Plaintiffs have met this burden here.

Omega's duty to disclose the Loan arose directly from Rule 10b–5's requirement to disclose "material fact[s] necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5(b); *see also Stratte-McClure*, 776 F.3d at 101 ("[A] duty [to disclose omitted facts] may arise when there is . . . a corporate statement that would otherwise be inaccurate, incomplete, or misleading." (internal quotation marks and citation omitted)).  A review of Defendants' statements makes clear that, without disclosing the existence of the Loan, Defendants' statements regarding Orianna's rent payments gave a false impression of the financial health of one of Omega's largest assets.

On May 4, 2017, Defendants told analysts and investors that, as of March 31, 2017, Orianna was "45 days past due" on its rental payments.  J.A. 301.  Defendants later indicated that, as of June 30, 2017, Orianna was "approximately 90 days past due on rent payments," but that it was "currently making partial monthly rent payments."  *Id.* at 590.  By failing to disclose that the Loan accounted for all (or most) of Orianna's "partial monthly rent payments," [13] Defendants effectively

---

[13] In a filing before the Bankruptcy Court, Orianna disclosed that "[m]ost of the proceeds of the [Loan] were used by [Orianna] to pay rent and real property taxes."  J.A. 26.

19

communicated that, notwithstanding any disclosures regarding Orianna's performance issues, Orianna could pay more than half of its rent from its earnings.[14]  The omission concealed the extent of Orianna's solvency problems: Orianna could not pay rent without borrowing from its landlord.  Under the facts as alleged, because in July 2017 Omega had stated that Orianna was making "partial monthly payments," Omega was duty-bound to disclose that its loan was the source of Orianna's rent payments.[15]

---

Moreover, the Complaint alleges that the primary purpose of the Loan was to enable "Orianna to cover real estate taxes and to pay rent back to Omega." *Id.* at 44.  The strong inference is that Orianna could not have made its "partial monthly rent payments" but for the Loan.

[14] Had Orianna not made any rent payments after March 31, 2017, it would have been 137 days in arrears as of June 30, 2017.  Defendants' statements that Orianna was only 90 days past due as of June 30, 2017 conveyed that Orianna had made 47 days' worth of rent payments during the second quarter of 2017—representing payments for over half of the 92-day quarter.

[15] Because we find that Omega's duty to disclose the Loan arose under Rule 10b–5, we need not address Plaintiffs' argument that Item 303 imposed an independent duty on Omega to disclose the Loan.  *See* Appellants' Br. 35–37.  Moreover, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) (citation omitted).  Thus, by putting Orianna's rental payments "in play," Defendants were required to speak accurately and completely.  *See id.* at 250–51 & n.3 (citation omitted); *see also Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty is not . . . a defense to Rule 10b–5 liability because upon choosing to speak, one must speak truthfully about material issues.  Once [Defendant] chose to discuss its hedging strategy, it had a duty to be both

## II.     Plaintiffs Adequately Allege Facts Showing Omega's Recklessness

Although the existence of a clear duty to disclose the omitted information is necessary to state a claim under a recklessness theory of scienter, a plaintiff must also allege facts showing the defendant's "conscious recklessness—*i.e.,* a state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (internal quotation marks and citation omitted).  In other words, the facts alleged in the Complaint must support the conclusion that Omega's non-disclosure of the Loan was at least "highly unreasonable and . . . represent[ed] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks, emphasis, and citation omitted); *see also In re Carter-Wallace*, 220 F.3d at 39. The question is: Was Omega's decision not to disclose the Loan—in the context of

---

accurate and complete." (citations omitted)).  We do not understand these references to the "whole truth" and to speaking "completely" to describe a duty to disclose all the facts that pertain to a subject (many of which would be immaterial), but instead to describe a duty not to omit material facts whose omission, in the light of what was stated, would be misleading.  *See* 17 C.F.R. § 240.10b–5(b) ("It shall be unlawful . . . to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .").

its disclosures regarding Orianna's financial health—a sufficiently extreme departure from the standards of ordinary care to satisfy the PSLRA's requirement for showing recklessness?

It was. We have previously explained that "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. Thus, in determining whether the Complaint adequately alleges facts giving rise to a strong inference that Defendants acted recklessly, we focus on Defendants' degree of knowledge and the seriousness of the impact that results from their conduct. *See id.* (discussing various examples of recklessness sufficient for Section 10(b) liability).

Here, the allegations in the Complaint raise a strong inference that Defendants acted, at the very least, recklessly in choosing to disclose incomplete and misleading information regarding Orianna. As the district court noted, there is no question that the inability of one of Omega's "top" tenants to pay rent absent the Loan was material. *See* SPA-18. Orianna represented seven percent of Omega's investment portfolio; it was a significant source of income through rental payments. *See* J.A. 21 ¶ 28; *see also id.* at 523 (explaining that Orianna's rent

22

obligations to Omega amounted to $44 million per year, or roughly $11 million per quarter).  Orianna's performance plainly impacted Omega's overall financial health; Omega had to know that revealing the full extent of Orianna's performance problems would have been troubling news to its investors.

Moreover, assuming most of the Loan proceeds were used to pay Orianna's rent during the second quarter—as the Complaint alleges, *see id.* at 26 ¶ 36, 31–33 ¶¶ 45, 47—Omega knew that its money would be going directly back into its FFO and/or AFFO.  Nevertheless, Defendants chose to represent these numbers as "partial monthly payments" indicating that Orianna was on the road to recovery.[16] The facts as alleged create a compelling inference that Defendants made a conscious decision to not disclose the Loan in order to understate the extent of Orianna's financial difficulties.  This is especially convincing where multiple

---

[16] In dismissing the Complaint, the district court seemed to focus on the fact that Plaintiffs "fail[ed] to allege a GAAP violation or other accounting irregularity."  SPA-23.  While loaning money to a tenant to pay its rent and then expressing optimism about that tenant's performance because it is making "partial monthly payments" may not violate GAAP, it is still seriously misleading under the facts as alleged here.

analysts homed in on Orianna's rental payments being key to Omega's prospects. *See id.* at 37–39, ¶¶ 54–55.[17]

That Defendants made several disclosures regarding Orianna's financial difficulties does not alter our conclusion.  Indeed, those disclosures support a finding of recklessness here as they strongly suggest that Defendants sought to use Orianna's "partial rental payments" to express optimism and underrepresent the extent of those very problems.

The facts alleged in the Complaint therefore support a strong inference that Defendants' failure to disclose the Loan constituted "conscious misbehavior," *Kalnit*, 264 F.3d at 144, or, at the very least, "highly unreasonable [conduct] . . . [that] represents an extreme departure from the standards of ordinary care." *Hennessee*, 573 F.3d at 109.  The inference is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 314.  Reversal of the district court's decision is therefore in order.

---

[17] While not dispositive, we also note that Omega had previously disclosed the possibility of a working capital loan to another troubled operator.  *See, e.g.*, J.A. 522.  It is therefore somewhat suspect that Omega did not make a similar disclosure about the Loan, which had already been made, in its discussions about Orianna.

### III.   Plaintiffs' Section 20(a) Claims

Finally, Plaintiffs also allege control person liability under Section 20(a) of the Exchange Act.  *See* 15 U.S.C. § 78t(a).  The district court held that Plaintiffs' failure to state a claim under Section 10(b) precluded relief under Section 20(a). *See* SPA-29 (citing, *inter alia*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).  Because we disagree with the district court's determination as to scienter, we also reverse the district court's dismissal of the Section 20(a) claims and remand for further proceedings consistent with this opinion.

## CONCLUSION

For the reasons stated above, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

25