**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re OMEGA HEALTHCARE INVESTORS, INC. SECURITIES LITIGATION | **1:17-cv-08983-NRB**<br><br>**CLASS ACTION**<br><br>**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Royce Setzer and additional plaintiff Earl Holtzman (collectively, "Plaintiffs"), individually and behalf of all other persons similarly situated, by and through their attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public statements and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Omega Healthcare Investors, Inc. ("Omega" or "Company"), securities analysts' reports, news stories, witness interviews, bankruptcy court filings in the case *In re: 4 West Holdings, Inc., et al.*, 18-30777 (HDH) (N.D.Tex.Br.) ("Orianna Bankruptcy"), including adversary proceedings that various parties to the Orianna Bankruptcy sought to file and deposition transcripts of senior Omega officers and others, and review of other publicly available information. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.       This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Omega's securities between February 8, 2017 and October 31, 2017, both dates inclusive ("Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.       Omega is a self-administered real estate investment trust (REIT) that invests in healthcare facilities such as skilled nursing facilities and assisted living facilities. Omega provides lease or mortgage financing to these healthcare facilities and earns money for its stockholders largely by collecting rent and/or mortgage payments from the operators of those facilities. Omega's largest operators each manage dozens of facilities.

3.       As such, Omega's ability to pay dividends to its stockholders depends heavily on the financial health of its operators, as those operators' ability to make regular rent payments directly affects Omega's bottom line. The financial health and quality of Omega's operators is a matter on which investors focus intently. Investors also focus intently on whether an operator needs to be replaced, as finding a new operator for one or more troubled or failing facilities is a cumbersome and expensive process. As a result, it is critical that Omega disclose to the market when one or more of its operators – particularly its largest operators – face problems that could materially impact Omega's reported earnings.

4.       As 2017 began, the skilled nursing industry was experiencing increasing costs and the reimbursement landscape was evolving, straining operators financially. According to Defendant Pickett's comments in a February 8, 2017 press release, "[w]e share the industry

leadership and investor concerns that increasing labor and liability costs and evolving reimbursement models may put near term financial strain on many operators within our industry." Shrugging off these industry concerns as they related to Omega, Defendant Pickett stated, "[i[n light of these concerns, we are pleased to have built a conservative balance sheet allowing us to manage through this uncertainty while delivering superior earnings and reliable dividends."

5.      Defendants echoed this confidence in Omega's February 24, 2017 Annual Report on Form 10-K for the year ended December 31, 2016 ("2016 10-K"), stating, "[w]e believe that our operating results display the strength of our conservative balance sheet and operating model against the backdrop of an increasingly difficult operating environment." Defendants concluded, "[i]ncreasing labor and liability costs, evolving reimbursement models and an increasingly aggressive regulatory and enforcement environment may put near term financial strain on many operators within the skilled nursing industry." By referencing its conservative portfolio, Defendants sought to distinguish Omega's situation from the problems plaguing the industry. Defendants could ill afford material failures of its largest operators.

6.      These industry challenges coincided in early 2017 with investors' learning of and focus on Signature Holdings II ("Signature"), Omega's third largest operator, representing 6% of Omega's investment portfolio. In 2016, Signature experienced acute operational and financial problems. In early 2017, analysts questioned Defendants about whether Omega would reduce or relieve Signature of its rent payment obligation. Defendants acknowledged their focus on Signature, stating in response to an analyst's question during Omega's February 9, 2017 earnings call, that they "had ongoing conversations with Signature . . . and with a lot of our other operators, quite frankly, about what we can do." Defendant Stephenson continued that Omega had considered "repositioning of our portfolio, what can we do to help them and whether it involves perhaps the

sale of a few buildings that don't otherwise fit into their markets or their portfolio to a third party."

Thus, Defendants knew that investors were concerned about the stability of Omega's largest operators.

7.      Orianna Health Systems ("Orianna") was, as of December 31, 2016, Omega's second largest operator, operating 59 facilities across the country. Omega was intimately familiar with Orianna, having financed the creation of Orianna in 2013 with a $525 million loan. As of December 31, 2016, Orianna facilities represented 7% of Omega's overall investment portfolio. Omega's gross investment in Orianna's facilities was over $619 million.

8.      From its inception, Orianna was plagued with operational, financial, and liquidity problems. These problems never abated. By early 2016, Orianna's operational and financial problems caused Omega to intervene to enable Orianna to continue paying Omega. Omega changed Orianna's management, wholesale, in order to change Orianna's operational culture, and sold off Orianna's northwest United States and Texas facilities.

9.      In early January 2017, despite Defendants' efforts to stabilize Orianna, Orianna's acute operational and financial problems began to impact Omega's financuial results materially. No later than early January 2017, Orianna directly informed Defendant Pickett, himself, that it could not pay rent and would be unable to pay rent for the foreseeable future. Prior to May 4, 2017, however, Defendants never alerted investors either that Orianna's financial and operational problems had become acute in 2016, requiring Omega's intervention, or that, as of January 2017, it could no longer pay rent. Defendants' knowing or reckless failure to disclose Orianna's acute operational and financial problems in its February 2017 disclosures about Omega's fiscal 2016 rendered certain public statements and SEC filings materially false.

10.     It was not until Omega's May 4, 2017 earnings conference call that Defendants disclosed to the market, generally, that Orianna faced struggles in 2016, as well as the measures Orianna and Omega took to return Orianna to operational and financial stability. Defendants' May 4, 2017 conference call statements portrayed Orianna as recovering, including generating cash flow sufficient to cure any rent delinquencies and to return Orianna to current status on its payments to Omega.

11.     Once again, however, Defendants knowingly or recklessly concealed from the market that by January 2017 Orianna's financial distress disabled it from paying any rent to Omega or paying its real estate taxes. As such, by May 4, 2017, when Defendants stated affirmatively that as of March 31, 2017 Orianna was 45 days delinquent on its rent, they knew that Orianna was ***90 days delinquent***. Defendants further knowingly concealed that in response to Orianna's struggles, on May 2, 2018, ***just two days before the May 4, 2017 earnings conference call***, pursuant to a Working Capital Agreement, Omega lent Orianna over $15 million in material part ***to pay rent directly back to Omega,*** reducing Orianna's first quarter 2017 delinquency to $0. Given Orianna's then-current financial and operational crisis, Omega did not lend money to Orianna because Orianna was a secure lending opportunity. Rather, Defendants caused Omega to make the Working Capital Loan to enable Orianna to pay rent so that Orianna's inability to pay did not materially impact Omega's financial results.

12.     Thus, as of May 4, 2017, Defendants knowingly or recklessly stated that Orianna was 45 days delinquent as of March 31, 2017 when it was 90 days delinquent. More, in the context of disclosing Orianna's operational and financial picture, their plan to turn around Orianna, and reiterating Omega's own financial guidance, Defendants omitted any disclosure of the Working Capital Loan. Having disclosed that Orianna was 45 days delinquent as of March 31, 2017,

Defendants knew or recklessly disregarded that as of May 4, 2017, Orianna was 34 days delinquent for the second quarter of 2017, having missed rental payments in both April 2017 and May 2017. By concealing the Working Capital Loan, Defendants materially misled investors about the true state and trend of Orianna's delinquency, hiding that as of May 4, 2017, but for the Working Capital Loan, Orianna's delinquency was 124 days and not 45 days as Defendants disclosed.

13.     Defendants' Working Capital Loan to Orianna enabled Orianna to cure its 90 day rent delinquency as of March 31, 2017, in turn enabling Omega to record revenue from Orianna in its first quarter 2017 financial statements and in its second quarter 2017 financial statements (for the three and six months ended June 30, 2017). The revenue Omega recognized included the funds it had lent to Orianna. The Working Capital Loan, itself, was neither improper nor illegal. Moreover, it was neither improper nor illegal for Defendants to record the funds Omega lent to Orianna, and then received back as rent payments, as revenue and income in Omega's Consolidated Statements of Income ("Income Statement") for the first and second quarter of 2017, and to include those funds in the Funds from Operations ("FFO") and Adjusted Funds from Operations ("AFFO") that Defendants disclosed to investors during the Class Period.

14.     SEC regulations, generally accepted accounting principles ("GAAP"),[1] and defendants own statements about Orianna, however, imposed a clear duty on Defendants to disclose Orianna's 2016 financial and operational crises, and January and February 2017 rent

---

[1] The SEC has statutory authority to promulgate GAAP for public companies, a function it has delegated to the Financial Accounting Standards Board ("FASB"). Moreover, the accounting profession recognizes GAAP as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to prepare their financial statements.

delinquency, no later than February 2017 and, thereafter, to disclose the fact and Orianna's use of the proceeds of the Working Capital Loan. Defendants knowingly or recklessly flouted those duties, rendering Omega's disclosures for 2016 and the first two quarters of 2017 materially false.

15. First, SEC Regulation S-K, Item 303, 17 C.F.R. § 229.303(a)(3) ("Item 303"), requires registrants to disclose in management's discussion and analysis of a registrant's financial condition and results of operations ("MD&A"), "unusual or infrequent events or transactions . . . that materially affected the amount of reported income from continuing operations" and "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." To render Omega's Income Statements and its results of operations for 2016, for the three months ended March 31, 2017, and for the three and six months ended June 30, 2016, not misleading, Defendants were duty-bound to disclose both that Orianna had an operational and liquidity crisis in 2016 causing it to be unable to pay rent in January or February 2017, and that Omega had lent Orianna money to cover Orianna's first quarter delinquency. The Working Capital Loan—an "unusual or infrequent event or transaction"—enabled Defendants to report as income Omega's own cash, without which Omega would have recorded materially less income, FFO, and AFFO.

16. In addition, by lending Orianna funds to pay rent back to Omega, Defendants effectively stopped the known trend or uncertainty surrounding Orianna's delinquency that Item 303 obligated them to disclose. Not only did Defendants lie about the duration of Orianna's delinquency in the first quarter of 2017, but by lending Orianna funds to pay rent to satisfy its first quarter delinquency, they started the delinquency clock running again as of April 1, 2017. As of May 4, 2017, when Defendants expressed their confidence that Orianna would turn its financial

situation around and begin paying rent again, stating "But frankly, at 45 days past due, to start fiddling around with guidance, just doesn't make sense, we feel pretty comfortable that they're going to come back with coverages at their previous levels . . .," and that as a result Omega would not revise its FFO/AFFO guidance downward, Defendants knew two material facts that they improperly withheld from the market: On May 4, 2017, but for the Working Capital Loan, Orianna's delinquency trend was 134 days, and, even with the Working Capital Loan, the trend of delinquency continued as Orianna had already missed its rent payments in April and May 2017. In violation of Item 303, therefore, Defendants knowingly or recklessly deceived investors.

17.    With respect to GAAP, FASB Concept Statement No. 5 ("CON 5"), ¶7, "Recognition and Measurement in Financial Statements of Business Enterprises," states, "some useful information is better provided by financial statements and some is better provided, or can only be provided, by notes to financial statements or by supplementary information or other means of financial reporting." Such information is "an integral part of financial statements prepared in accordance with [GAAP]."[2] ASC[3] 855-10-20 and ASC 855-10-50-2 obligate disclosure in the notes of a "nonrecognized subsequent event," an event "provid[ing] evidence about conditions that did not exist at the date of the balance sheet but arose subsequent to the" reporting period "of such a nature that [it] must be disclosed to keep the financial statements from being misleading."

18.    Just as Item 303 required Defendants to disclose in the MD&A in the 2016 10-K that Orianna had experienced a financial and operational crisis in 2016, in turn and in that context,

---

[2] According to FASB Concept Statement No. 6 ("CON 6"), while notes are integral to financial statements, "they are not elements" of the financial statements. Rather, notes serve to amplify or complement the information the financial statements contain.

[3] ASC are the "Accounting Standards Codification," the single source for United States GAAP, effective for both interim and annual financial reporting after September 15, 2009. The FASB maintains the ASC.

GAAP required Defendants to disclose in the Notes to the Financial Statements in the 2016 10-K that Orianna did not pay rent in either January or February 2017 and that Orianna informed Defendants in early 2017 that it would not be able to pay rent going forward. Defendants' knowing or reckless failure to disclose Orianna's 2016 financial and operational problems and its early 2017 rent delinquency rendered their statements about Omega in February 2017 materially misleading and violated GAAP.

19.     With respect to Omega's May 2017 financial statements, SEC Regulation S-X 10-01(a)(5), 17 C.F.R. § 210.10-01(a)(5)[4] further obligated Defendants to disclose the Working Capital Loan as an "event subsequent" to the period that had a material impact on the registrant. Similarly, GAAP required Defendants to disclose the Working Capital Loan as a "nonrecognized subsequent event," an occurrence after the reporting period "of such a nature that [it] must be disclosed to keep the financial statements from being misleading." Defendants did not record the Working Capital Loan in the first quarter 2017 financials, notwithstanding that Orianna applied the funds from that loan to cure its first quarter delinquency. Indeed, they were wholly silent on the issue. As such, the Defendants recognized revenue in the first quarter from the proceeds of the Working Capital Loan that it did not include on its balance sheet until they disclosed Omega's financial statements for the quarter ended June 30, 2017. Thus, Defendants transmogrified a past due rental obligation from the first quarter into a loan obligation they omitted until surreptitiously including it on the second quarter balance sheet. The obligation remained but evolved from a probable hit to income on the first quarter 2017 Income Statement to a fresh asset on the second quarter 2017 balance sheet. As a result, Defendants knowingly or recklessly deceived investors and violated GAAP.

---

[4] The SEC amended this Section of Regulation S-X after the Class Period.

20.     With respect to the June 30, 2017 financials, Defendants buried the Working Capital Loan that they made during the second quarter, recording it on the balance sheet as part of "Other Investments." Neither in Note 5 of the Notes to the Financial Statements in the Quarterly Report on Form 10-Q for the quarter ended June 30, 2017, relating to Other Investments, nor anywhere in that document or Defendants' other second quarter 2017 disclosures did Defendants disclose that they had made the Working Capital Loan to Orianna. By purposefully hiding the Working Capital Loan from investors, Defendants disabled investors from understanding that as of June 30, 2017, but for the Working Capital Loan, Orianna would have been 180 days delinquent. By failing to disclose that loan, Defendants disabled investors from knowing that despite a sizable cash infusion into Orianna, that operator still could not pay rent. As a result, Defendants knowingly or recklessly deceived investors.

21.     On October 30, 2017, after the market's close, Defendants disclosed that for the third quarter ended September 30, 2017, Omega recorded a $194.7 million impairment on its direct financing leases with Orianna, along with $9.5 million in provision for uncollectible accounts related to Orianna. Further, Orianna reported a $46.8 million loss in FFO. On this news, the price of the Company's shares fell $2.11 per share, or 6.8%, from an October 30, 2017 close of $30.97 to an October 31, 2017 close of $28.86 per share on relatively enormous volume of 16.2 million shares traded, directly and proximately causing Plaintiffs and other Class members to suffer damages.

## JURISDICTION AND VENUE

22.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

25.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

26.     Plaintiff Royce Setzer purchased Omega securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

27.     Plaintiff Earl Holtzman purchased Omega securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

28.     Defendant Omega Healthcare Investors, Inc. is incorporated in Maryland. Omega's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "OHI."

29.     Defendant C. Taylor Pickett ("Pickett") has served at all relevant times as the Chief Executive Officer ("CEO") of Omega.

30.     In the 2016 10-K and both the Quarterly Reports on Forms 10-Q for the Quarters ended March 31, 2017 and June 30, 2017, as Omega's CEO, Defendant Pickett falsely certified as follows:

### RULE 13a-14(a)/15d-14(a) CERTIFICATION OF CHIEF EXECUTIVE OFFICER

### Certification

I, C. Taylor Pickett, certify that:

1.     I have reviewed this Quarterly Report on Form 10-Q of Omega Healthcare Investors, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     b.     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of

financial statements for external purposes in accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

31.    In addition, in those Forms 10-Q, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Defendant Pickett certified that the Forms 10-Q "fully compl[y] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "the information contained in the Report[s] fairly presents, in all material respects, the financial condition and results of operations of the Company."

32.    Defendant Robert O. Stephenson ("Stephenson") has served at all relevant times as the Chief Financial Officer ("CFO") of Omega.

33.     In the 2016 10-K and both the Quarterly Reports on Forms 10-Q for the Quarters ended March 31, 2017 and June 30, 2017, as Omega's CFO, Defendants Stephenson falsely certified as follows:

### RULE 13a-14(a)/15d-14(a) CERTIFICATION OF CHIEF FINANCIAL OFFICER

### Certifications

I, Robert O. Stephenson, certify that:

1.      I have reviewed this Quarterly Report on Form 10-Q of Omega Healthcare Investors, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of

financial statements for external purposes in accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

34.      In addition, in those Forms 10-Q, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Defendant Stephenson certified that the Forms 10-Q "fully compl[y] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "the information contained in the Report[s] fairly presents, in all material respects, the financial condition and results of operations of the Company."

35.      Defendant Daniel J. Booth ("Booth") has served at all relevant times as the Chief Operating Officer ("COO") of Omega.

36.     Defendants Pickett, Stephenson, and Booth (collectively, "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Omega's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

37.     Omega is a self-administered REIT that invests in income-producing healthcare facilities, including long-term care facilities located in the United States and the United Kingdom.

38.     Omega claims to provide lease or mortgage financing to operators of healthcare facilities, the majority of which are skilled nursing facilities ("SNFs"). Omega also provides lease and mortgage financing to assisted living facilities ("ALFs"), independent living facilities and rehabilitation and acute care facilities

39.     According to Omega's 2016 10-K, Omega's typical relationship with its operators is through triple-net operating leases, ranging from 5-15 years in duration, pursuant to which the operators are responsible for all expenses related to the leased facilities. Omega also accounts for certain of its leases as direct financing leases.

40.     As of December 31, 2016, Omega's real estate investments included properties managed by 79 different operators. Omega describes operators as "our tenants and mortgagors and their affiliates who manage and or operate our properties." Two of Omega's top lessees are Orianna, identified in Omega's public filings through its affiliate New ARK Investments, Inc., and Signature, identified in Omega's public filings through its affiliate Signature Holdings II, LLC.

41.     Among other sources, Plaintiffs base the following allegations upon the complaint in an adversary proceeding that the Unsecured Creditors Committee ("Unsecured Creditors") in Orianna's bankruptcy sought permission to file against Omega and others ("Unsecured Creditors' Complaint"). The Unsecured Creditors based their allegations on their investigation that included reviewing thousands of pages of documents, emails, and financial information that both Orianna[5] and Omega produced, and deposition testimony. At the time the Unsecured Creditors deposed witnesses related to these actions, the parties agreed to designate them "Attorneys' Eyes Only." [6]

42.     The Unsecured Creditors' Complaint alleges that through a series of allegedly fraudulent transfers, Omega sought improperly to benefit itself and various Orianna insiders to the detriment of Orianna itself and the Unsecured Creditors. Critically for this case, Omega and its senior officers knew or recklessly disregarded that Orianna had operated in financial difficulty,

---

[5] The "Orianna Entities" consist of several holding companies that owned over 100 property companies ("PropCos") that were nominal tenants of the SNFs and that were to pay rent to Omega. In turn, the PropCos sub-leased the SNFs to Schwartzberg operating companies ("OpCos") that held licenses and government certifications to operate the SNFs in question. The "Omega Entities" are the wholly-owned operating companies that Omega formed to be nominal landlords for the SNFs. Omega wholly owns each operating company.

[6] Orianna Bankruptcy Docket No. 469. The Unsecured Creditors filed their Unsecured Creditors' Complaint after Plaintiffs filed their Consolidated Amended Class Action Complaint (ECF No. 46) on May 25, 2018. Plaintiffs did not obtain deposition transcripts until late August 2019.

bordering on insolvency, since Omega, itself, financed Orianna's formation in 2013 and that by January 2017, it could no longer pay rent.

43.     In 2013, Behrman Capital sought to sell its ownership stake in the old Ark Holding Company, Inc. ("Ark"), later known as Orianna. Behrman Capital retained Jeffries LLC as its investment bank. In turn, Jeffries LLC identified Red Oak Acquisitions ("Red Oak"), owned by the Schwartzberg Family Trusts ("Schwartzbergs"), as a potential buyer. Omega had an ongoing relationship with the Schwartzbergs, having financed another Schwartzbergs-owned SNF operator called Gulf Coast. Jeffries and the Schwartzbergs identified Omega as a source of financing for the transaction.

44.     On September 13, 2013, Omega financed a $525 million leveraged buyout ("LBO") of the SNFs that would become Orianna. The Schwartzbergs orchestrated a transaction through a Merger Agreement whereby, through their wholly owned subsidiary, 4 West Holdings, Inc. ("4 West"), they obtained from "Behrman Capital" all the stock of Ark. 4 West borrowed $525 million from Omega to pay $239 million to Behrman Capital for its stock, to repay Ark's then-outstanding debt, and to cover transaction costs. Simultaneously, in a sale leaseback transaction, Omega financed the Schwartzbergs' $525 million purchase, securing the funds it loaned with the assets of Ark – the SNFs.

45.     According to the Unsecured Creditors, Omega sought to finance the Ark transaction as a prototype for future large portfolio acquisitions normally not practicable because of tax repercussions. In addition, Ark's SNFs were in four states in which Omega had no prior exposure. Thus, notwithstanding that the Schwartzbergs' Gulf Coast SNFs were, at the time, experiencing financial difficulty, Omega proceeded with the transaction. At the time of the LBO, Omega

obtained no independent solvency opinion, even as it was aware that after the LBO, Orianna would have no equity capital on its balance sheet.

46.     The Schwartzbergs contributed none of their own capital to the transaction. The LBO, however, enabled the Schwartzbergs to gain control of 100% of Orianna's common stock, increasing materially the number of SNFs they operated. More, the Schwartzbergs owned and operated three companies that provided operations and other ancillary services to SNFs. The LBO enabled them to impose contracts upon the Orianna SNFs with Schwatzbergs-owned providers. Those providers included Health Care Navigator LLC ("HCN"), provider of consulting, in-house legal, back-office administrative and other services to SNFs, Halcyon Rehabilitation, LLC, provider of therapy services, and HMS Purchasing LLC, a group purchaser of medical supplies, food, equipment, and other supplies. Ultimately, these Schwartzbergs-owned entities charged millions of dollars in services to Orianna.

47.     The LBO resulted in the former shareholders of Ark, Behrman Capital, cashing out, receiving $239 million. As security for the financing, the Omega Entities obtained title to the SNFs Ark had owned and a lien on certain related assets. Without paying any of their own funds, the Schwartzbergs obtained 100% of the stock of the new Ark, Orianna. The financial ramifications of these transactions caused immediate distress to Orianna as its long-term debt rose from $267 million to $529 million, and its pre-LBO stockholders' equity of $193 million declined to $0. Replacing stockholders' equity with debt materially increased Orianna's debt to equity ratio from its inception as the new company the Schwartzbergs and Omega controlled. In addition, in Omega's Annual Report on Form 10-K for the year ended December 31, 2013 ("2013 10-K"), filed with the SEC on February 11, 2014, Omega stated, "[a]t December 31, 2013, we had investments with one operator and/or manager that exceeded 10% of our total investments: New

Ark Investment, Inc. ("Ark") (14%). No other operator represents more than 10% of our investments at December 31, 2013."As of December 31, 2016, Omega reported the gross real estate investment in the Orianna facilities as $619,281,496. At that time, Omega's investment in Orianna facilities represented nearly 7% of its overall investment portfolio. Omega's public filings identify only one operator in which it has a larger total investment – Ciena Healthcare, with a total investment of $910,430,967. Another large operator, Signature, had more facilities than Orianna (63 to 59), but Omega's overall investment in Signature, $557,985,685, was smaller than its investment in Orianna.. In terms of total investment Orianna was Omega's second largest operator.

48.     Orianna operated SNF facilities in different regions of the country. Master lease agreements governed its relationship with Omega, each of which set forth the lease obligations of several Orianna facilities. As of March 2018, when Orianna filed a bankruptcy petition,[7] Omega (through its affiliates), was a party to multiple active master leases with Orianna facilities.

49.     Omega does not operate the SNFs in which it invests. Rather, it owns the property on which those facilities operate, or provides financing to the entities that operate those facilities. Omega delivers returns to its stockholders by collecting rent and mortgage payments from its operators, and, as such, relies upon those operators to run their facilities profitably and in compliance with the vast legal and regulatory obligations faced by medical facilities. Due to the legal and operational complexity of running large numbers of skilled nursing facilities, and the limited number of large operators in the industry, Omega must be sensitive to the problems of its operators, as finding new operators for its facilities is time-consuming and expensive. Reflecting

---

[7] 4 West Holdings, Inc., along with 134 other entities (collectively doing business as Orianna Health Systems), filed petitions under Chapter 11 bankruptcy on March 6, 2018 in the United States Bankruptcy Court for the Northern District of Texas, Case No. 18-30777 ("Orianna Bankruptcy").

this complexity, Omega's leases with its operators, including Orianna, do far more than set forth the term of the lease and the operator's rental obligations. As Omega describes in its 2016 10-K:

> We seek to obtain (i) contractual rent escalations under long-term, non-cancelable, "triple-net" leases and (ii) fixed-rate mortgage loans. We typically obtain substantial liquidity deposits, covenants regarding minimum working capital and net worth, liens on accounts receivable and other operating assets, and various provisions for cross-default, cross-collateralization and corporate and or personal guarantees, when appropriate.

In other words, Omega protects its investments by ensuring it is well-informed about its operators' financial condition, and that its investments are secured by multiple forms of collateral.

50. Defendants conveyed the importance of financially healthy operators and the concern over the risk of Omega's losing operators. For example, on May 4, 2017, Hilliard Lyons analyst John Roberts issued a generally positive report on Omega, noting that management had "retained its FFO guidance for 2017 at $3.40-$3.44 a share . . . ." With respect to certain justice department investigations into operators and the potential "headline risk" to which this exposed Omega, Roberts dismissed it as constituting a "fundamental risk" to Omega. He did note, however, that "[i]nvestors always worry about a REIT's ability to find a new tenant when one leaves, and we believe that OHI management is very capable of doing just that, replacing a problem tenant with a new one, if any investigation were to result in such an issue."

### Orianna's Liquidity Problems

51. In his early 2018 hearing testimony before the bankruptcy court, Louis E. Robichaux, IV ("Robichaux"), ultimately Orianna's Chief Restructuring Officer ("CRO"),[8] stated

---

[8] Robichaux is a principal at Ankura, located in Dallas, Texas. According to Ankura's website, it provides services to clients "facing an immediate challenge to its business trying to opportunistically increase the value of their company, or protect against future risks, Ankura designs, develops, and executes tailored solutions by assembling the right combination of expertise." Robichaux describes himself as "provid[ing] restructuring, crisis management, financial advisory, and expert witness services to parties in a broad variety of distressed corporate

that Orianna was "overleveraged from the inception, from the time the [Schwartzbergs] purchased the company." Later, Trey Blalock, HCN's Chief Development and Legal Officer, confirmed that Orianna was "overleveraged from the inception." During his April 12, 2018 deposition,[9] Robichaux admitted that "the structure of the rent payments in the Omega lease escalates and increases over time. So over time," he continued, "even if the company's performance is flat, their rent payments become a larger and larger burden." While, according to Robichaux, Orianna likely had, at its inception, "sufficient cash flow to pay rent and pay its operating obligations," sometime in mid-2015, Orianna encountered difficulties paying.

52.     According to Robichaux's March 7, 2018 Declaration In Support of Chapter 11 Petitions and First Day Pleadings, Orianna hired Ankura on May 8, 2017 "in an advisory capacity as well as to review strategic alternatives relating to [Orianna's] existing debt obligations." Robichaux testified that in May 2017, when he first assumed his role as a consultant to Orianna to "look[] at some operational reporting and potential ways to improve performance of [Orianna]," he found the Company "liquidity constrained, operationally struggling." From 2014 until May 2017, Defendants gave investors no hint that its second largest operator suffered from liquidity and operational challenges that rendered future rent payments in doubt.

53.     According to the Unsecured Creditors' review of the information and testimony they received and reviewed, as of the 2013 LBO, Orianna had no capital and was, for all practical purposes, insolvent as a result of the LBO. In the years following the 2013 LBO, Orianna never

---

settings, with a significant emphasis on the US healthcare industry," and claiming "30 years of industry and restructuring experience, with significant expertise serving in chief restructuring officer roles."

[9] The Unsecured Creditors Committee deposed Robichaux on April 12, 2018 and again on October 18, 2018.

achieved financial stability. Over that time, its unsecured trade debt doubled from $34 million to $64 million and stockholders' equity plummeted from negative $3 million in 2013 to negative $164 million in 2017. Before May 4, 2017, Defendants never disclosed this or warned about Orianna's material financial problems.

54.     Orianna's financial outlook did not improve. Pursuant to four long term Master Leases,[10] the Omega Entities became landlords with respect to the SNFs that the Orianna Entities, for all practical purposes, owned. In turn, the Omega Entities leased the SNFs to the Orianna Entities. To repay the $525 million Omega lent, the Orianna Entities, through the PropCos as nominal tenants, paid to Omega what the Master Leases called "rent."

55.     Each of the four Master Leases showed rent payments on a schedule titled "Amortization of Funded Amount." The schedule also includes Omega's gross investment, the carrying amount of the leased property, unearned profit, and the total amount of principal paid per month.

56.     About the LBO, Omega's 2013 10-K stated:

> On November 27, 2013, we closed on a purchase/leaseback transaction with Ark Holding Company, Inc. ("Ark Holding") pursuant to which Omega acquired 55 SNFs and 1 ALF. We leased the facilities back to the prior operator pursuant to four 50-year lease *yielding 10.6% per annum over the term of the lease*. The purchase/leaseback transaction is being accounted for as a direct financing lease.
>
> The lease agreement allows the tenant the right to purchase the facilities for a bargain purchase price plus closing costs at the end of the lease. In addition, commencing in the 41st year of the lease, the

---

[10] The Master Leases consisted of the South East Master Lease, where 40 Omega operating subsidiaries served as nominal landlords to Orianna's property companies, the Indiana Master Lease, where one Omega operating subsidiary served as nominal landlord to Orianna property companies, the North West Master Lease, where seven Omega operating subsidiaries served as nominal landlords to Orianna property companies, and the Texas Master Lease, where nine Omega operating companies served as landlords to Orianna property companies.

tenant will have the right to prepay the remainder of its obligations thereunder for an amount equal to the sum of the unamortized portion of the investment plus the net present value of the remaining payments under the lease, and closing costs. In the event the tenant exercises either of these options, we have the right to purchase the properties for fair market value at the time.

The 56 facilities represent 5,624 licensed beds located in 12 states, predominantly in the southeastern United States. The 56 facilities are separated by region and divided amongst four cross-defaulted master leases. The four regions include the Southeast (39 facilities), the Northwest (7 facilities), Texas (9 facilities) and Indiana (1 facility). Contractual rent for years 1-4 is approximately $47 million with 2.5% annual escalators beginning in year five through the term of the lease. (Emphasis added).

57.    From the inception of the Master Leases, however, the monthly rent the PropCos paid to Omega was insufficient to cover the amount Orianna owed to Omega. The South East Master Lease, for example, had a December 31, 2013 outstanding balance of $472,823,963. At the 10.58% interest rate on the outstanding balance, the beginning annual rent on the South East SNFs should have been just over $50 million or $4.17 million monthly. Instead, according to §1.4 of the South East Master Lease, "Base Rent" was $42 million per year for the first, second, third, and fourth years. As a result, instead of paying down the outstanding balance in each of the first three years of the South East Master Lease, Omega added over $8 million to the outstanding balance.

58.    Beginning January 1, 2017, under the terms of the Master Leases, Base Rent on Orianna's North West, Indiana, and Texas SNFs increased by 2.5% annually. Base Rent on the South East Master Lease did not increase until January 1, 2018. During the February 9, 2017 Earnings conference call ("February 9 Earnings Call"), Defendant Booth stated that "we've always looked at the escalator between 2% to 2.5%. And our current average is slightly above 2%. As such, the rent increases for the four Orianna Master Leases was nearly 50 basis points or 25% more than Omega's average rent increase. The rent increase for three of the four Master Leases on

24

January 1, 2017 added to Orianna's financial instability. The threat of the rent increase for the South East Master Lease, by far the largest of the four, loomed.

59.     According to Robichaux's April 12, 2018 testimony, "[Julie Gutzmann,[11] "senior financial person, historically" of Orianna's operations company, HCN,] said there were not cash flow problems initially." Rather, he continued:

> Cash flow problems arose as a result of . . . [t]hree things: Unexpected headwinds in the industry, which is generally well known and folks have written about; second, operating managerial issues specific to Orianna such as this northwest lease, such as other problems of noncompliance and so on; and third, the escalating lease payments that were in existence at the time of the merger.

60.     During Lease Years one and two, according to the Unsecured Creditors' Complaint, Orianna "limp[ed] along," with increasing negative shareholder equity. No later than December 2015, "Omega became very concerned with [Orianna's] rent coverage ratio." Even as Orianna was able to pay rent for the first two Lease Years, its unsecured debt, monies it owed beyond rent, began to grow, reaching $100 million in March 2018 when Orianna sought protection from creditors. Even as Orianna was current on its rent, therefore, it became increasingly financially unstable as its payables accumulated. Aware of this mounting debt, approximately a year after the LBO, with Omega's assistance, Orianna analyzed its SNF portfolio and determined to "divest" those SNFs it operated at historical losses. Together, in or around late 2014, Orianna and Omega began to market for sale the SNFs that the Texas Master Lease covered. Defendants failed to

---

[11] At the times relevant to this case, Julie Gutzmann was chief financial officer of Asset Navigator, LLC, an entity the Schwartzbergs owned, and CFO of HCN. Asset Navigator provided no goods or services to Orianna. Rather, through its contractors and/or employees, it provided senior-level management consulting services to HCN under a consulting and advisory services agreement. HCN pays Asset Navigator a monthly fee in exchange for providing the services to HCN.

disclose publicly Omega's efforts *since 2014* to divest Orianna of its nine Texas SNFs until its quarterly report on Form 10-Q for the second quarter of 2017.

61.     In the fall of 2016, Orianna and Omega began marketing the SNFs the North West Master Lease covered, transitioning those SNFs to other operators in early 2017. Again, Defendants failed to disclose publicly Omega's efforts to divest Orianna of all seven North West SNFs until early May 2017.

62.     By January 2017, as the rent on three of four Master Leases increased, Orianna's troubles worsened. The material issues plaguing Orianna, Omega's second largest operator, occurred in the context of overall industry challenges. Downplaying these challenges, Defendant Pickett stated in Omega's February 8, 2017 press release, announcing Omega's fourth quarter 2016 financial results, that notwithstanding industry challenges, Omega was well positioned to deliver superior results. Pickett stated:

> Our record quarterly Adjusted FFO of $0.88 per share and FAD of $0.80 per share is a strong testament to the strength of our operating model against the backdrop of an increasingly difficult operating environment. We share the industry leadership and investor concerns that increasing labor and liability costs and evolving reimbursement models may put near term financial strain on many operators within our industry. In light of these concerns, we are pleased to have built a conservative balance sheet allowing us to manage through this uncertainty while delivering superior earnings and reliable dividends.

63.     In addition, during the February 9 Earnings Cal, Defendant Pickett stated:

> As I indicated in our press release we believe *2017 will be particularly challenging for the skilled nursing facility industry*. The combination of labor cost pressures and [census] pressure will continue to challenge operators' net cash flow. In addition, an increasingly aggressive regulatory and Department of Justice environment continues to divert many management teams' attention away from patient care to deal with survey and legal issues not to mention the cost of defending and settling these issues. We will continue to work proactively with our operators to identify ways to

maintain operating cash flow and manage through these issues.
(Emphasis added).

64.     Echoing Defendant Pickett, during the February 9 Earnings Call, Defendant Booth

described the impact of industry problems on Omega, stating:

> Our operator coverage has steadily declined throughout 2016 due to
> a number of factors including: increased labor costs, a dip in the
> overall quality mix as a percentage of revenue, which has been
> driven by continued pressure on the length of stay, and Omega's
> annual rent escalators which average over 2%. As Taylor mentioned
> we continue to work with our operators to provide support for the
> challenges currently facing our industry. Accordingly, during 2016
> Omega repositioned a number of assets within our portfolio
> including a sale of 38 facilities and the re-leasing of eight additional
> facilities we expect to continue these reposition efforts throughout
> 2017.

65.     In the context of both 2016 and 2017 general industry challenges and Defendants'

statements about the strength of Omega's portfolio, the financial stress Orianna and Signature, two

of its top three operators, faced was material to Omega and its financial results.

66.     From April 2015 through the present, Vikas Gupta ("Gupta") has served as

Omega's Senior Vice President of Acquisitions and Development. Gupta has worked for Omega

since 2011. According to the Company's website, "Mr. Gupta is involved in acquisitions,

construction, and capital expenditure activity, overseeing a team of investment professionals,

while being one of the primary contacts for operator relationships at Omega." In that position,

Gupta testified,[12] "I lead new deal activity [and] dispositions. I'm very heavily involved with

workouts and I'm one of the main client -- one of the main people who interacts with clients from

the management team."

---

[12] Gupta testified under oath twice in the Orianna Bankruptcy, once on April 12, 2018 and once
on September 12, 2018. At the time, the parties designated the transcripts "Attorneys' Eyes Only."

67.     According to Gupta's sworn deposition testimony, in January 2017, Orianna informed Omega that it could not pay rent. Gupta testified that in January 2017 Harris Schwartzberg called Defendant Pickett, informing him "that things are really bad. . . . We're going to have tough time making January's rent." According to Gupta between January and September 2017, when Omega began restructuring its relationship with Orianna, "[t]he debtors were not paying Omega any rent" and Omega was "in discussions with [Orianna] with regard to the unpaid rent" and Orianna's performance, "trying to figure out a way to make it all work without restructuring." Gupta called Orianna's and Omega's efforts from January 2017, when Omega ceased paying rent, until September 2017 the "workout mode." In September 2017, Omega shifted to "restructuring mode." According to Gupta, Omega entered restructuring mode "when it got to the, now we need to restructure or something really bad is going to happen." Indeed, Gupta testified, "Orianna presented to us their outstanding liabilities all across-the-board. And we go, this will never work."

68.     Orianna never paid rent at any time in 2017. In response to a question asking how the discussions between Omega and Orianna began, Gupta testified that "Omega regularly monitors our operators, the financial performance of our operators. So the performance of Orianna had been slipping even well into 2016, but it never came to an issue where they would not be able to pay us rent." He continued that "[w]e were discussing with them why performance was down. We were having regular meetings. We were trying to understand what was going on." Gupta concluded that "[i]t had never gotten to the point where they were not going to be able to pay us rent until January of 2017." The first time Orianna missed a rent payment was in January 2017. In response to a question about whether "[Orianna's] inability or not paying rent, did that continue through 2017," Gupta testified that with the exception of "some very small partial payments,"

"yes." In response to a question, asking "[b]ut they were not able to satisfy the full monthly rent at any time," Gupta testified, "not even close."

69.     Gupta testified that sometime in or around September 2017, on Orianna's behalf, Ankura, the advisor Orianna hired on May 8, 2017, "presented to us kind of a balance sheet that showed their liabilities, what was out there. And you put that on top of all the rent they owed us, we knew this wasn't going anywhere good."

70.     Even before that, with respect to Orianna's periodic reporting to Omega, according to Gupta, "we had monthly financial statements. . . [f]or each of the facilities, which we then put into our own systems here at Omega and we analyzed them and kind of do a – we do various testing." Gupta continued, testifying "[b]ut one of – the most important one is a rent coverage ratio to make sure there is ample bottom-line income to cover our rent." Omega, Gupta stated, noticed Orianna's "slipping" performance in "late 2015" when Omega noticed "slippage" in Orianna's rent coverage ratio. Gupta defined rent coverage ratio as "EBITDAR divided by rent."[13]

71.     Again, according to Gupta, Orianna's "[p]erformance was declining at the facilities. Census was down. Revenue was down. Payor mix was down. Overall performance was down." In response to a question asking whether Orianna's condition improved at any time during 2017, Gupta testified, "I don't remember on a month to month basis. There may have been some ups and downs, but nothing where it was getting back to normal levels." Even before 2017, however, with the Orianna financials Omega received monthly, Defendants saw that Orianna's North West and Texas SNFs were performing poorly with rent increases looming for each. The South East SNFs were also underperforming with a rent increase scheduled for January 1, 2018.

---

[13] EBITDAR is earnings before interest, taxes, depreciation, amortization, and rent/restructuring costs.

72.     According to the Unsecured Creditors' Complaint, Orianna proposed that Omega accept Orianna's security deposit as payment for the first quarter 2017 rent. Omega refused. Gupta confirmed that at the time he informed Defendant Pickett that Orianna could not pay its rent, Harris Schwartzberg asked, "can you use our security deposit?" According to Gupta, he and Defendant Pickett said "[n]o. It's your call if you want to pay us rent or not, but we're not using your security deposit."

73.     In sworn deposition testimony,[14] Defendant Pickett confirmed his actual knowledge that Orianna informed Omega that it could not pay rent as of January 2017. Defendant Pickett testified that "[s]ometime in very late 2016 or early 2017 was the first indication we had that Orianna might have difficulty making their monthly rent payment" to Omega. Pickett testified that while he did not "remember specific dialogue" around that time, he was aware that Orianna failed to pay rent in January 2017. He testified further that in early January 2017, the time Orianna missed its January 2017 rent payment, "we were engaged in active discussions with the management team at Orianna about their ability to pay, the nature of their issues, what the solutions might be."

74.     Under the terms of the Master Leases, Orianna was responsible for paying rent "in advance in consecutive monthly installments payable on the first day of each month during the Term commencing on the Commencement Date." Under the terms of the Master Leases, therefore, Omega and Pickett, himself, knew from no later than very early January 2017 that Orianna would not and then did not pay rent.

---

[14] The Unsecured Creditors Committee deposed Defendant Pickett on September 12, 2018, and the parties designated the transcript "Attorneys' Eyes Only."

## Omega Intervenes in Orianna's Liquidity Crisis

75.     About that time, according to Pickett's testimony, Orianna was "optimistic that they would be able to improve performance of that portfolio. They, in particular, pointed out," he continued, "struggles in the Northwest Portfolio, which was its own separate lease of the four leases within Orianna." In addition to its concerns with the North West SNFs, Defendant Pickett stated, Orianna "expressed some concern around the Texas Portfolio and indicated a high level of optimism that they had taken steps to improve the cash flow of the balance of the portfolio."

76.     During the first quarter of 2017, Defendant Pickett continued, "we agreed that we would sell or release the Northwest Portfolio, which they indicated was a significant drain on cash. We would look at permanently moving the Texas Portfolio out; and that with those things and the operational improvements," Orianna conveyed to Omega, "they felt they could make, they would be back on track to pay full rent."

77.     In his testimony, Gupta confirmed that from early January 2017, Orianna "started giving us proposals of ways to fix the problem, but it took us a few months to get our arms around that. We started asking for tons of facts, tons of information. We started asking for payables, balance sheets, management fee schedules, intercompany payments, distributions." Prior to January 2017, however, Omega had focused solely on Orianna's ability to pay rent, ignoring, for the most part, that material trade payables continued to accrue prior to 2017. Gupta continued, "[w]e wanted to know what was going on because they were asking for a note from us, a second AR note, which becomes a working capital note later on in this story." According to Gupta, Orianna requested a loan from Omega, but "we go, no money. We need to know what's going on first."

78.     According to Gupta, Orianna asked for cash to assist it in continuing to work-out its issues, including "selling off the Northwest; keep doing some of this other stuff; this will all

come together with these different pieces." Gupta continued that in return, Orianna proposed that

the note that "would be collateralized by a second position in the AR.[15] You know, we-could look

at the borrowing base that we had with Sterling [National Bank] and notice that there was

additional receivables there. So they're offering the receivables post Sterling as collateral." That

is, in exchange for a loan from Omega, Orianna offered as collateral its accounts receivable beyond

those it used to secure other borrowings from another lender, Sterling National Bank.

79.     Thus, both Pickett and Gupta testified about Omega's efforts during the first quarter

of 2017 to investigate thoroughly Orianna's struggles and to impose workable solutions during the

workout mode. In early May, 2017, Defendants disclosed publicly for the first time Orianna's

problems and the efforts to resolve Orianna's problems, claiming that they "spent an enormous

amount of time understanding the plan," and that they "f[elt] pretty comfortable that [Orianna is]

going to come back with coverages at their previous level. . . ."

80.     At the same time as they expressed that comfort, however, Defendants were

negotiating to hire Ankura and Robichaux. Again, according to Robichaux, Orianna engaged

Ankura on May 8, 2017, only days after Defendants' expression of comfort with Orianna's plan.

As Gupta testified, Omega "ha[d] experience with Ankura." Omega, Gupta agreed, "wanted

somebody in to kind of help fix the problems." With Defendants' knowledge and approval,

therefore, Orianna hired Ankura to fix problems that Defendants had already claimed publicly that

Orianna had a plan to fix, that Defendants had spent an enormous amount of time understanding

that plan, and that they were comfortable Orianna's plan would yield positive results.

81.     More, upon hiring Ankura in early May 2017, Gupta and Defendants Pickett and

Booth engaged in discussions with Ankura about Orianna's financial situation. Notwithstanding

---

[15] "AR" is accounts receivable.

Defendants' early May 2017 public statements, expressing comfort with Orianna's plan, Gupta testified that he thought that Omega's discussions with Ankura during the spring of 2017 "was a matter of always just understanding what's going on to change things; what's the outlook; what's going to happen?" Prior to September 2017, Gupta remembered no discussion with Ankura about "potential restructuring alternatives or financing."

82.     Gupta did, however, recall that throughout workout mode, "there was always discussions about transferring assets . . ., various ideas that came along moving certain facilities to certain different operators or even to other affiliated entities of Orianna such as Gulf Coast." Gupta testified that "in an ideal world, Omega would have loved to just take these buildings all back and release them to new operators. We would have done it months ago." Omega avoided that, Gupta testified, because removing a nursing home operator from a nursing home "is not an easy process. . . . [F]or this many buildings in this many states, it would take months and millions of dollars to get them out, including evictions." Gupta continued that "[i]nstead of going up against Orianna and trying to kick them out of all of these buildings, let's come up with a plan with them. Maybe recoup some of our investment and release some of the buildings."

83.     With respect to Omega's goal as the workout mode progressed to the restructuring mode, Gupta testified:

> The goal of Omega's -- the primary goal was to release every building so we could start getting rent back in the door. Orianna is one of our largest operators. So the moment they stopped paying us rent, it was bad. So our number 1 goal has always been to put our buildings back to works and start collecting rent again. Ideal world, we would have done that with every building. But we knew that was going to be a big fight. So instead, we're like, let's see what they have to offer. Let's see if we can figure this out so we don't have to get into an endless legal battle.

84.     Both before and throughout the Class Period, Omega claimed to be constantly vigilant about the ability of its operators to meet their rent and/or mortgage obligations. In addition, both before and throughout the Class Period, Omega was focused on the pressures faced by several of its operators that had the potential to affect those operators' liquidity. Notwithstanding the problems that had plagued Orianna for well over a year, problems Omega was aware of well before the Class Period, it was not until Omega's May 4, 2017 earnings conference call ("May 4 Call") to discuss the First Quarter 2017 financial results that Defendants began disclosing Orianna's financial issues. During the May 4 Call, Defendant Booth described the state of Omega's asset portfolio, as follows:

> As of March 31, 2017, Omega had an operating asset portfolio of 972 facilities, with approximately 99,000 operating beds.
>
> These facilities were spread across 77 third-party operators and located within 41 states and the United Kingdom. Trailing 12-month operator EBITDARM and EBITDAR coverage for our portfolio increased slightly during the fourth quarter of 2016 to 1.69x and 1.33x, respectively versus 1.68x and 1.31x, respectively for the trailing 12-month period ended September 30, 2016. The pressures on portfolio performance experienced in 2016, such as increased labor costs and decreased lengths of stay have begun to show some signs of stability in the fourth quarter results, as well as year-to-date results in the first quarter.

85.     Booth went on to discuss the operational struggles Orianna faced (without mentioning Orianna by name) in 2016, describing positively Omega's hands-on approach to correcting Orianna's problems:

> One private top 10 operator, of note, however, felt the performance pressure more than most. This was exacerbated in 2016 by complete replacement of senior management early in the year.
>
> The new management team well known and respected by Omega worked throughout 2016 to transform the culture of the company, which included changing out many facility-level management teams. During this transition period, the company's operational

34

performance suffered such that the portfolio dipped below 1x EBITDAR coverage for the trailing 12 months ended December 31, 2016.

In an effort to assist the company during this transitional period, Omega embarked on an effort to sell off the company's northwest region, which consisted of 7 facilities. This region has struggled of late and given its geographical remoteness, has been difficult to oversee.

We anticipate the sale of all 7 facilities in that region to be completed by the second quarter of 2017, with 3 facilities having already been sold.

86.    Far from stabilizing Orianna, however, by the May 4, 2017 Earnings Call, Defendants knew not only that Orianna had failed to pay rent since January, 2017 but that on May 2, 2017 *Omega secretly provided Orianna with a "Working Capital Loan," disclosing nothing about that loan to the market*. Omega surreptitiously extended the Working Capital Loan through a subsidiary, OHI Asset RO, LLC, lending Orianna up to $18.8 million for working capital. In its March 6, 2018 motion seeking to obtain post-bankruptcy-petition financing ("DIP Financing Motion"), Oriana described the Working Capital Loan as follows:

Pursuant to the Working Capital Loan Agreement, dated May 2, 2017 (the "Working Capital Loan Agreement" and together with all related agreements, documents, and instruments, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Working Capital Documents" and, together with the Master Lease Documents, the "Prepetition Documents"), OHI Asset RO, LLC, as lender (the "Working Capital Lender" and collectively with the Master Lease Parties, the "Prepetition Secured Parties"), which is an Omega Party, provided an $18.8 million line of credit to the Debtors listed as "Borrowers" on Schedule 2 thereto (the "Working Capital Debtors") for working capital expenses (the "Working Capital Loan"). *Most of the proceeds of the Working Capital Loan were used by the Debtors to pay rent and real property taxes* with the remainder used for other Debtor operating expenses. *As of the Petition Date, the outstanding principal balance under the Working Capital Loan Agreement is approximately $15 million* (together with all other amounts incurred

or accrued prior to the Petition Date, the "Working Capital Obligations"). (Emphasis added).

87.     Orianna made an initial and only draw on the Working Capital Loan of $15 million. The Working Capital Loan required Orianna to pay monthly at least one-half of the 9% interest accrued on the outstanding principal during the previous month. Omega rolled into the principal amount of the Working Capital Loan all remaining, unpaid interest. Even as Orianna paid monthly interest payments, it never repaid any portion of the $15 million principal.

88.     In other words, while telling the market that Orianna had stabilized somewhat, creating the impression that Omega had scrutinized Orianna's recovery plan and that its investment was under control, Omega hid from the market that it had just lent Orianna $15 million principally to **pay rent back to Omega**. Notwithstanding that Orianna had sought a loan from Omega in January 2017, Omega took nearly 4 months to make the Working Capital Loan. By the time Omega made the Working Capital Loan available to Orianna, Orianna was 120 days delinquent on its rent obligations.

89.     Critically, without the Working Capital Loan, as of March 31, 2017, Orianna would have been 90 days delinquent in paying Omega rent. As Gupta testified, "[h]ad Omega not made that working capital loan to [Orianna]," Orianna would not "have been in a position to pay rent to Omega." Gupta continued with respect to Orianna using the Working Capital Loan proceeds to pay rent, "[a]nd that was a very small partial payment based on everything that was due to [Omega]. By no means was it like, now we're back on track. It was just one piece of trying to help solve their puzzle." Indeed, as of Orianna's March 6, 2018 bankruptcy petition, its "Prepetition Unpaid Rent & Expenses" were $53,306,834.11 and the outstanding balance on the Working Capital Loan was $15,241,670.33.

90.     Upon information and belief, Omega made the Working Capital Loan to Orianna either from its cash on hand, or by drawing on Omega's own revolving line of credit.[16] According to Omega's public filings, the Company reported $40,349,000 in cash or cash equivalents as of March 31, 2017, and reported an outstanding balance of $123,000,000 on its revolving line of credit. As of June 30, 2017, the Company reported $21,031,000 in cash or cash equivalents, and an outstanding balance of $155,000,000 on the Company's revolving line of credit. Thus, on May 2, 2017, Omega made a surreptitious loan to one of its largest operators that amounted to approximately 46.6% of its available cash, or 12% of the outstanding balance of its revolving credit facility. It disclosed nothing to the market.

91.     Even as they failed to disclose the Orianna Working Capital Loan, Defendants understood the materiality of a Working Capital Loan. For example, in its 2017 10-K Annual Report, filed February 23, 2018, Omega disclosed the following concerning the mere negotiations surrounding a working capital loan to another struggling top-ten operator, Signature:

> A second operator, Signature Healthcare ("Signature") has also fallen more than 90 days past due on rent, we believe primarily as a result of restrictions on their borrowing capacity and significant professional and general liability claims. A large majority of Signature's past due rent is covered by a letter of credit in excess of $9.0 million and guarantees from the principals of Signature. Despite their current liquidity concerns, we believe we have a path to continue our long standing relationship with Signature under a long term consensual restructure outside of a court-involved restructuring that involves multiple third-party constituents (i.e., Sabra Heath Care REIT, Inc., the United States Department of Justice, and other third-party claimants). ***We are working towards finalizing a comprehensive settlement agreement amongst Signature and their three primary landlords which will effectively bifurcate each of the three portfolios into three distinct legal silos and separate virtually all legal obligations. As part of this agreement, Omega has agreed to defer certain rent payment***

---

[16] Omega lists OHI Asset RO LLC as a direct or indirect wholly owned subsidiary and claims to eliminate intra-company transactions in consolidating its financial statements.

> ***obligations and provide for a working capital loan.*** While we
> cannot predict the final outcome with these third-party constituents,
> we are optimistic that an out of court restructure can be realized.
> (Emphasis added).

In the case of Signature, Omega disclosed that it had agreed to provide Signature with a working capital loan, before that loan was even closed or funded. In the case of Orianna, however, Omega did not disclose the Working Capital Loan to the market.

92.     Thus, by the beginning of the Class Period, Defendants knew or recklessly disregarded that Orianna, Omega's second largest operator, had not paid rent since January 2017, could not pay any rent whatsoever without the Working Capital Loan, and that the January 1, 2018 rent increase on the South East Master Lease was fast approaching. In addition, Orianna was unable to pay real estate taxes on its SNFs. Defendants knowingly and surreptitiously lent Orianna $15 million to avoid disclosing to the market both that Orianna had not and could not pay any rent just as the Master Leases required increased rental payments, and that Orianna's inability to pay rent would have a material adverse impact on Omega's financial results.

## DEFENDANTS' OBLIGATIONS UNDER SEC REGULATIONS AND GAAP

93.     SEC regulations govern the content of registrants' disclosures in their filings with the SEC. SEC Regulation S-K requires that every Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

94.     Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (i.e., Forms 10-Q and 10-K), among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

95.     Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

96.     As set forth above, Defendants violated the affirmative duties imposed by Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose the following material information in the May 5th 10-Q during the Class Period: that the risk set forth in Omega's stated "Risk Factors" had materialized with respect to Orianna, Omega's second largest operator. By making the $15 million Working Capital Loan to Orianna to allow Orianna to make rent payments to Omega, Defendants were able to report their own cash (or their own borrowing under their own revolving line of credit) as FFO. Thus, Defendants knew as of May 2, 2017 that Orianna could not pay either its rent payments to Orianna or its real estate taxes on its facilities. Therefore, not only had the risk materialized, but only by lending Orianna money was Omega able to immunize its FFO from a material decline.

97.     Item 303 required Defendants to disclose the facts that Defendants concealed, first in the 2016 10-K about Orianna's 2016 critical financial and operational problems, and then about the Working Capital Loan. Those facts were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations." Defendants' failure to disclose these facts rendered their Class Period disclosures materially false.

98.     Further, during the Class Period, Rule 10-01 of SEC Regulation S-X, 17 C.F.R. § 210.10-01(a)(5), required registrants to provide in their interim reports "disclosure . . . where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant." Similarly, under GAAP, ASC 855-20-20 and ASC 855-10-50-20 obligate disclosure in the notes to the financial statements of a "nonrecognized subsequent event," an event "provid[ing] evidence about conditions that did not exist at the date of the balance sheet but arose subsequent to the" reporting period "of such a nature that [it] must be disclosed to keep the financial statements from being misleading." Thus, because of the qualitative and quantitative materiality of the Working Capital Loan in the context of Orianna's ongoing operational and financial crisis as it related to Omega's financial results for the first and second quarters of 2017, Defendants were duty-bound to disclose all material facts related to Orianna's struggles, including the Working Capital Loan.

## MATERIALLY FALSE AND MISLEADING
## <u>STATEMENTS ISSUED DURING THE CLASS PERIOD</u>

99.     The Class Period begins on February 8, 2017. On that date, Defendants issued a

press release, announcing fourth quarter 2016 financial results and that Omega had increased its

dividend during both the fourth quarter of 2016 and the first quarter of 2017 by $0.01 each quarter

to $0.62 per share.

> Pickett: Our record quarterly Adjusted FFO of $0.88 per share and
> FAD of $0.80 per share is a strong testament to the strength of our
> operating model against the backdrop of an increasingly difficult
> operating environment. We share the industry leadership and
> investor concerns that increasing labor and liability costs and
> evolving reimbursement models may put near term financial strain
> on many operators within our industry." Mr. Pickett, continued, "In
> light of these concerns, we are pleased to have built a conservative
> balance sheet allowing us to manage through this uncertainty while
> delivering superior earnings and reliable dividends.
>
> During the fourth quarter of 2016, the Company sold 18 facilities
> for approximately $104.8 million in net proceeds recognizing a gain
> of approximately $30.3 million. Eleven of the sold facilities were
> previously classified as assets held for sale. No provisions for
> impairment were recorded in the fourth quarter of 2016. The
> Company's strategy to prune underperforming assets and non-
> strategic relationships resulted in the sale of 38 facilities for $169.6
> million in cash proceeds resulting in a gain of $50.2 million for the
> year ended December 31, 2016. As part of that process, the
> Company recorded $58.7 million of asset impairments in 2016.

100.     The foregoing statements were false and misleading. In the context of then-current

"financial strain on many operators" and Pickett's emphasis on Omega's strength and conservative

financial planning, Defendants knew or recklessly disregarded that (a) Orianna had suffered from

critical financial and operational problems in 2016 of which Defendants had actual knowledge, (b)

in late December 2016 or early January 2017, Orianna had informed Defendants directly—

including Defendant Pickett—that it would be unable to pay rent for the foreseeable future, and

(c) that, in fact, Orianna did not pay rent in January or February 2017. Given that Orianna's rent

payments were material to Omega's financial results, Orianna's ongoing financial and operational challenges rendered Defendants' statements about Omega's fourth quarter 2016 results, while technically true, materially misleading.

101.    On February 9, 2017 at 3:00pm, Defendants convened the February 9 Earnings Call. BofA Merrill Lynch Analyst Juan Sanabria asked, "Okay, great. Last one for me, have you had any discussions with Signature, one of your larger tenants, about any rent relief or rent cuts?" Defendant Stephenson responded:

> We've had ongoing conversations with Signature but we've had no conversations about any rent relief or rent cuts. We've had conversations with -- and I really hate to highlight individual names, but with Signature and with a lot of our other operators, quite frankly, about what can we do -- we talked about repositioning of our portfolio, what can we do to help them and whether it involves perhaps the sale of a few buildings that don't otherwise fit into their markets or their portfolio to a third party. If it involves the releasing of some of their facilities to another party, maybe even a closure of a building in the worst-case scenario. Those are the type of things that we're talking about with Signature and with a couple of other operators quite frankly. And that's what we will continue to do in 2017.

102.    The foregoing was false and misleading. In the context of Defendants' discussion regarding the trouble that Omega's operator, Signature, faced, Defendants were duty-bound to disclose that Orianna, Omega's second largest operator, had experienced financial and operational problems throughout its history that became critical in 2016, that in early 2016, Defendants, themselves, directly intervened in an attempt to stabilize Orianna, and that in late December 2016 or early January 2017 Orianna had informed Defendants directly—including Defendant Pickett— that it would be unable to pay rent for the foreseeable future and that, in fact, it did not pay rent in January and February 2017. Their failure to disclose Orianna's circumstances and their efforts to stabilize it rendered their statements about Signature and "our other operators," while technically

accurate, materially misleading. Defendants knew or recklessly disregarded that Orianna's problems were material. Signature was Omega's third largest operator while Orianna was its second. This rendered Defendants duty-bound to disclose Orianna's crisis, including that it had not paid rent in January or February 2017 and had no prospects at that time to resume paying monthly rent.

103.    During the February 9 Earnings Call, analyst Michael Gorman asked, "given some of the stresses on the operators right now, Bob, there hasn't been any change in terms of reserving against any straight-line receivables or anything, correct?" in response, Defendant Stephenson stated, "No. No changes at all."

104.    The foregoing was materially false. Defendants knew or recklessly disregarded that Orianna, Omega's second largest operator, had experienced critical financial and operational problems that became acute in 2016, requiring Defendants' direct intervention, and that in late December 2016 or early January 2017 it had informed Defendants directly—including Defendant Pickett—that it would be unable to pay rent for the foreseeable future and that, in fact, it did not pay rent in January and February 2017. As such, even as Defendants' statements that there had been no changes in reserving against any of its receivables may have accurately reflected Omega's accounting, in light of Orianna's continuing critical financial and operational problems and its failure to pay rent in 2017 these statements were materially misleading.

105.    During the February 9 Earnings Call, with respect to coverage ratios, analyst Michael Knott of Green Street Advisors asked Defendant Pickett directly, "it seems like you're suggesting that maybe we will get down to the high 1.2 range but maybe not much lower than that." Knott continued, asking, "Hoping you can help me understand how it might not be worse than that just based on the roughly 10 bps of decline we've seen in the last several quarters." In

response, Pickett replied, "I think part of it is that the decline hasn't been at the revenue line." Defendant Pickett continued:

> Our operators have managed to maintain relatively flat census. So that's an important component. And then you look at the expense side of the equation and it's tough to predict labor but there's nobody in our group of operators saying labor is going to be a 5% component of the increase. But it's continued to put pressure on us. So as long as census continues to hold up, and we think it should, then it's really managing the expense side of the equation. And these guys are pretty effective at it but that's not to say that labor is not going to pressure them throughout the year.

106.    The foregoing was false and misleading. Defendants knew, according to Gupta, that Orianna's "[p]erformance was declining at the facilities. Census was down. Revenue was down. Payor mix was down. Overall performance was down." Thus, Defendants knew or recklessly disregarded that Orianna, Omega's second largest operator, had suffered financial and operational problems that became critical in 2016 that were materially dissimilar from industry pressures that other operators faced, and that Orianna had not paid rent in two months and had informed Defendants that it would be unable to pay rent for the foreseeable future.

107.    During the February 9 Earnings Call, analyst Nick Yulico of UBS asked, "going back to the idea that your operators may face some more strain, if we go to your tenant buckets and the 27% of your rent where coverage is below 1.2, are you having conversations with these operators about rent relief or lower [rent] escalators?" In response, Defendant Stephenson said, "No and no." Defendant Stephenson continued:

> I think I went through in some detail what we are going through with these operators, which is how do we call or reposition some of the assets within their portfolios, which in effect has the effect of reducing rent to some degree and to the extent that you sell off one of their buildings and you provide them with a rent cut that's equal to the amount of the sales proceeds times some cap rate, call it 9%. So in that way, yes, they would get a rent haircut and it does ultimately benefit them. And it takes away some of their time that

they're focused on facilities that might otherwise be taking up an undue amount of their time. So, we are having those conversations.

108.    The foregoing was false and misleading. Defendants knew or recklessly disregarded that Orianna's financial distress was acute, that it had not paid rent in two months, and that Defendants were actively selling Orianna's Northwest and Texas SNFs.

109.    On February 24, 2017, Defendants filed the 2016 10-K. In the 2016 10-K, Defendants caused Omega to include material risk disclosures. Generally, with respect to risks, the 2016 10-K states:

> Following are some of the risks and uncertainties that could cause the Company's financial condition, results of operations, business and prospects to differ materially from those contemplated by the forward-looking statements contained in this report or the Company's other filings with the SEC. These risks should be read in conjunction with the other risks described in this report, including but not limited to those described in "Taxation" and "Government Regulation and Reimbursement" under "Item 1" above. The risks described in this report are not the only risks facing the Company and there may be additional risks of which the Company is not presently aware or that the Company currently considers unlikely to significantly impact the Company. Our business, financial condition, results of operations or liquidity could be materially adversely affected by any of these risks, and, as a result, the trading price of our common stock could decline.

110.    In particular, Defendants warned of risks related to Omega's operators, stating:

> **Risks Related to the Operators of Our Facilities**
>
> Our financial position could be weakened and our ability to make distributions and fulfill our obligations with respect to our indebtedness could be limited *if our operators, or a portion thereof, become unable to meet their obligations to us or fail to renew or extend their relationship with us as their lease terms expire or their mortgages mature*, or if we become unable to lease or re-lease our facilities or make mortgage loans on economically favorable terms. We have no operational control over our operators. Adverse developments concerning our operators could arise due to a number of factors, including those listed below.

> ***The bankruptcy or insolvency of our operators could limit or delay our ability to recover on our investments.***
>
> ***We are exposed to the risk that a distressed or insolvent operator may not be able to meet its lease, loan, mortgage or other obligations to us or other third parties***. This risk is heightened during a period of economic or political instability. Although each of our lease and loan agreements typically provides us with the right to terminate, evict an operator, foreclose on our collateral, demand immediate payment and exercise other remedies upon the bankruptcy or insolvency of an operator, title 11 of the United States Code (the "Bankruptcy Code") would limit or, at a minimum, delay our ability to collect unpaid pre-bankruptcy rents and mortgage payments and to pursue other remedies against a bankrupt operator. While we sometimes have third party guarantees of an operator's lease or loan obligations, such guarantees can be expensive to enforce, and have their own risks of collection as against the guarantors. (Emphasis in original and added)

111.    The foregoing risk disclosure was false or misleading because Defendants knew or recklessly disregarded that this risk had already materialized with respect to Orianna. Defendants knew or recklessly disregarded that throughout its history, Orianna had experienced financial, operational, and liquidity distress that became acute in 2016, causing Defendants to intervene with changes to Orianna's management and operational culture. More, in late December 2016 or early January 2017 Orianna had informed Defendants directly—including Defendant Pickett—that it would be unable to pay rent for the foreseeable future and that, in fact, it did not pay rent in January and February 2017. In addition, not only was Orianna unable to pay rent, but by the end of 2016, its unpaid trade payables were in the tens of millions of dollars forcing a choice of paying Omega or paying trade payables. Even if, therefore, Orianna was able to resume paying rent, its liquidity was poor, and its solvency in jeopardy. As such, Defendants were duty-bound to disclose that with respect to Orianna, the risks of which it warned had materialized.

112.    In the 2016 10-K, with respect to Orianna, Defendants stated:

On November 27, 2013, we closed an aggregate $529 million purchase/leaseback transaction in connection with the acquisition of Ark Holding Company, Inc. ("Ark Holding") by 4 West Holdings Inc. At closing, we acquired 55 SNFs and 1 ALF operated by Ark Holding and leased the facilities back to Ark Holding, now known as New Ark Investment Inc. ("New Ark"), pursuant to four 50-year master leases with rental payments yielding 10.6% per annum over the term of the leases. The purchase/leaseback transaction is being accounted for as a direct financing lease.

The lease agreements allow the tenant the right to purchase the facilities for a bargain purchase price plus closing costs at the end of the lease term. In addition, commencing in the 41st year of each lease, the tenant will have the right to prepay the remainder of its obligations thereunder for an amount equal to the sum of the unamortized portion of the original aggregate $529 million investment plus the net present value of the remaining payments under the lease and closing costs. In the event the tenant exercises either of these options, we have the right to purchase the properties for fair value at the time.

The 56 facilities represent 5,623 licensed beds located in 12 states, predominantly in the southeastern United States. The 56 facilities are separated by region and divided amongst four cross-defaulted master leases. The four regions include the Southeast (39 facilities), the Northwest (7 facilities), Texas (9 facilities) and Indiana (1 facility).

Additionally, we own four facilities and lease them to New Ark under a master lease which expires in 2026. The four facility lease is being accounted for as an operating lease.

113.   The foregoing was false or misleading because Defendants knew or recklessly disregarded that Orianna had experienced financial, operational and liquidity problems that became acute in 2016, causing Defendants to intervene with wholesale changes to Orianna's management and operational culture and having already begun selling Orianna's Northwest and Texas facilities, representing more than 28% of Orianna's total SNFs. More, in late December 2016 or early January 2017 Orianna had informed Defendants directly—including Defendant Pickett—that it would be unable to pay rent for the foreseeable future and that, in fact, it did not

pay rent in January and February 2017. Together, these facts of which Defendants had actual knowledge rendered the 10.6% per annum yield of which Defendants boasted materially misleading.

114.    The 2016 10-K MD&A was also materially false because in the face of a clear duty, Defendants knowingly or recklessly omitted that Orianna's financial, operational, and liquidity problems had become acute in early 2016, causing Defendants to intervene with wholesale management changes and operational challenges, and that in late December 2016 or early January 2017 Orianna had informed Defendants directly—including Defendant Pickett—that it would be unable to pay rent for the foreseeable future and that, in fact, it did not pay rent in January and February 2017. As material events that occurred both during 2016 and subsequently, in 2017, Item 303 required registrants to disclose Orianna's financial, operational, and liquidity distress in the 2016 10-K's MD&A, "unusual or infrequent events or transactions . . . that materially affected the amount of reported income from continuing operations" and "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

115.    In addition, the financial statements Defendants included in the 2016 10-K were materially false, in violation of GAAP. ASC 855 required Defendants to disclose in Omega's Notes to the Financial Statements all material "nonrecognized subsequent event," "provid[ing] evidence about conditions that did not exist at the date of the balance sheet but arose subsequent to the" reporting period "of such a nature that [it] must be disclosed to keep the financial statements from being misleading." Thus, in addition to Defendants' Item 303 disclosure obligations, requiring Defendants to disclose in the 2016 10-K's MD&A that Orianna had experienced a financial and operational crisis in 2016, GAAP required them to disclose in the Notes to the

48

Financial Statements in the 2016 10-K that Orianna informed Defendants in early 2017 that it would not be able to pay rent going forward and that, in fact, Orianna did not pay rent in either January or February 2017 and would be unable to pay rent for the foreseeable future. In violation of clear duties to disclose, Defendants' knowing or reckless failure to disclose Orianna's 2016 financial, operational, and liquidity problems and its early 2017 rent delinquency rendered the 2016 10-K materially misleading for omitting that information, of which Defendants had actual knowledge or recklessly disregarded.

116.    On May 3, 2017, the Company issued a press release ("May 3 Press Release") titled "Omega Announces First Quarter 2017 Financial Results; Increased Dividend Rate for 19th Consecutive Quarter." In the May 3 Press Release, Defendants disclosed GAAP Net Income for the first quarter, stating, "the Company reported net income of $109.1 million, or $0.53 per common share, on operating revenues of $231.7 million. This compares to net income of $58.2 million, or $0.29 per common share, on operating revenues of $212.9 million, for the same period in 2016." Defendants continued, attributing the increase in 2017 "to revenue associated with new investments completed in 2016, a one-time contractual settlement in 2017 and the reduction in impairments on real estate assets and acquisition costs." They concluded that the "increase in net income was partially offset by $7.6 million in increased depreciation and amortization expense, $1.1 million in incremental general and administrative expenses and $1.0 million in increased stock-based compensation expense." In addition, for the first quarter of 2017, Defendants reported FFO[17] of $181 million and AFFO of $176.7 million.

---

[17] In the 2016 10-K, Defendants defined FFO "as net income (computed in accordance with GAAP), adjusted for the effects of asset dispositions and certain non-cash items, primarily depreciation and amortization and impairment on real estate assets, and after adjustments for unconsolidated partnerships and joint ventures."

117.    The foregoing statements about Omega's net income, FFO, and AFFO in the May 3 Press release were materially false. At that time, Defendants knew that they had made the Working Capital Loan, lending Orianna $15 million, in material part to pay it delinquent rent for the first quarter of 2017.[18] As of May 3, 2017, Defendants knew too that Orianna had failed to pay rent in April and May 2017, meaning the adverse trend of Orianna's actual rent delinquency without the infusion for the Working Capital Loan continued unabated. Without the Working Capital Loan, therefore, Orianna could not have recognized revenues on Orianna leases and would have reported materially less net income than it did. As such, Defendants knew or recklessly disregarded that even as their disclosure about net income accurately reflected Omega's accounting, it was misleading. In turn, given that Defendants based their FFO and AFFO results principally on net income, without the Working Capital Loan Defendants would have reported materially less FFO and AFFO. As such, in light of its material impact on net income, FFO, and AFFO for the first quarter of 2017, Defendants knowingly or recklessly disregarded a clear duty to disclose the Working Capital Loan.

118.    On May 4, 2017, the Company held a conference call to discuss its first quarter results ("May 4 Earnings Call"). On the call, Defendant Booth stated the following with respect to Orianna:

> As of March 31, 2017, Omega had an operating asset portfolio of 972 facilities, with approximately 99,000 operating beds.
>
> These facilities were spread across 77 third-party operators and located within 41 states and the United Kingdom. Trailing 12-month operator EBITDARM and EBITDAR coverage for our portfolio increased slightly during the fourth quarter of 2016 to 1.69x and

---

[18] In their July 27, 2017 earnings conference call, Defendant Pickett disclosed that Orianna's annual rent obligation for 2017 was $44 million or approximately $11 million per quarter or just under $3.67 million monthly.

1.33x, respectively versus 1.68x and 1.31x, respectively for the trailing 12-month period ended September 30, 2016. The pressures on portfolio performance experienced in 2016, such as increased labor costs and decreased lengths of stay have begun to show some signs of stability in the fourth quarter results, as well as year-to-date results in the first quarter.

*One private top 10 operator, of note, however, felt the performance pressure more than most. This was exacerbated in 2016 by complete replacement of senior management early in the year.*

*The new management team well known and respected by Omega worked throughout 2016 to transform the culture of the company, which included changing out many facility-level management teams. During this transition period, the company's operational performance suffered such that the portfolio dipped below 1x EBITDAR coverage for the trailing 12 months ended December 31, 2016.*

In an ***effort to assist*** the company during this transitional period, Omega embarked on an effort to sell off the company's northwest region, which consisted of 7 facilities. This region has struggled of late and given its geographical remoteness, has been difficult to oversee.

We anticipate the sale of all 7 facilities in that region to be completed by the second quarter of 2017, with 3 facilities having already been sold.

119.   The foregoing statement was false or misleading. Defendants knew or recklessly disregarded that as of March 31, 2017, Orianna, its second largest operator, was 90 days delinquent on its rents, could not pay its real estate taxes, and owed tens of millions of dollars in unpaid trade payables. In addition, Defendants failed to disclose that in an effort to hide the actual duration of Orianna's delinquency Omega had taken additional, material "efforts to assist" Orianna, including lending Orianna $15 million on May 2, 2017, so that Orianna could cure its first quarter delinquency. In light of Defendants' disclosure about Orianna, they were duty-bound to disclose these material facts, and their failure to do so rendered their statements materially misleading.

120.     Later in the May 4 Earnings Call, Defendant Pickett engaged in the following colloquy concerning Omega's guidance for 2017:

>    **Nicholas Yulico** - UBS Investment Bank, Research Division - Executive Director and Equity Research Analyst- REIT's: Okay. And so going back to this tenant who is not current on rent, sounds like they missed a rent payment in the first quarter. I'm confused as to why then your guidance for the year doesn't get reflected? Why wasn't the guidance reduced if you have a tenant that's not paying rent? And still hasn't paid rent?
>
>    **Pickett:** Well, it's -- well, ***they're 45 days past due***, so it's a month and a half. We spent an enormous amount of time understanding the plan, and we look at Q1 with 1.09 coverage. Once the Northwest sale is executed, which we're halfway through, and we look at their plan going out throughout the rest of the year, and it's pretty clear if they hit their plan that we're going to be back to current. ***But frankly, at 45 days past due, to start fiddling around with guidance, just doesn't make any sense, we feel pretty comfortable that they're going to come back with coverages at their previous level, which is*** (inaudible). (Emphasis added).
>
>    **Nicholas Yulico**: Okay. But just so I make sure I understand this. Even if their coverage comes back, they still missed the whole rent payment, right? So why would their -- just because if their coverage gets -- improves going forward, why does that give you confidence that they'd be able to repay the rent payment that they already missed?
>
>    **Pickett**: Because by definition, if their coverage comes back, they have cash in excess of the rental obligation, which is cash that would then be paid to us. We're first in line, they can't move that cash outside their entity, that depends.

121.     The foregoing statement was false and misleading. Defendants' discussion of Orianna's condition rendered them duty-bound not to mislead investors. Defendants, however, knew or recklessly disregarded, but omitted to disclose, that Orianna's situation was materially more adverse than they disclosed and in no way whatsoever indicative that Orianna would recover and be able to satisfy its obligations in the near future. First, Defendants knew that Orianna was

not "45 days past due" but as of March 31, 2017 was 90 days past due, having not paid rent in January, February, or March 2017. Second, Defendants knew that Omega had lent Orianna $15 million through the Working Capital Loan, enabling Orianna to cure its rent delinquency for the first quarter. As of May 4, 2017, therefore, Orianna was not delinquent in rent payments of the first quarter of 2017. Yet Defendants chose to mislead that the delinquency persisted rather than disclose that Omega had lent Orianna $15 million to cure it. Third, Defendants knew that Orianna had failed to pay rent in either April or May 2017, indicating that its delinquency persisted and that its "coverage" was not greater than 1.0x. At the time of the above-referenced statements, then, Defendants were duty-bound but failed to disclose the existence of the $15 million Working Capital Loan and that but for the Working Capital Loan Orianna was, as of May 4, 2017, 124 days delinquent in rental payments and that its coverage ratio remained below 1.0x.

122.    On May 5, 2017, the Company filed the May 5 10-Q. The May 5 10-Q reaffirmed the Company's statements about its financial results contained in the press release issued on May 3, 2017.

123.    The foregoing statements in the May 5 10-Q about Omega's net income, FFO, and AFFO in the May 3 Press release were materially false. At that time, Defendants knew that they had made the Working Capital Loan, lending Orianna $15 million, in material part to pay it delinquent rent for the first quarter of 2017.[19] As of May 3, 2017, Defendants knew too that Orianna had failed to pay rent in April and May 2017, meaning the adverse trend of Orianna's actual rent delinquency without the infusion for the Working Capital Loan continued unabated. Without the Working Capital Loan, therefore, Orianna would not have been able to recognize

---

[19] In their July 27, 2017 earnings conference call, Defendant Pickett disclosed that Orianna's annual rent obligation for 2017 was $44 million or approximately $11 million per quarter or just under $3.67 million monthly.

revenues on Orianna leases and would have reported materially less net income than it did. As such, Defendants knew or recklessly disregarded that even as their disclosure about net income accurately reflected Omega's accounting, it was misleading. In turn, given that Defendants based their FFO and AFFO results principally on net income, without the Working Capital Loan Defendants would have reported materially less FFO and AFFO. As such, in light of its material impact on net income, FFO, and AFFO for the first quarter of 2017, Defendants knowingly or recklessly disregarded a clear duty to disclose the Working Capital Loan.

124.    In addition, the May 5 10-Q contained the following Note concerning the Company's direct financing leases, including the leases it held with Orianna:

> On November 27, 2013, we closed an aggregate $529 million purchase/leaseback transaction in connection with the acquisition of Ark Holding Company, Inc. ("Ark Holding") by 4 West Holdings Inc. At closing, we acquired 55 SNFs and 1 ALF operated by Ark Holding and leased the facilities back to Ark Holding, now known as New Ark Investment Inc. ("New Ark"), pursuant to four 50-year master leases with rental payments yielding 10.6% per annum over the term of the leases. The purchase/leaseback transaction is being accounted for as a direct financing lease.
>
> The lease agreements allow the tenant the right to purchase the facilities for a bargain purchase price plus closing costs at the end of the lease term. In addition, commencing in the 41st year of each lease, the tenant will have the right to prepay the remainder of its obligations thereunder for an amount equal to the sum of the unamortized portion of the original aggregate $529 million investment plus the net present value of the remaining payments under the lease and closing costs. In the event the tenant exercises either of these options, we have the right to purchase the properties for fair value at the time.
>
> The 56 facilities represent 5,623 licensed beds located in 12 states, predominantly in the southeastern U.S. The 56 facilities are separated by region and divided amongst four cross-defaulted master leases. The four regions include the Southeast (39 facilities), the Northwest (7 facilities), Texas (9 facilities) and Indiana (1 facility).

Additionally, we own four facilities and lease them to New Ark under a master lease which expires in 2026. The four facility lease is being accounted for as an operating lease.

***In March 2017, we executed sale agreements with two unrelated third parties to sell the 7 Northwest facilities with a carrying value of approximately $36.4 million for $34.0 million. As a result, we recorded an allowance for loss of approximately $2.4 million. For the three months ended March 31, 2017, we recognized approximately $0.8 million of direct financing lease income on a cash basis related to the Northwest facilities lease. The sale of these facilities is expected to close in the second quarter of 2017.*** (Emphasis added).

125.    The foregoing statements concerning Omega's actions in March 2017 were false and misleading. Defendants' discussion of Orianna's condition rendered them duty-bound not to mislead investors. Defendants, however, knew or recklessly disregarded, but omitted to disclose, that Orianna's situation was materially more adverse than they disclosed. Indeed, Defendants knew or recklessly disregarded that Omega was also working with Orianna to dispose of Orianna's Texas SNFs and that together with the Northwest SNFs, Orianna was seeking to divest itself of 28% of its total facilities. In addition, even with the sale of the Northwest facilities, Defendants were still unable to pay rent in April and May 2017.

126.    More, the foregoing statements were also false and misleading because, in the context of disclosing Omega's efforts to stabilize Orianna, Defendants knew or recklessly disregarded that they were duty-bound to disclose that Omega had lent Orianna $15 million through the Working Capital Loan, enabling Orianna to cover real estate taxes and to pay rent back to Omega. At the time of the above-referenced statements, then, Omega should have disclosed, but omitted, the existence of the $15 million Working Capital Loan, and the possibility that its direct financing leases with Orianna could be impaired. Together, these facts of which Defendants

had actual knowledge rendered the 10.6% per annum yield of which Defendants boasted materially

misleading.

127.    Also in the May 5 10-Q, the Company described its evaluation process for

determining the impairment of an asset, in relevant part, as follows:

> Management evaluates our real estate investments for impairment
> indicators at each reporting period, including the evaluation of our
> assets' useful lives. The judgment regarding the existence of
> impairment indicators is based on factors such as, but not limited to,
> market conditions, operator performance, legal structure, as well as
> our intent with respect to holding or disposing of the asset. If
> indicators of impairment are present, management evaluates the
> carrying value of the related real estate investments in relation to the
> future undiscounted cash flows of the underlying facilities.
> Provisions for impairment losses related to long-lived assets are
> recognized when expected future undiscounted cash flows based on
> our intended use of the property are determined to be less than the
> carrying values of the assets. An adjustment is made to the net
> carrying value of the real estate investments for the excess of
> carrying value over fair value. The fair value of the real estate
> investment is determined by market research, which includes
> valuing the property as a nursing home as well as other alternative
> uses. All impairments are taken as a period cost at that time, and
> depreciation is adjusted going forward to reflect the new value
> assigned to the asset. Management's impairment evaluation process,
> and when applicable, impairment calculations involve estimation of
> the future cash flows from management's intended use of the
> property. Changes in the facts and circumstances that drive
> management's assumptions may result in an impairment of the
> Company's assets in a future period that could be material to the
> Company's results of operations.

128.    Defendants knowingly or recklessly omitted from the May 5 10-Q, however, that

the Company had engaged in this evaluation process with respect to the Orianna leases, nor does

it indicate that as of the date of the 10-Q there existed the possibility of impairment.

129.    The May 5 10-Q also contains, in the notes to the financial statements, an entry

titled "Note 18 – Subsequent Events," which states as follows:

On April 4, 2017, we issued (i) $550 million aggregate principal amount of our 4.75% Senior Notes due 2028 (the "2028 Notes") and (ii) an additional $150 million aggregate principal amount of our existing 4.50% Senior Notes due 2025 (the "2025 Notes", and together with the 2028 Notes collectively, the "Notes"). The 2028 Notes mature on January 15, 2028 and the 2025 Notes mature on January 15, 2025.

The 2028 Notes were sold at an issue price of 98.978% of their face value before the underwriters' discount and the 2025 Notes were sold at an issue price of 99.540% of their face value before the underwriters' discount. Our net proceeds from the Notes offering, after deducting underwriting discounts and expenses, were approximately $690.7 million. The net proceeds from the Notes offering were used to (i) redeem all of our outstanding $400 million aggregate principal amount of 5.875% Senior Notes due 2024 (the "2024 Notes") on April 28, 2017, (ii) prepay the $200 million Tranche A-2 Term Loan Facility on April 5, 2017 that otherwise would have become due on June 27, 2017, and (iii) repay outstanding borrowings under our revolving credit facility. As a result of the redemption of the 2024 Notes, during the second quarter of 2017, the Company will record approximately $16.5 million in redemption related costs and write-offs, including $11.8 million for the call premium and $4.7 million in net write-offs associated with unamortized deferred financing costs.

130.    The foregoing statements concerning subsequent events were false and misleading. SEC Regulation S-X, 10-01(a)(5) and GAAP, ASC 855, both imposed a clear duty on Defendants to disclose the Working Capital Loan that Omega made on May 2, 2017 as a subsequent event with a material impact on Omega. Defendants knew or recklessly disregarded that Orianna, its second largest operator, could neither pay real estate taxes nor pay its rent to Omega, and that Orianna's circumstances were so dire that Omega lent Orianna $15 million on May 2, 2017, so that Orianna could pay rent back to Omega. In addition, given Orianna's actual condition, Defendants were duty-bound to disclose that Orianna continued not to pay rent in April and May 2017. In the face of this clear duty, Defendants' omission of both the Working Capital Loan and

Orianna's continued delinquency for the first two months of the second quarter rendered their Note on subsequent events materially false.

131.     The May 5 10-Q also states, under Item 1A – Risk Factors, that "[t]here have been no material changes to our risk factors as previously disclosed in Item 1A contained in Part I of our Annual Report on Form 10-K for the fiscal year ended December 31, 2016 and filed with the Securities and Exchange Commission ("SEC") on February 24, 2017." In its 2016 10-K, Omega disclosed the following risk factors, including, critically, that operators' failure to pay rent could weaken Omega's financial footing, resulting in operator insolvency and the possible inability of Omega to find a suitable replacement operator, stating in relevant part:

> Following are some of the risks and uncertainties that could cause the Company's financial condition, results of operations, business and prospects to differ materially from those contemplated by the forward-looking statements contained in this report or the Company's other filings with the SEC. These risks should be read in conjunction with the other risks described in this report, including but not limited to those described in "Taxation" and "Government Regulation and Reimbursement" under "Item 1" above. The risks described in this report are not the only risks facing the Company and there may be additional risks of which the Company is not presently aware or that the Company currently considers unlikely to significantly impact the Company. Our business, financial condition, results of operations or liquidity could be materially adversely affected by any of these risks, and, as a result, the trading price of our common stock could decline.
>
> **Risks Related to the Operators of Our Facilities**
>
> Our financial position could be weakened and our ability to make distributions and fulfill our obligations with respect to our indebtedness could be limited ***if our operators, or a portion thereof, become unable to meet their obligations to us*** or fail to renew or extend their relationship with us as their lease terms expire or their mortgages mature, or if we become unable to lease or re-lease our facilities or make mortgage loans on economically favorable terms. We have no operational control over our operators. Adverse developments concerning our operators could arise due to a number of factors, including those listed below.

### *The bankruptcy or insolvency of our operators could limit or delay our ability to recover on our investments.*

We are exposed to the risk that a distressed or insolvent operator may not be able to meet its lease, loan, mortgage or other obligations to us or other third parties. This risk is heightened during a period of economic or political instability. Although each of our lease and loan agreements typically provides us with the right to terminate, evict an operator, foreclose on our collateral, demand immediate payment and exercise other remedies upon the bankruptcy or insolvency of an operator, title 11 of the United States Code (the "Bankruptcy Code") would limit or, at a minimum, delay our ability to collect unpaid pre-bankruptcy rents and mortgage payments and to pursue other remedies against a bankrupt operator. While we sometimes have third party guarantees of an operator's lease or loan obligations, such guarantees can be expensive to enforce, and have their own risks of collection as against the guarantors.

132.    The foregoing risk disclosure was false and misleading because Defendants knew or recklessly disregarded that the risk of Orianna's, Omega's second largest operator, failing to meet its rent obligations to Omega had materialized no later than January 2017. By making the $15 million Working Capital Loan to Orianna to allow Orianna to make rent payments to Omega, Defendants were able to report their own cash as income, FFO, and AFFO. In addition, Defendants knew that but for the Working Capital Loan, Orianna's delinquency had grown to 125 days as of May 5, 2017 and that even with the Working Capital Loan, Orianna was delinquent again, having failed to pay rent in April or May 2017. Still further, Defendants knew that in addition to delinquent rent payments and the Working Capital Loan, Orianna owed tens of millions of dollars in trade payables. Thus, Defendants knew as of May 2, 2017 that Orianna could not pay either its rent payments to Orianna or its real estate taxes on its facilities. Therefore, not only had the risk materialized, but only by lending Orianna money was Omega able to immunize its net income and FFO from a material decline.

133.    Moreover, the May 5 10-Q was materially false because in the face of a clear duty, Defendants knowingly or recklessly omitted that Orianna's financial, operational, and liquidity problems were materially more adverse than Defendants disclosed and that as of March 31, 2017, Orianna's rent delinquency was 90 days, requiring Omega to lend Orianna $15 million. Notwithstanding that $15 million cash infusion, Defendants knew, but omitted, that Orianna had failed to pay its rent in April or May 2017. As material unusual events or transactions that masked a materially adverse trend—Orianna's persistent delinquency—Item 303 required Defendants to disclose that Omega had lent Orianna $15 million in material part to satisfy its $11 million first quarter rent obligation and that Orianna failed to pay its rent in April or May 2017 such that its delinquency was—but for Defendants' deliberate transfer of the obligation from delinquent rent to an "Other assets" on Omega's balance sheet—125 days as of May 5, 2017.

## OMEGA'S PARTIAL DISCLOSURE TO THE MARKET

134.    On July 26, 2017, after the market closed, the Company issued a press release entitled "Omega Announces Second Quarter 2017 Financial Results; Increased Dividend Rate for 20th Consecutive Quarter." Therein, the Company stated, in relevant part:

> ***Funds From Operations*** – For the three-month period ended June 30, 2017, FFO was $150.9 million, or $0.73 per common share on 207 million weighted-average common shares outstanding, compared to $172.3 million, or $0.87 per common share on 199 million weighted-average common shares outstanding, for the same period in 2016.
>
> The $150.9 million of FFO for the three-month period ended June 30, 2017 includes the impact of $23.5 million of one-time interest refinancing costs, $3.7 million of non-cash stock-based compensation expense and $2.7 million in provision for uncollectible accounts, offset by $1.9 million of one-time revenue.
>
> The $172.3 million of FFO for the three-month period ended June 30, 2016 includes the impact of a $5.4 million cash receipt related to early termination of mortgages, $3.7 million of non-cash stock-

based compensation expense, $3.5 million of acquisition costs and a $1.2 million adjustment (recovery) related to the provision for uncollectible accounts.

Adjusted FFO was $179.0 million, or $0.87 per common share, for the three months ended June 30, 2017, compared to $173.0 million, or $0.87 per common share, for the same period in 2016. For further information see the "Funds From Operations" schedule.

135.    The foregoing statements concerning FFO and Adjusted FFO were false and misleading because Defendants knew or recklessly disregarded that Orianna, its second largest operator, could neither pay real estate taxes nor pay its rent to Omega, and that Orianna's circumstances were so dire that Omega had lent Orianna $15 million on May 2, 2017, so that Orianna could pay rent back to Omega. As a result, Defendants knew or recklessly disregarded that by making the $15 million Working Capital Loan to Orianna to allow Orianna to make rent payments to Omega, when without the Working Capital Loan Orianna could not pay rent, Defendants were able to report their own cash (or their own borrowing under their own revolving line of credit) as FFO and AFFO.

136.    In anticipation of Defendants' July 27, 2017 conference call to discuss second quarter results, in a July 26, 2017 report, UBS analyst Nick Yulico focused on the Orianna issue. In a report sub-titled "Top 10 Tenant Still Behind on Rent," Yulico wrote that among the issues that he expected Defendants to address were "top operators New Ark [(Orianna)] and Signature, among others." Yulico wrote further:

**Q: What do 2Q results mean for the stock?**

Tenant operating metrics looked similar for 2Q vs. 1Q; however, one top tenant (New Ark, 6.4% of rent) remains under 1x EBITDAR coverage and late on rent (beyond 30 days). We look to hear more about what payments (if any) were recouped from New Ark after 1Q shortfall. A smaller portion of rent (0.2), an add'l SNF w/ coverage below 1x, is also now behind in rent. OHI removed its cash flow statement from the supplemental; this comes after 1Q when

operating cash flow growth underperformed EBITDA and FFO/FAD because of missed rent payments. We note ytd accounts receivable growth (+30% y/y) is meaningfully outpacing revenue growth ytd (6% y/y), which may signal increased mismatch on rent collections. We continue to think the skilled nursing industry is facing meaningful headwinds from bundling programs, CJR, and shifts to Medicare Advantage. OHI has the highest SNF exposure (~90% of NOI) in our coverage.

137.    Also on July 26, 2017, BTIG analyst Michael Gorman wrote a report, titled "Omega Healthcare Investors Reports Adjusted FFO of $0.84, But Tenant Health Remains the Focus; Maintain Neutral." In his report, Gorman wrote:

Omega reported 2Q17 FFO/sh of $0.84 after adjusting for one-time refinancing expenses during the quarter. The result compares to our estimate of $0.85 and the consensus of $0.83. Management narrowed its 2017 adjusted FFO guide to $3.42-$3.44 from $3.40-$3.44 previously. However, tenant health within the portfolio remains an issue as tenants representing more than 10% of revenue have an EBITDAR coverage below 1.0x, and tenants representing 6.6% of revenue are more than 30-days delinquent on rent. We maintain our Neutral rating.

- Omega's adjusted FFO of $0.84 missed our estimate by $0.01. Relative to our model NOI, mortgage interest income, and provisions for uncollectible accounts all drove the lower result.

- Management adjusted its 2017 FFO/sh guidance range to $3.42-$3.44, raising the midpoint $0.01 from the prior range. The new $3.43 midpoint compares to our estimate of $3.41 and the consensus of $3.39. However, we would note that management's guidance includes certain add-backs that we exclude from our estimates.

- Tenant health remains an issue for the portfolio. While EBITDARM coverage levels were flat sequentially at 1.69x, they were down from 1.75x in the prior-year period. Moreover, 11 tenants representing 10.3% of revenue carry an EBITDAR coverage ratio of less than 1.0x. While this is roughly in line with the 10.4% from 1Q17, we would note that two of those tenants, representing 6.6% of rents, are now more than 30-days late on their rental payments. We believe this highlights potential material risks to the near-term income stream.

Case 1:17-cv-08983-NRB   Document 80   Filed 08/28/20   Page 63 of 86

138.    Thus, analysts following Omega recognized that the financial condition of its

tenants, and particularly Orianna, was critical to Omega's FFO.

139.    On July 27, 2017, the Company held a conference call to discuss its second quarter,

2017 results. On the call, Booth stated, in relevant part:

> While we're cautiously optimistic that portfolio-wide coverages
> have stabilized, we continue to see certain regional operators
> struggle with various operational pressures, including a tightened
> labor market, length of stay compression and an increase in PL/GL
> claims. Two our top ten private operators in particular have seen
> margins and coverages decline and as a result created liquidity
> concerns.
>
> The first of these private operators, and one which we discussed on
> our last earnings call, has continued to experience [quarterly
> pressures], despite finally showing signs of operational
> improvements. Coverage for the trailing 12-months ended March
> 31, 2017 remained slightly below 1 times. However, results for the
> standalone first quarter was 1.12 times and year-to-date results
> through May remained consistent.
>
> Efforts to manage through these operational pressures have included
> the following initiatives: replacing the entire executive management
> team, including a very recent and significant downsizing of both
> corporate and regional staff; establishing a new disciplined
> corporate culture which involve replacing a majority of facility-level
> management; rebranding its corporate identity; revising its mission
> statement; and implementing new business practices; negotiating
> numerous vendor contracts; and lastly, establishing a centralized
> reform network. Additionally, Omega has helped concentrate this
> operator's geographic footprint by selling off six of its seven
> Northwest facilities to third-party operators. One remaining facility
> in the Northwest is expected to be sold on August 1, pending
> regulatory approval. Omega has also transitioned this operator's
> entire Texas region which consisted of nine facilities to another
> existing Omega tenant.
>
> We are consciously optimistic that the combination of these efforts
> will result in steadily improving margins and eventually return to its
> former profitability. However, in the meantime, our past due rent
> has reached nearly ninety days in arrears. As such, any further
> deterioration and/or the failure of the tenant to achieve its budgeted

> plan may result in cash basis accounting and a potential review of
> the value of these capital lease assets.

140.    The foregoing statements concerning Orianna's financial condition were false and misleading. Defendants' discussion of Orianna's condition rendered them duty-bound not to mislead investors. Defendants, however, knew or recklessly disregarded, but omitted to disclose, that Orianna's situation was materially more adverse than they disclosed. Indeed, Defendants knew or recklessly disregarded that but for the undisclosed, $15 million Working Capital Loan, enabling Orianna to cover real estate taxes and to pay rent back to Omega, Orianna's delinquency was not 90 days but was 180 days. In addition, Orianna was burdened by tens of millions of dollars of trade payables casting its continued liquidity in doubt and, together with its rent delinquencies, belied Defendants' claim of improving margins.

141.    In a colloquy during the July 27, 2017 earning conference call, with respect to an unknown operator with which Omega was discussing a restructuring involving a sale of assets, analyst Nicholas Yulico stated, "this has been news about Signature in the press about that they do have a working capital loan out." Yulico continued "so I'm wondering . . . if one of the steps of relief in a restructuring, would you be willing to step in as a working capital lender to this tenant in case they cannot get their current lender to restructure?" In response, Defendant Pickett stated, "Something that we haven't talked about, Nick, but it's something – we've been through dozens of these and occasionally that is part of the solution." Pickett continued, "so it hasn't been discussed. But if it's part of the solution that makes sense, then we'd probably go down that pathway."

142.    The foregoing statement was false and misleading. Defendants knew or recklessly disregarded that they had made the Working Capital Loan to Orianna. In the context of measures Omega took to stabilize Orianna Defendant Booth described earlier in that conference call—

expressing cautious optimism that Omega's efforts "will result in steadily improving margins and eventually return to its former profitability"—Defendant Pickett's reference to working capital loans as part of restructurings imposed a duty upon him to disclose the Working Capital Loan Omega made to Orianna.

143.    In response to this partial disclosure, the Company's stock price fell $1.35 per share, or 4%, to close at $32.10 per share on July 27, 2017, on unusually heavy volume of 6.33 million shares traded.

144.    On August 9, 2017, the Company filed its 10-Q for the quarter ending June 30, 2017. The 10-Q reaffirmed the Company's statements about its financial results contained in the July 26th press release, and also contained the following statements concerning the struggles faced by two of its top operators, Orianna and Signature, respectively:

> At June 30, 2017, two of our top 10 operators were approximately 90 days past due on rent payments to the Company. One of these operators has been facing liquidity pressures following a management transition, but has been showing signs of operational improvement and is currently making partial monthly rent payments. The current management of this operator is pursuing operational improvements, such as replacing executive management and senior level management, renegotiating vendor contracts and establishing a centralized referral network. The Company is working with this operator to concentrate its geographic footprint by selling certain facilities, of which five were sold prior to June 30, 2017. The Company expects to sell two other facilities and transition its existing Texas portfolio to another operator during the third quarter of 2017. The Company is optimistic that the combination of these efforts will result in improving margins and performance by this operator. The Company is currently recording rental revenue from this operator on an accrual basis. The Company continues to monitor the operator's operating plan and in the event its performance deteriorates, the Company will reassess the carrying value of the portfolio and consider recording future rental revenue on a cash basis.
>
> The other operator with approximately 90 days rent past due has been adversely affected by an adverse general and professional

liability environment in Kentucky and is in ongoing discussions to settle matters arising from a U.S. Department of Justice investigation. The Company has negotiated a proposed restructuring plan with this operator, subject to the operator's resolution of its obligations with other landlords and lenders and the Department of Justice investigation. Receivables from this operator are backed by a security deposit and guarantees from the principals of the operator.

The Company believes the current performance of these two operators primarily reflects specific operator-related or localized issues rather than issues generally impacting the industry. The Company continues to closely monitor the performance of these two operators specifically, as well as industry trends and developments generally.

145. The foregoing statements concerning Orianna's financial condition were false and misleading. Defendants' own discussion of Orianna's condition rendered them duty-bound not to mislead investors. In addition, Item 303 imposed a clear duty on Defendants to disclose in Omega's MD&A unusual events or transactions and/or known adverse trends. Flouting these clear duties, Defendants knew or recklessly disregarded, but omitted to disclose, that Orianna's situation was materially more adverse than they disclosed. Indeed, Defendants knew but omitted to disclose that during the second quarter of 2017, Omega lent Orianna $15 million through the Working Capital Loan, a "part of the solution" Defendant Pickett called in the July 27, 2017 earnings conference call, "occasional[]"—an unusual event or transaction. The Working Capital Loan enabled Orianna to cure its first quarter delinquency, meaning that instead of 180 days delinquent as of June 30, 2017, Orianna was only 90 days delinquent. By means of the Working Capital Loan, therefore, Defendants materially obscured the magnitude of the adverse trend of Orianna's delinquency. At the time of the above-referenced statement, therefore, Defendants failure to disclose that the $15 million Working Capital Loan rendered the August 10-Q materially false.

146. In response to Defendants' late July disclosures, analysts continued to focus on "tenant health," even in the context of a positive second quarter. Analysts were unaware that the

only way Omega "beat their 2Q17 AFFO/sh guidance" was by means of the Working Capital Loan

to Orianna. For example, in an August 3, 2017, Jeffries analyst Omotayo Okusanya wrote:

**Key Takeaway**

**Although OHI beat their 2Q17 AFFO/sh guidance and revised their FY AFFO/sh outlook to $3.42-$3.44 from $3.40-$3.44, investors were more concerned with the health of two top ten tenants (Signature Healthcare and Ark) who continue to not be current on their rents. We are increasingly relying on scenario analysis (see below) to assess tenant credit risk and lowering our PT to $32 to reflect our updated base case scenario.**

**Our Base Case ($32 PT, 2017/2018 AFFO/sh $3.37/$3.31, 2017/2018 FAD $3.01/ $2.93):** Our base case scenario has OHI not recouping the $20M of outstanding rents from Ark & Signature. In addition, this scenario includes our view that OHI recognizes just cash rents received going forward given the challenges that these two tenants face. Rent received was $35M in 1H17, which we model as $17.5M per quarter going forward.

**Our Downside Case ($27 PT, 2017/2018 AFFO/sh $3.37/$3.30, 2017/2018 FAD: $3.01/$2.92):** Under this case, both Signature and Ark's financial health deteriorates, causing them both to go bankrupt. We also assume a third tenant (Consulate Healthcare) defaults under this scenario given the recent $347M fraud judgment against it. In the event that this occurs, we see low risk of leases being rejected given current rent coverage (~0.96x at Ark and ~1.3x at Signature). We believe OHI would be able to either renegotiate their leases with Signature & Ark or find new tenants to operate the facilities, where they would be paying rents similar if not more than what Signature & Ark were currently paying. The downside risk comes from bankruptcies driving heightened tenant credit risk, which would cause valuation multiple compression. Our $27 valuation under this scenario implies a compressed 8.0x P/AFFO multiple, which is warranted as we note SNF focused Healthcare REITs hit historical lows of 4-5x P/AFFO in the late-1990's when several SNF operators were going bankrupt due to a major change in reimbursement policy. Should all three tenants enter bankruptcy, we expect dividend growth would be suspended and the quarterly dividend held at its current rate of $0.64. (Emphasis in original).

## THE FULL TRUTH EMERGES

147.   On October 30, 2017, after the market closed, the Company issued a press release

entitled "Omega Announces Third Quarter 2017 Financial Results; Increased Dividend Rate for

21st Consecutive Quarter." In the press release, Defendants disclosed that Omega had put Orianna

on a cash basis, transitioning its assets to other operators and connecting that action directly to

Orianna's failure to pay rent. In relevant part, the October 30, 2017 press release stated:

### CEO COMMENTS

Taylor Pickett, Omega's Chief Executive Officer stated, "We are in
active discussions with Orianna regarding the transition of some or
all of their remaining portfolio to new operators. ***Since 2014,
occupancy in the Orianna portfolio has declined from 92% to
89%. Revenue has grown by 2%, while operating expenses have
grown by 6%***. We believe that for some of the Orianna facilities new
operators may be able to improve occupancy and reduce expenses;
however, based on current facility performance, we anticipate that
the current annual contractual rent of $46 million will likely be
reduced to a range of $32 million to $38 million once the transition
process is complete." Mr. Pickett, continued, "The transition timing
is expected to take approximately six months."

***

### THIRD QUARTER 2017 RESULTS

***Operating Revenues and Expenses*** – Operating revenues for the
three-month period ended September 30, 2017 totaled $219.6
million which included $13.3 million of non-cash revenue.
***Operating expenses for the three-month period ended September
30, 2017 totaled $307.9 million and consisted of $194.7 million in
impairment on direct financing leases related to the Orianna
portfolio, $11.9 million in provision for uncollectible accounts
($9.5 million related to Orianna)***, 71.9 million of depreciation and
amortization expense, $17.8 million of impairment on real estate
properties, $7.7 million of general and administrative expense, and
$3.9 million of stock-based compensation expense.

***

***Funds From Operations*** – For the three-month period ended September 30, 2017, FFO was a loss of ($46.8) million, or a loss of ($0.24) per common share on 207 million weighted-average common shares outstanding, compared to $162.6 million, or $0.80 per common share on 204 million weighted-average common shares outstanding, for the same period in 2016.

***The $46.8 million loss of FFO for the three-month period ended September 30, 2017 includes the impact of $194.7 million in impairment on direct financing leases, $11.9 million in provision for uncollectible accounts*** and $3.9 million of non-cash stock-based compensation expense.

The $162.6 million of FFO for the three-month period ended September 30, 2016 includes the impact of $3.7 million of non-cash stock-based compensation expense, $2.3 million of acquisition and merger related costs, $1.8 million of interest refinancing costs and $0.5 million of noncash revenue.

Adjusted FFO was $163.6 million, or $0.79 per common share, for the three-month period ended September 30, 2017, compared to $169.9 million, or $0.83 per common share, for the same period in 2016. For further information see the "Funds From Operations" schedule.

## <u>CFO COMMENTS</u>

Bob Stephenson, Omega's Chief Financial Officer commented, "During our second quarter earnings call, we stated we were closely monitoring one of our operators and may have to place them on a cash basis for revenue recognition if their performance did not improve. ***Since Orianna did not*** achieve their revised operating plan and ***pay their full contractual rent, we placed them on a cash basis*** and therefore our third quarter results, including AFFO and FAD, do not include any revenue related to Orianna." Mr. Stephenson continued, "Since 93% of our Orianna portfolio was classified as a direct financing lease, placing them on a cash basis and initiating the process to transition some or all of their portfolio to new operators also required us to record several large provisions related to the direct financing leases during the quarter."

***

**2017 ADJUSTED FFO GUIDANCE REVISED**

Bob Stephenson, Omega's CFO commented, "***We are lowering our 2017 guidance to reflect the temporary loss of third and fourth quarter 2017 revenue primarily related to placing Orianna and a non-top ten operator on a cash basis***."

The Company's revised guidance for 2017 Adjusted FFO is now $3.27 to $3.28 per diluted share. The following table presents a reconciliation of Omega's guidance regarding Adjusted FFO to projected GAAP earnings. (Emphasis added and in original)

148.    On the next day, October 31, 2017 at 10:00 a.m., the Company held a conference call to discuss its third quarter results. Once again, as in the press release, Defendants linked Omega's decision to place Orianna on cash accounting directly to its failure to pay rent. On the call, Defendants Pickett, Stephenson, and Booth stated, in relevant part:

**Pickett**

Adjusted FFO for the third quarter is $0.79 per share. Funds available for distribution, FAD, for the quarter is $0.73 per share. ***The reduction in adjusted FFO and FAD is primarily related to converting the Orianna portfolio to cash basis accounting with no adjusted FFO or FAD recognized for Orianna in the third quarter***.

\*\*\*

**Stephenson**

Operating revenue for the quarter was approximately $220 million versus $225 million for the third quarter of 2016. The decrease was ***primarily a result of placing Orianna on a cash basis, and therefore, we recorded no Orianna revenue for the quarter***.

\*\*\*

We have lowered our 2017 adjusted FFO guidance to $3.27 to $3.28 per share. The reduction is primarily a result of two items: first, it reflects the temporary loss of Orianna revenue for both the third and fourth quarters; and second, we placed a non-top ten operator on a cash basis effective September 1st, as our outstanding contractual receivable exceeded our revenue recognition test.

*\*\**

**Booth**

In addition to Orianna, we continue to experience specific operator performance issues as discussed on our last several calls, including Signature Healthcare, another top 10 operator. In both cases, liquidity issues are impacting the ability of these operators to pay rent on a timely basis.

The first operator, Orianna, ***has fallen significantly behind on rent and as a result has been placed on a cash basis accounting as previously discussed by both Taylor and Bob***. While we have endeavored to assist Orianna in streamlining operations by transitioning both their Northwest and Texas regions, the overall portfolio continues to struggle in past due rent headwind.

Our next step, hopefully, is to consensually transition of the remaining portfolio of 42 facilities by virtue of either asset sales or re-leasing to other operators. While we believe the remaining states are considered very attractive within our industry. We expect our contractual rent to decline by a range of between 8 million and 14 million per annum. This will result in a pro forma EBITDAR coverage ratio, assuming all the facilities are released of between 1.2 times and 1.5 times given current performance.

Our second top 10 operator, Signature Healthcare, has also fallen further behind on rent in the third quarter, predominantly as a result of anticipated tightening restrictions upon their borrowing base by their working capital lender thus reducing availability. At this time, it is important to note that the vast majority of Signature's past due rent balance is covered by a letter of credit in excess of $9 million. Despite the current liquidity situation, we believe we have a path to continue our longstanding relationship with Signature, under a long-term consensual restructure that involves multiple constituents and then keep Signature out of a formal court-involved reorganization. This out of court restructuring may involve the following components of consideration: a certain amount of deferred rent, CapEx funds and working capital line of credit. This scenario would involve the approval of other third-party constituents, including Signature's other significant landlord; Signature's working capital lender, the Department of Justice and certain other third-party claimants. While we cannot predict the ultimate outcome of these third-party constituent discussions, we feel that we have made

significant progress and are optimistic that an out of court resolution can be realized.

In addition to the ***Orianna and Signature ongoing restructure efforts, we have one other non-top 10 operator that has fallen behind on rent and that has required future rent payments to be placed on cash basis accounting***. Over the last several months, we have negotiated a settlement and forbearance agreement with this operator, which will result in rent payments in the fourth quarter to be about approximately 23% less than our current contractual rent. Beginning in January, we expect rent to return to the full contractual amount and the past-due rents will begin to be repaid in the latter half of 2018.

149.    On this news, the Company's stock price fell $2.11 per share, or 6.8%, from an October 30, 2017 close of $30.97 to an October 31, 2017 close of $28.86 per share on relatively enormous volume of 16.2 million shares traded.

150.    On November 7, 2017, the Company filed its quarterly report on Form 10-Q for the quarter ending September 30, 2017. In the 3Q 10-Q, Defendants elaborated on the statements contained in the press release and earnings call about the Company's financial results. The 3Q 10-Q contained the following discussion of the impairment of its direct financing leases with Orianna:

In July 2017, we transitioned nine SNFs, representing all of the facilities subject to another direct financing lease with Orianna in the Texas region, to an existing operator of the Company pursuant to an operating lease. In connection with this transaction, we recorded the real estate properties at our original cost basis of approximately $19.0 million, eliminated our investment in the direct financing lease and recorded an impairment of approximately $1.8 million. In conjunction with this transaction, we also amended our Orianna Southeast region master lease in July 2017 to reduce the outstanding balance by $19.3 million. As a result of the amendment, we recorded an impairment of approximately $20.8 million in the third quarter of 2017.

Orianna has not satisfied the contractual payments due under the terms of the remaining two direct financing leases or the separate operating lease with the Company and the collectability of future amounts due is uncertain. The Company is in preliminary discussions with Orianna regarding future actions. Such actions may

include a) the sale of some or all of the facilities, b) transitioning some or all of the facilities from Orianna to other operators and c) pursuing legal action to enforce the terms of the existing agreements.

During the third quarter of 2017, the Company recorded an allowance for loss of $171.9 million with Orianna covering 38 facilities in the Southeast region of the U.S. The amount of the allowance was determined based on the fair value of the facilities subject to the direct financing lease. To estimate the fair value of the underlying collateral, the Company utilized an income approach and Level 3 inputs. The Company considered current and projected operating performance of the facilities, projected rent, prevailing capitalization rates and coverages and bed values. Such assumptions are subject to change based on changes in market conditions and the ultimate resolution of this matter. Such changes could be significantly different than the currently estimated fair value and such differences could have a material impact on the Company's financial statements.

The 39 facilities under our direct financing master leases with Orianna as of September 30, 2017 are located in seven states, predominantly in the southeastern U.S. (38 facilities) and Indiana (1 facility). Our recorded investment in these direct financing leases, net of the $171.9 million allowance, amounted to $337.7 million, as of September 30, 2017. For the three months ended September 30, 2017, we did not recognize any direct financing lease income from Orianna. We recognized total impairments on direct financing leases for the three and nine months ended September 30, 2017 of $194.7 million and $198.0 million, respectively.

151.    Analysts focused their analysis on the Orianna issue. For example, on October 30, 2017, Jeffries analyst Omotayo Okusanya wrote a report titled "Omega Healthcare Investors (OHI) 3Q17 Big Miss, Guidance Lowered." In that report, Okusanya stated:

**Bottom Line:** It was a challenging quarter for OHI given one of its struggling tenants, Orianna (Ark), did not achieve their revised operating plan and pay its full contractual rent. This caused OHI to place the tenant on cash basis accounting and not recognize any revenue from the tenant in the quarter. The disparity between reported AFFO/sh and our estimates is attributable to the nearly $12M a quarter in rents the company is not recording from Orianna (we had estimated closer to a $10M hit for the entire tenant watch list), as well as higher than expected interest expense ($0.01) and

lower interest income ($0.01). OHI has initiated the process to transition some or the entire Orianna portfolio to new operators (see below for further details). After previously raising FY2017 AFFO/sh guidance last quarter to $3.42- $3.44, OHI rolled back its estimates and lowered FY2017 guidance to $3.27-$3.28 in 3Q17. While the tenant issues in the OHI portfolio were made evident to investors in 2Q17, the magnitude of the impairment from Orianna, the lowered full year guidance, and continued concerns about tenant credit risk will likely weigh heavily on the stock tomorrow.

**Orianna Creates Ugly 3Q17 Results:** Given the challenges at Orianna, OHI took a $198M impairment against their $618M investment. As part of the ongoing process of transitioning the portfolio to a new operator, OHI expects annual rents to be reduced from $46M to a range of $32M-$38M, with a six month transition period. This suggests at least a $30M impact ~($0.15 AFFO/sh) to 2018 AFFO/sh. To date, OHI has already transitioned 9 Texas facilities to an existing operator in the OHI portfolio. Lastly, management notes that OHI recorded an $11.9M provision for uncollectible accounts during 3Q17 mainly in relation to Orianna.

Thus, had Omega not lent Orianna money in May 2017, Orianna would not have paid its quarterly rent. The undisclosed loan, therefore, enabled Omega to stave off alerting the market to a $12 million hole it is FFO guidance.

152.   On October 31, 2017, Hilliard Lyons analyst John Roberts, in response to Defendants' disclosures, wrote in relevant part:

On the company's conference call, management obviously spent most of its time discussing concerns around the issues with tenants. Three tenants are currently having issues, with one (Orianna) being of immediate issue, as they are currently not paying rent, one other likely subject to a restructuring (Signature) and a third being a near term issue that management anticipates being cured by the beginning of next year. Management anticipates replacing Orianna with a new tenant(s) over the coming six months with an eventual loss of rental income of around $10 million (about 1% of gross rent). In the meantime, no rent will be received on the properties, although Orianna essentially continues to be running the properties. The company has fully reserved for these non-paid rents. We have worked these expectations into our earnings model and adjusted our estimates accordingly. Management had hoped to work with Orianna to restructure this lease, but came to the conclusion that this

74

was the best course of action for these properties. Management noted that they expect a coverage ratio range of 1.2-1.5 times on the new rental rates once the new leases are in place. This compares with the current ratio of under 1.0 times.

As far as Signature goes, they are about a month behind in rent, although they continue to pay a portion of the contractual rent due ($11 million of the $14.5 million contractual amount). OHI has a letter of credit on this lease that covers all of the past due rent. We anticipate a restructuring of this lease, with OHI forgiving some near term rent but receiving higher rental bumps or some other similar advantages. We have worked this assumption into our model as well. As far as the other tenant goes, we are not assuming any loss here beyond the current year (adjusted) due to this being a liquidity issue, rather than an operating issue. While OHI placed the lease on a cash basis, they expect the coverage ratio on the lease to approach a very solid 1.5 times by the start of 2018, which should allow for the tenant to begin paying the contractual rent at that point. There may be some near term reduction of cash flow paid to the company in Q4, however. We anticipate that this amount will be made up to OHI at a later date.

In discussing the issues regarding Orianna, we questioned management on whether the issues that led to the tenant's nonpayment of rent were specific to that tenant or an industry-wide concern. While there are two other tenants currently having issues, all three of these instances are believed to be tenant-specific events, in a challenging industry environment. Management pointed to the occupancy decline between 2014 and the present from 92% to 89% in the Orianna portfolio as a major catalyst behind Orianna's issues. Orianna generated 2% revenue growth over this period while expenses increased at a 6% pace. OHI management does not believe it is appropriate at this time to adjust their underwriting requirements and believes 1.4x coverage remains conservative. Management also feels that their strength is in investing in regional portfolios and partnering with regional operators, while Orianna had a wide geographic dispersion of properties. Moving forward, they expect to stick with separating portfolios by region amongst their operators in an attempt to avoid situations like this in the future. On the cap rate front, management expects to make acquisitions in the 9% to 9.5% range, which will help to offset lost rent from dispositions.

On the operator front, the overall portfolio improved, although that is more a function of the Orianna portfolio moving out of the group due to the lease going to cash accrual. Portfolio coverage in the most recent trailing twelve months was 1.71 times on a gross cash flow

basis compared to the previous number of 1.69 times. That number would be around 1.68 were the Orianna portfolio included, so there was a very slight deterioration. We believe that most of the deterioration was a function of labor costs. Management noted that operating costs were up 6% for Orianna, and that most of these costs are likely labor. We would expect other operators to see pressure on this front as well, although higher coverage ratios should allow them to better absorb these costs.

153.    Thus, failing to disclose the true state of Orianna in May 2017 enabled Defendants to convey to the market a falsely positive view of Omega's "overall portfolio."

## CLASS ACTION ALLEGATIONS

154.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Omega securities between May 3, 2017, and October 31, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

155.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Omega's common stock actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Omega shares were traded publicly during the Class Period on the NYSE. As of October 27, 2017, Omega had 198,073,305 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Omega or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

156.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

157.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

158.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> (b)  whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Omega; and
>
> (c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

159.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

160.    Plaintiffs will rely on the presumption of reliance established by the fraud on the market doctrine. At all relevant times, the market for Omega's securities was open, well-

developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Omega's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Omega's securities and market information relating to Omega, and have been damaged thereby.

161.    During the Class Period, the artificial inflation of Omega's stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Omega's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Omega and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

162.    At all relevant times, the market for Omega's securities was an efficient market for the following reasons, among others:

> (a) Omega stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;
>
> (b) As a regulated issuer, Omega filed periodic public reports with the SEC and/or the NYSE;

(c) Omega regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Omega was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

163.    As a result of the foregoing, the market for Omega's securities promptly digested current information regarding Omega from all publicly available sources and reflected such information in Omega's stock price. Under these circumstances, all purchasers of Omega's securities during the Class Period suffered similar injury through their purchase of Omega's securities at artificially inflated prices and a presumption of reliance applies.

164.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

165.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Omega who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

166.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

167.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs

and other members of the Class to purchase Omega's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

168.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Omega's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

169.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Omega's financial well-being and prospects, as specified herein.

170.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Omega's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Omega and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

171.   Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

172.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Omega's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

173.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Omega's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Omega's securities during the Class Period at artificially high prices and were damaged thereby.

174.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Omega was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Omega securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

175.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

176.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

177.     Individual Defendants acted as controlling persons of Omega within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

178.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

179.     As set forth above, Omega and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 28, 2020

**THE ROSEN LAW FIRM, P.A.**

/s/ Jacob A. Goldberg
Jacob A. Goldberg
Gonen Haklay
Leah Heifetz-Li
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com
Email: lheifetz@rosenlegal.com

Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2020, I electronically filed the foregoing ***Second Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
E-M: jgoldberg@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Class***