UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re OMEGA HEALTHCARE INVESTORS, INC.
SECURITIES LITIGATION                                    **MEMORANDUM AND ORDER**
----------------------------------------X
This Document Relates To:                                 17 Civ. 8983 (NRB)

     ALL ACTIONS
----------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


        This is the third opinion assessing the sufficiency of
lead plaintiffs' putative class action claims for securities
fraud in violation of Sections 10(b) and 20(a) of the Exchange
Act and Rule 10b-5 promulgated thereunder against Omega
Healthcare Investors, Inc., its CEO C. Taylor Pickett, its
CFO Robert O. Stephenson, and its COO Daniel J. Booth.

        The Court assumes familiarity with the facts of the case
and the legal standards governing motions to dismiss a
complaint for securities fraud, as set forth in its prior
opinion, In re Omega Healthcare Invs., Inc. Sec. Litig., 375
F. Supp. 3d 496 (S.D.N.Y. 2019) ("Omega I"), and the Second
Circuit's subsequent opinion, Setzer v. Omega Healthcare
Invs., Inc., 968 F.3d 204 (2d Cir. 2020) ("Omega II").[1]  It
is, however, helpful to summarize the procedural history of
this action.

_____

        [1]    Unless otherwise noted, the Court incorporates all
abbreviations used in Omega I.

In Omega I, we found that plaintiffs' first amended complaint adequately alleged that defendants had made actionable omissions of material facts between May and October 2017 related to a $15 million Loan that Omega had issued in May 2017 to Orianna, its second-largest healthcare facilities operator.   375 F. Supp. 3d at 507-09. Specifically, we held that in the context of discussing Omega's financial results in press releases and earnings calls during that period, it was materially misleading for defendants not to disclose the Loan and the fact that Orianna was unable to pay rent to Omega without the Loan proceeds. Id.[2]  Ultimately, however, we dismissed the first amended complaint because we found that plaintiffs had not alleged a strong inference of scienter related to these omissions.   Id. at 509-12.   Plaintiffs appealed.

In Omega II, the Second Circuit agreed with our finding that defendants' failure to disclose the Loan in the context of discussing Orianna's financial performance and rent

---

[2]    We also held that plaintiffs had not adequately alleged a material misrepresentation related to Omega: (1) having its funds from operations or adjusted funds from operations reflect rent collected from Orianna that had been paid using the Loan proceeds; (2) not disclosing Orianna's financial issues in the context of risk disclosures related to operator bankruptcy in its May 5, 2017 10-Q report; or (3) not disclosing that it had engaged in an evaluation process for determining the impairment of assets related to the Orianna leases in that same report. Omega I, 375 F. Supp. 3d at 507-08.  We further rejected plaintiff's claim that the failure to disclose Orianna's financial issues in the May 5, 2017 10-Q risk disclosures violated Item 303 of Regulation S-K.  Id. at 512-13.

payments "rendered statements about Orianna's performance actionably misleading." 968 F.3d at 213-14.[3] As explained by the Second Circuit, defendants' omission of the Loan "gave a false impression of the financial health of one of Omega's largest assets" and "concealed the extent of Orianna's solvency problems," as "Orianna could not pay rent without borrowing from its landlord." Id. at 214.

However, the Second Circuit reversed our decision on scienter, finding that plaintiffs had adequately alleged that defendants' decision not to disclose the Loan in the context of statements about Orianna's performance and rent payments was "a sufficiently extreme departure from the standards of ordinary care" to plead a strong inference of scienter under a "conscious recklessness" theory. Id. at 214-16.[4]

Two key factors informed the panel's conclusion. First, given the importance of Orianna to Omega's overall portfolio, the Second Circuit reasoned that "Omega had to know that

---

[3]     Despite plaintiffs' arguments for reversal of our holding on the universe of material misstatements (see Appellants' Br., Omega II, No. 19-1095 (2d Cir. June 13, 2019), ECF No. 30 at 25-34), Omega II left undisturbed our dismissal of plaintiffs' claims based on alleged misstatements and omissions beyond the failure to disclose the Loan.  The Second Circuit also declined to address plaintiffs' argument that "Item 303 imposed an independent duty on Omega to disclose the Loan." Omega II, 968 F.3d at 214 n.15.

[4]     Based on concessions made by plaintiffs on appeal, the Second Circuit did not consider our holding that plaintiffs had not adequately alleged scienter based on a "motive and opportunity" theory. Omega II, 968 F.3d at 213 n. 11.

revealing the full extent of Orianna's performance problems would have been troubling news to its investors." Id. at 215. Second, because Omega knew that the Loan proceeds were used to pay Orianna's rent and would be going directly back to Omega's funds from operations and adjusted funds from operations, the panel concluded that defendants created the illusion that Orianna was "on the road to recovery" despite "ma[king] a conscious decision to not disclose the Loan in order to understate the extent of Orianna's financial difficulties." Id. at 215-16.

Notably, in reaching its conclusion on scienter, the Second Circuit disagreed with our view on the nature of Omega's interim disclosures throughout the class period on Orianna's financial difficulties. While we originally determined that these disclosures were adequate warnings to investors about Orianna's financial predicament, see Omega I, 375 F. Supp. 3d at 511, the Second Circuit found that these disclosures about Orianna's "partial rent payments" "strongly suggest" that defendants intended to "express optimism" about Orianna's financial prospects and ability to pay rent while "underrepresent[ing] the extent of those very problems," Omega II, 968 F.3d at 216. In other words, according to the Circuit, these disclosures further concealed the issues affecting Orianna that defendants had failed to disclose.

- 4 -

Following remand, the parties entered into a stipulation permitting plaintiffs to file the operative second amended complaint ("Complaint" or "SAC" (ECF No. 80)), which seeks to move the start of the proposed class back from May 2017 to February 2017 by asserting claims for alleged material misstatements in February 2017.[5]

Defendants now move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) on two grounds.  (ECF No. 88.)  First, they renew their argument that plaintiffs fail to plead a cogent theory of loss causation, an issue that was not reached in either <u>Omega I</u> or <u>Omega II</u>.[6]  Second, defendants argue that the new allegations of misrepresentations from February 2017 fail to state a claim for securities fraud.  Oral argument was held on defendants' motion on August 30, 2021.  For the reasons below, defendants' motion is granted in part and denied in part.

---

[5]    The Second Amended Complaint also bolsters plaintiffs' allegations of defendants' scienter by including references to testimony from the related Orianna bankruptcy proceeding that had not been available to plaintiffs when they filed the complaint that was the subject of <u>Omega I</u>.  (SAC at 17 n.6.)

[6]    While defendants urged the Second Circuit to affirm on the alternative ground that the plaintiffs had not adequately alleged loss causation (<u>see</u> Appellees' Br., <u>Omega II</u>, No. 19-1095 (2d Cir. July 15, 2019), ECF No. 38 at 43-48), the Court of Appeals declined to address that argument or affirm <u>Omega I</u> on those grounds.

**DISCUSSION**

**I.    Loss Causation**

We begin by addressing defendants' argument that the Complaint fails to allege that plaintiffs' losses——the diminution in Omega's stock price——were caused by the market learning of the truth underlying defendants' alleged misrepresentations about the full extent of Orianna's financial distress, including its inability to pay rent, and its ramifications.

**A.    Pleading Loss Causation**

Loss causation is the proximate "causal connection between the material misrepresentation and the loss" allegedly suffered by plaintiffs. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005) (citing 15 U.S.C. § 78u-4(b)(4)); see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 106-07 (2d Cir. 2007).  Thus, to state a claim for securities fraud, a complaint must allege that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Abramson v. Newlink Genetics Corp., 965 F.3d 165, 179 (2d Cir. 2020) (citation, emphasis, and internal quotation marks omitted).  At bottom, loss causation separates the instances in which plaintiffs can establish some connection between their securities losing value because of defendants' alleged fraudulent conduct, which may be

actionable, from instances where the alleged fraud played no role in causing plaintiffs' losses, which are not actionable for securities fraud under Section 10(b) and Rule 10b-5.

Plaintiffs may plead loss causation either by alleging "(a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232-33 (2d Cir. 2014) (noting that pleading loss causation under either theory is sufficient) (citations and internal quotation marks omitted).

Plaintiffs' burden in pleading loss causation is "not a heavy one," and they need only "give [d]efendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 187 (2d Cir. 2015) (quoting Dura Pharm., 544 U.S. at 347); accord Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 93 (2d Cir. 2018).[7]

---

[7]     While the Second Circuit has not definitively ruled on whether allegations of loss causation are to be evaluated under Rule 8's notice pleading standard or Rule 9's heightened requirement to plead matters with specificity, see Abramson, 965 F.3d at 179 n. 65, the "vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8," Wilamowsky v. Take-Two Interactive Software, Inc., 818 F. Supp. 2d 744, 748 n. 7 (S.D.N.Y. 2011) (listing cases).  This position appears to be consistent with the assumptions

Indeed, at the pleading stage, plaintiffs need not establish that the disclosure of the truth underlying the alleged fraud was the sole cause of their losses nor must they conclusively rule out the role of potentially intervening events in the causal chain, as those are issues of proof reserved for the merits stage of the case. See Loreley, 797 F.3d at 187, 189 (citing Lentell, 396 F.3d at 174 and Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, 783 F.3d 395, 404 (2d Cir. 2015)).

**B.   Application to Plaintiffs' Allegations**

Plaintiffs argue that they adequately allege loss causation through both corrective disclosures and the materialization of a concealed risk.  In arguing that plaintiffs fail to plead loss causation under either approach, defendants first submit that plaintiffs do not point to a corrective disclosure that revealed the falsity of

---

applied by the Supreme Court regarding the standards governing loss causation pleading.  See Dura Pharms., 544 U.S. at 346 ("assum[ing]," on an arguendo basis, that "neither the Rules [of Civil Procedure] nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss" than Rule 8(a)(2)'s "short and plain statement" standard).

To the extent that the Second Circuit's case law could be read to impose a heightened standard on pleading aspects of loss causation, see Oregon Public Employees Retirement Fund v. Apollo Group Inc., 774 F.3d 598, 604 (9th Cir. 2014) (characterizing the Second Circuit's loss causation pleading standard as "heightened," insofar as it "requir[es] that plaintiffs show that the loss was both foreseeable and caused by the materialization of the risk concealed by the fraudulent statement"), it does not alter the conclusion we reach below, as the Complaint adequately explains plaintiffs' theory of causation.

a prior alleged misrepresentation.  Defendants next contend
that plaintiffs cannot establish loss causation through the
materialization of the allegedly concealed risk of the
likelihood of Orianna's potential failure, as Omega
sufficiently warned investors about this risk in interim
disclosures throughout the class period.

### 1.  Corrective Disclosure

We start with plaintiffs' theory that their losses were
caused by defendants issuing corrective disclosures that
revealed that prior representations had been false.

To plead loss causation through a corrective disclosure,
plaintiffs must establish that the latter disclosure
"reveal[ed] to the market the falsity" of the prior disclosure
and that the market reacted negatively to the revelation that
that prior disclosure had been false.  Lentell, 396 F.3d at
175 & n.4.

Here, plaintiffs argue that defendants consistently
understated the extent of Orianna's rent delinquency by
several weeks in their quarterly disclosures and related
earnings calls and then corrected that information in the
disclosures from the following quarter.  Thus, for example,
plaintiffs allege that defendants represented in May 2017
that in Orianna was only 45 days past due on its rent as of
the end of the first fiscal quarter when, in fact, Orianna

was 90 days delinquent at that time but for the undisclosed Loan. (SAC ¶¶ 120-21.)  Likewise, plaintiffs allege that, in July 2017, defendants stated that Orianna was only 90 days delinquent at the end of the second quarter when it was really 180 days delinquent at that point but for the undisclosed Loan.  (Id. ¶¶ 139-40.)  According to plaintiffs, the July disclosures "corrected" the May disclosures because they accurately described the circumstances of Orianna's rent delinquency as they existed at the end of the prior quarter.

While there is no requirement that the corrective disclosure be a "mirror image" of the prior misstatement, Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (citation omitted), the supposedly "corrective" statements identified by plaintiffs did not reveal to the market or otherwise establish that the prior representations had been false.  Thus, while the latter disclosures may have accurately stated the extent of Orianna's delinquency as it existed at the time of the prior disclosures, there is nothing in these disclosures that suggested to the market that Omega had been untruthful in making its prior statements by understating the extent of Orianna's rent delinquency but for the Loan or that Orianna had been unable to pay rent using money from its own

operations in 2017.  Thus, plaintiffs' corrective disclosure theory of loss causation fails.

### 2.   Materialization of a Concealed Risk

We now turn to plaintiffs' allegations that their losses were caused by the materialization of a risk concealed by defendants' alleged misrepresentations.

To plead loss causation through the materialization of a concealed risk, plaintiffs must show their losses were: (1) foreseeable, that is, the "materialized risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor"; and (2) caused by the materialization of the concealed risk concealed by the fraud, i.e., "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Lentell, 396 F.3d at 173 (citations omitted) (emphasis in original); see In re Lehman Bros. Sec. & ERISA Litig., 799 F. Supp. 2d 258, 304-05 (S.D.N.Y. 2011) (listing cases and summarizing standard).

At the outset, we recognize that, in presenting their arguments on loss causation, defendants were perhaps encouraged by footnote 11 in Omega I, in which we expressed skepticism that plaintiffs could establish loss causation in part because of Omega's disclosures about Orianna throughout

the class period.  Omega I, 375 F. Supp. 3d at 512 n.11.
However, that footnote was written in the context of how we
viewed the nature of what defendants had concealed through
their alleged misrepresentations and what defendants had
correspondingly revealed through those interim disclosures.
As noted above, the Second Circuit took a broader view on
these issues.  And, of course, in assessing whether plaintiffs
have pleaded a viable theory of loss causation we must
evaluate the allegations consistent with the Second Circuit's
characterization of the case.

   Our analysis begins by defining what defendants
allegedly concealed, as described in Omega II.  As the Circuit
recognized, plaintiffs have alleged that Orianna was unable
to pay rent from its operations throughout 2017 and that the
only rent that Omega collected from Orianna was paid out of
the proceeds of Omega's $15 million Loan to Orianna.  Thus,
according to Omega II, defendants' omission of the Loan in
the context of the interim performance reports and earning
calls "gave a false impression of the financial health of one
of Omega's largest assets," and concealed both "the extent of
Orianna's solvency problems" and the fact that "Orianna could
not pay rent without borrowing from its landlord" throughout
2017.  Omega II, 968 F.3d at 214-16.  Thus, Omega II reasoned

that defendants had a duty to disclose that Omega's Loan "was the source of Orianna's rent payments."  Id.

Among the risks concealed by not disclosing the Loan or the true nature of Orianna's financial straits was that Omega's second-largest tenant would continue to not be able to generate enough revenue from its own operations to fulfill its obligations to Omega after five months of not being able to pay rent.  This, in turn, concealed the likelihood that defendants would have to recognize significant losses related to Orianna, place Orianna on cash-basis accounting and correspondingly downgrade its financial guidance to reflect the gap in revenue it had expected to receive from its second-largest asset.  Given the nature of these concealed risks, defendants reasonably could have foreseen that their materialization would cause Omega's stock price to drop.

This is the scenario pled by plaintiffs.  As set forth in the Complaint, Omega acknowledged for the first time in July that Orianna's operations were impaired to the point that Omega might have to transition to a cash-basis accounting with respect to Orianna.  While the extent of Orianna's issues and the likelihood of its insolvency were not fully disclosed at that time, Omega's stock price fell by 4% immediately following the announcement.  The concealed risks further materialized in October, when Omega announced that Orianna's

liquidity crisis had caused Omega to place Orianna on cash-basis accounting, to transition assets from Orianna to other operators, to revise its financial guidance to reflect no revenue from Orianna at all for the rest of the year, and to recognize a $9.5 million provision for losses associated with Orianna.  This, too, was followed by an immediate 6.8% drop in Omega's stock price.  Of course, absent the concealment of the Loan, Orianna's inability to pay rent from its own operations would have been known to investors since May and presumably would have been reflected in Omega's stock price.

As the Complaint plausibly pleads that the extent of Orianna's financial issues and the likelihood of Orianna reaching critical levels of insolvency were within the zone of risk concealed by defendants' alleged misrepresentations and further asserts that plaintiffs' losses were connected to the public disclosures of the true nature of these risks and the materialization of the ramifications of those risks, we find that the Complaint adequately plead loss causation related to defendants' alleged omissions of the Loan between May and October 2017.

Defendants resist the conclusion that plaintiffs have alleged loss causation primarily by asserting two arguments, which, in our view, fail to fully internalize the Second Circuit's approach to this case.

First, defendants argue that Omega's disclosures throughout the class period sufficiently alerted the market to Orianna's struggles and thus investors would not have viewed the risk of Orianna's failure to pay rent and its potential ramifications as "remote or highly unlikely." (Defs.' Mot. (ECF No. 89) at 10 (quoting Lentell, 396 F.3d at 173).)[8]  However, as noted above, the Second Circuit found that Omega's interim disclosures did not sufficiently reveal the extent of Orianna's financial problems but rather "strongly suggest[ed]" that defendants "underrepresent[ed] the extent" of Orianna's financial problems and, in some instances, used references to Orianna's "partial rent payments" throughout the class period to "express optimism" about Orianna's prospects, which supported the finding that defendants acted recklessly.  Omega II, 968 F.3d at 216.

---

[8]     Specifically, defendants point to: (1) the generic disclosure in Omega's February 2017 Form 10-K annual report for 2016 that "significant limits on the scope of services reimbursed and on reimbursement rates and fees could have a material adverse effect on an operator's . . . financial condition, which could adversely affect the operator's ability to meet its obligations to us"; (2) Omega's May 2017 acknowledgement that Orianna was 45 days delinquent on rent; (3) comments related to Omega's second quarter earnings announcement that further deterioration to Orianna's condition might cause Omega to record Orianna's revenue on a cash basis, which were accompanied by expressions of cautious optimism about returning Orianna to profitability; and (4) the August 2017 statement in Omega's third quarter 10-Q that Omega "continues to monitor [Orianna's] operating plan and in the event its performance deteriorates, the Company will reassess the carrying value of the portfolio and consider recording future rental revenue on a cash basis," which was accompanied by the disclosure that Orianna was "showing signs of operational improvement and is currently making partial monthly rent payments."  (Defs.' Mot. at 10-11.)

Given that the Second Circuit has characterized these disclosures as furthering the fraud as opposed to revealing it, we likewise find that these disclosures did not sufficiently warn investors about the full extent of Orianna's performance issues and the likelihood that the related consequences would materialize to rebut plaintiffs' theory of loss causation, even if Omega's interim disclosures did reference Orianna's rent delinquency and possible accounting ramifications.  Indeed, the allegations of sharp drops in Omega's share price in reaction to Omega's announcements about Orianna in July and October 2017 suggest that the market had not fully internalized the extent of the risks related to Orianna's financial impairment that defendants claim to have warned of in the interim disclosures, at least for purposes of pleading loss causation at the motion to dismiss stage.

Defendants' second argument similarly rests on the notion that they had adequately disclosed Orianna's financial issues during the class period and is premised on the following passage from Lentell:

> [W]here . . . substantial indicia of the
> risk that materialized are unambiguously
> apparent on the face of the disclosures
> alleged to conceal the very same risk, a
> plaintiff must allege (i) facts
> sufficient to support an inference that
> it was defendant's fraud——rather than

> other salient factors——that proximately
> caused plaintiff's loss; or (ii) facts
> sufficient to apportion the losses
> between the disclosed and concealed
> portions of the risk that ultimately
> destroyed an investment.

396 F.3d at 177.

As this passage establishes, the threshold condition for this test to apply is that there were "substantial indicia" of the risks concealed by the alleged fraud that were "unambiguously apparent" on the face of the challenged disclosures.  For substantially the same reasons discussed above, we find that defendants' disclosures between May and October 2017 did not "unambiguously" provide "substantial indicia" of Orianna's inability to pay rent in 2017 without the benefit of the Loan or the full extent and likelihood of the related consequences.  Indeed, our conclusion is well illustrated by distinguishing the two cases upon which defendants rely in presenting this argument.

The first is Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP, in which defendants allegedly made misrepresentations about a startup company's operations, ability to secure financing, and managerial integrity, which concealed the company's risk of bankruptcy.  No. 17 Civ. 1235 (GHW), 2018 WL 1627266, at *17 (S.D.N.Y. Mar. 30, 2018).  The defendants in Alpha Capital, however, explicitly warned

investors that there were substantial doubts about the
company's ability to continue as a going concern and that the
company faced the risk of bankruptcy if it could not raise
additional funds on acceptable terms because it was
experiencing recurring losses from operations, was having
difficulty raising finances, and might not be able to pay its
debts based on current cash flows.  Id.  In light of these
warnings, Judge Woods determined that the challenged "filings
facially contained substantial indicia of the Company's risk
of insolvency" and thus plaintiffs failed to allege facts
"sufficient to support an inference that those Defendants'
purported fraud, and not other factors," proximately caused
the losses when the company went into bankruptcy.  Id.

The warnings at issue in defendants' second case, In re
The Warnaco Group, Inc. Securities Litigation (II), were
likewise explicit and unambiguous.  388 F. Supp. 2d 307
(S.D.N.Y. 2005), aff'd sub nom. Lattanzio v. Deloitte & Touche
LLP, 476 F.3d 147 (2d Cir. 2007).  Warnaco concerned alleged
misstatements made by Deloitte, Warnaco's outside accountant,
regarding Warnaco's financial condition that, according to
plaintiffs, concealed the risk of Warnaco's bankruptcy and
its related ability to obtain waivers from its creditors.
Deloitte, however, noted in its audit letter that Warnaco
"was not in compliance with certain covenants" and "has a

working capital deficiency," which Deloitte warned "raise[s] substantial doubt about [Warnaco's] ability to continue as a going concern," a risk that was ultimately "dependent on the outcome of negotiations [with Warnaco's creditors] or upon its ability to refinance its debt." Id. at 311. As reasoned by the Second Circuit, the "going concern" warning and related disclosures about Warnaco's falling value made it "unambiguously apparent that Warnaco was in need of desperate measures and faced a risk of bankruptcy," and thus satisfied the threshold condition for the Lentell test to apply. Lattanzio, 476 F.3d at 158 (citation and internal quotation marks omitted).

Here, by contrast, while defendants alluded to issues at Orianna in their disclosures, the Second Circuit determined that defendants at the same time downplayed the full extent of the issues faced by Orianna. At no point in these disclosures did defendants reveal that Orianna had only been able to pay rent in 2017 because of the proceeds of the undisclosed Loan. Indeed, according to the Second Circuit, defendants used these disclosures at least in part to "express optimism" about Orianna's prospects by focusing on partial rent payments made by Orianna that, in fact, had been paid out of the proceeds of Omega's undisclosed Loan. We therefore find that these disclosures did not "unambiguously" warn of

Orianna's issues or reveal the full extent and likelihood of the related ramifications from its inability to pay rent from its own operations over an extended period.[9]

Accordingly, we hold that plaintiffs have adequately pled loss causation as to the omission of the Loan.

## II. New Allegations of Misrepresentations in February 2017

We now turn to plaintiffs' attempt to move the start of the proposed class period back to February 2017, several months before the Loan was issued.  In the new allegations set forth in the SAC, plaintiffs seek to expand their case beyond the alleged nondisclosure of the Loan and claim that defendants misleadingly omitted information about Orianna's financial condition in the context of three disclosures from February 2017: (1) a press release about Omega's 2016 fourth quarter financial results; (2) an earnings call about Omega's 2016 fourth quarter results; and (3) Omega's Form 10-K annual report for 2016.  (SAC ¶¶ 99-115.)

---

[9]    While we hold that plaintiffs have sufficiently alleged loss causation to survive a motion to dismiss notwithstanding these disclosures, it is conceivable that plaintiffs may struggle to establish as a factual matter that these statements did not cut off the chain of causation at some point or would otherwise limit the damages that plaintiffs can recover.  That, however, will be a merits question reserved for a later stage of the litigation.  See Loreley, 797 F.3d at 187, 198; Hawaii Pension Trust Fund v. AMC Entmt. Hldgs., 422 F. Supp. 3d 821, 855-56 (S.D.N.Y. 2019) ("[T]he degree of impact that . . . partial disclosures had on the market is properly reserved for a later stage in the litigation.") (citation omitted).

Specifically, plaintiffs allege that it was misleading for defendants to not disclose in February 2017 that Orianna suffered from operations difficulties, that "Orianna had informed Defendants directly—including Defendant Pickett—that it would be unable to pay rent for the foreseeable future," and that Orianna had failed to pay rent in January or February 2017. (Id. ¶¶ 100, 102, 104, 106, 111, 113, 114.) However, plaintiffs have since conceded that it was inaccurate to allege that Orianna had "directly informed" Omega by January 2017 that it could not pay rent for the "foreseeable future," and instead urge us to construe these allegations "to mean that Defendants knew both from facts Orianna provided and had not provided that Orianna would be unable to pay rent for the foreseeable future." (Pls.' Opp. Br. (ECF No. 21) at 21 n. 30.)

Here, though, the factual record incorporated by reference in the Complaint establishes only that Orianna had informed Omega at the beginning of 2017 that it would have difficult making January's rent[10] and that, by the time of the

---

[10]    SAC ¶ 67 (alleging that Orianna informed Omega's CEO Pickett in January 2017 that "things are really bad. . . . We're going to have tough time making **January's rent**.") (emphasis added); accord Dep. of Vikas Gupta (Rieder Decl. Ex. 17) at 76 (testifying to the same and adding that Orianna informed Omega at the time that it "needed to come up with a game plan of how to help improve things over the next few months.  We're going to have a tough time making **January's rent**. Can you use our security deposit?") (emphasis added); Testimony of C. Taylor Pickett (Rieder Decl. Ex. 20) at 122 (Q: "Okay. And around January of 2017, [Orianna] advised

February 2017 disclosures, its operational issues had only caused it to miss rent payments for January and February 2017. And, while plaintiffs allege that Orianna had experienced operational issues for some time prior to 2017 and suffered falling coverage ratios in 2016, there is no allegation that Orianna had ever missed a rent payment to Omega before January 2017. Moreover, the Complaint acknowledges that Omega was in the process of obtaining more information about Orianna's problems and exploring measures in January and February 2017 to help alleviate Orianna's falling coverage ratios and financial issues. (See SAC ¶¶ 75-79.)

Given that Orianna did <u>not</u> inform Omega that it would be unable to pay rent for the foreseeable future, that Orianna had for the first time missed a rent payment just weeks before the challenged disclosures were issued, and that Omega and Orianna were in the process of evaluating strategies to improve Orianna's financial condition, we reject the premise that defendants were obligated to disclose in February 2017 that Orianna would not be able to pay rent for the foreseeable future. Rather, the appropriate question is whether plaintiffs have adequately alleged that defendants had a duty to disclose that Orianna's financial issues had caused it to

---

Omega that they were unable to pay rent?" A: "**For the month of January. That's correct.**") (emphasis added).

miss two rent payments in the context of the February 2017 disclosures.  We hold that they have not.

### A.   The February 8, 2017 Press Release

We begin with Omega's February 8, 2017 press release about its 2016 fourth quarter earnings.  Specifically, plaintiffs allege that defendants' duty to disclose Orianna's deteriorated financial condition and missed rent payments arose from Omega's statements that:

> (1) Omega had increased its dividend by $0.01;

> (2) Omega's quarterly adjusted funds from operations "is a strong testament to the strength of our operating model against the backdrop of an increasingly difficult operating environment";

> (3) Omega shared industry and investor "concerns that increasing labor and liability costs and evolving reimbursement models may put near term financial strain on many operators within our industry"; and

> (4) Omega is "pleased to have built a conservative balance sheet allowing us to manage through this uncertainty while delivering superior earnings and reliable dividends."

(SAC ¶¶ 99-100.)

While the Complaint concedes that these statements about Omega's fourth quarter results are "technically true" (id. ¶ 100), plaintiffs nevertheless insist that defendants had a duty to disclose information about Orianna's financial condition and missed rent in order to render the statements not materially misleading.  However, to prevail on such a

theory, plaintiffs must establish a sufficiently close nexus between the affirmative statement and the alleged omission to demonstrate that defendants specifically put Orianna's financial condition and missed rent payments "in play" and thus had a duty to disclose the omitted information about Orianna in order to prevent the statement from being materially misleading. See Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc., No. 19 Civ. 7536 (NRB), 2021 WL 1199035, at *15-18 (S.D.N.Y. Mar. 30, 2021) (listing cases).

Here, in the absence of any factual attack on the accuracy of the statements about Omega's quarterly financial performance and given the broad and generic descriptions of both industry trends and Omega's overall balance sheet, plaintiffs cannot show anything but a tenuous connection between the affirmative statement and the specific information about Orianna that plaintiffs claim should have been disclosed. In other words, these broad statements did not put Orianna's specific issues "in play." Accordingly, we find that plaintiffs have not established a materially misleading omission arising from these statements.

## B.   The February 9 Earnings Call

The next set of statements challenged by plaintiffs arises from the February 9, 2017 earnings call regarding Omega's 2016 fourth quarter performance. (Id. ¶¶ 101-08.)

The first two statements were responses by defendant Stephenson, Omega's CFO, to analysts' questions about: (1) whether Omega was having conversations about rent relief or rent cuts with Omega's tenant Signature; and (2) whether Omega was having conversations about rent relief or lower rent escalators with underperforming tenants. (Id. ¶¶ 101-02, 107-08.)   In both instances, Stephenson responded that Omega was not having those specific discussions but broadly added that Omega was exploring the possibility of repositioning, selling, releasing, or closing facilities with several operators, which would

> in effect ha[ve] the effect of reducing rent to some degree . . . to the extent that you sell off one of their buildings and you provide [the operator] with a rent cut that's equal to the amount of the sales proceeds times some cap rate . . . they would get a rent haircut and it does ultimately benefit them.   And it takes away some of their time that they're focused on facilities that might otherwise be taking up an undue amount of their time.   So, we are having those conversations.

(Id. ¶¶ 101, 107.)

Plaintiffs maintain that it was materially misleading for Stephenson to make these statements and not specifically mention Orianna's financial issues and missed rent. (Id. ¶¶ 102, 108.)  We reject this argument.  To start, these statements accurately conveyed the nature of the conversations that Omega was having with distressed operators, including Orianna, at the time.[11]  Otherwise, the statements are either directed towards other operators besides Orianna or too broad in their focus to require that defendants specifically reveal that Orianna's financial issues had caused it to miss January's and February's rent in order to prevent the statement from being misleading.

Plaintiffs next challenge Stephenson's comment that Omega had not made any accounting changes in response to an analyst's question about whether there had "been any change in terms of reserving against any straight-line receivables or anything" given "some of the stresses on the operators right now." (Id. ¶ 103.)  Although plaintiffs argue that it

---

[11]    Indeed, the Complaint acknowledges that Stephenson's response to the first question about whether Omega had discussed rent cuts with Signature was "technically accurate." (SAC ¶¶ 101-02.)  Moreover, plaintiffs allege in the Complaint that Omega refused to engage with Orianna in discussions about the possibility of Orianna applying its security deposit to pay rent and rejected Orianna's initial request for a loan. (See id. ¶¶ 72, 75-79.)  Instead, Omega focused on investigating why Orianna was underperforming and exploring how to improve Orianna's cash flow, including through potentially selling underperforming facilities, which is consistent with Stephenson's answer. (See id.)

was misleading for Stephenson to omit information specific to Orianna from his answer, they concede in the Complaint that Stephenson's statement "accurately reflected Omega's accounting." (Id. ¶ 104.) Given the narrow focus of the question and the equally narrow response, we find that it was not materially misleading for Stephenson to refrain from discussing specific issues related to Orianna in the context of this truthful statement about Omega's accounting practices.

Plaintiffs' final attempt to claim that defendants made a materially misleading omission about Orianna on the February 9 earnings call concerns yet another question and answer that was focused on overall trends at Omega with no specific reference to Orianna. The statement at issue arises from following question posed by an analyst that was directed at Pickett, Omega's CEO:

> [I]t seems like you're suggesting that maybe [Omega] will get down to the high 1.2 range [for its coverage ratio] but maybe not much lower than that. . . . [I'm h]oping you can help me understand how it might not be worse than that just based on the roughly 10 bps of decline we've seen in the last several quarters.

(SAC ¶ 105.) In response, Pickett stated:

> I think part of it is that the decline hasn't been at the revenue line. Our operators have managed to maintain relatively flat census. So that's an

> important component.   And then you look
> at the expense side of the equation and
> it's tough to predict labor but there's
> nobody in our group of operators saying
> labor is going to be a 5% component of the
> increase.    But it's continued to put
> pressure on us.   So as long as census
> continues to hold up, and we think it
> should,  then  it's  really  managing  the
> expense side of the equation.   And these
> guys are pretty effective at it but that's
> not  to  say  that  labor  is  not  going  to
> pressure them throughout the year.

(Id.)  Plaintiffs once again allege that this statement was materially misleading because Omega concealed that Orianna's performance, census, and revenue was down, that Orianna was suffering operational problems dissimilar from other operators, and that Orianna had missed January's and February's rent.  (Id. ¶ 106.)  We, again, disagree.  The nature of the question concerned Omega's portfolio overall and was not directed at any particular operator.   The substance of Pickett's response was, accordingly, generalized and focused on across-the-board trends.  Given the breadth of the question, we find that Pickett's equally broad answer was not rendered materially misleading by not discussing issues specifically related to Orianna, especially in the absence of any allegation that Orianna's issues as of February 2017 posed a realistic threat at dropping Omega's overall coverage ration below 1.2.

C.    **The February 24 Form 10-K 2016 Annual Report**

We finally turn to the challenged statements in Omega's Form 10-K 2016 annual report.  (Id. ¶¶ 109-15.)

1.    **Risk Disclosures and Statements Regarding Historical Transactions**

Plaintiffs first challenge Omega's failure to disclose the materialization of the risk of operator bankruptcy and insolvency in its risk disclosure statements.  (Id. ¶¶ 109-11.)  In Omega I we rejected the allegations that Omega's May 2017 10-Q quarterly report's substantively identical risk disclosures were materially misleading.  See Omega I, 375 F. Supp. 3d at 507-08, 512-13.  While plaintiffs argued on appeal that the Second Circuit should overturn that conclusion, Omega II declined to address that argument and thus left our holding undisturbed.[12]  Accordingly, we see no reason to depart from our holding in Omega I and therefore find that the February risk disclosures are likewise not actionable.

_____

[12]    Citing to footnote 6 of Omega II, plaintiffs argue that the Second Circuit extended its holding that the Complaint adequately pled a duty to disclose the Loan to find that defendants made a material omission in the context of the May 2017 risk disclosures. (Pls.' Opp. Br. at 19.) No such holding is contained in footnote 6.  See Omega II, 968 F.3d at 208 n. 6.  To the contrary, footnote 6 appears in the factual background section of the Second Circuit's opinion and simply describes the contents of the risk disclosures alongside the panel's comment that those disclosures made no specific reference to Orianna.  Id.  Furthermore, in reasoning that defendants had a duty to disclose the Loan and that the Loan was the source of Orianna's rent payments, the Second Circuit framed its holding as applying to "[d]efendants' statements regarding Orianna's rent payments" and "Orianna's performance" and then proceeded to list a series of alleged misstatements that fit into this category, none of which included the risk disclosures at issue.  Id. at 213-14 & n.15.

We next consider the statement from Omega's February 10-K describing the details of its 2013 acquisition of Orianna's predecessor, including the number of facilities acquired and the related the 50-year leases whose terms dictated a 10.6% per annum yield on lease payments. (SAC ¶¶ 112-13.) Plaintiffs allege that it was materially misleading to discuss the details of the 2013 transaction, including the number of facilities acquired and the structure of the leases, when, in February 2017, Orianna was distressed, was attempting to sell off facilities, and had missed rent payments in January and February. (Id. ¶ 113.) The challenged statement, however, was describing the terms of a historical acquisition that was completed in 2013 and does not purport to have anything to do with Orianna's current condition. Accordingly, we reject the premise that defendants had a duty to disclose information about Orianna's current financial status in the context of this retrospective statement.

### 2.   Management Discussion and Analysis

Turning to the management discussion and analysis section of the February 24 10-K, plaintiffs allege that defendants omitted discussion of Orianna's financial issues

from 2016 through present and that Orianna had missed two months' rent in violation of Item 303.[13]   (Id. ¶ 114.)

Item 303(a)(3)(ii), as codified at the time, required registrants to "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations" in SEC filings.   17 C.F.R. § 229.303(a)(3)(ii) (2017).[14]

In Omega I, we rejected plaintiffs' assertion that Item 303 obligated defendants to disclose information about Orianna's financial issues and potential failure in the context of the May 5, 2017 10-Q quarterly report.   Omega I, 375 F. Supp. 3d at 512-13.   We now reject plaintiffs' new allegations that defendants had a duty under Item 303 to

---

[13]   While the Complaint pleads that defendants violated both Item 303(a)(3)(i), which requires disclosure of "unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income," 17 C.F.R. § 229.303(a)(3)(i) (2017), and Item 303(a)(3)(ii), which mandates disclosure of "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," id. § 229.303(a)(3)(ii), the arguments plaintiffs present in their brief focus exclusively on Item 303(a)(3)(ii) (2017) (see Pls.' Opp. Br. at 12-19).   In any event, we do not read Item 303(a)(3)(i) to impose a duty to disclose Orianna's failure to pay rent in January and February of 2017, as those missed rent payments did not materially affect the amount of reported income from Omega's 2016 fiscal year, which ended on December 31, 2016.   See In re Tempur Sealy Int'l, Inc. Sec. Litig., No. 17 Civ. 2169 (LAK), 2019 WL 1368787, at *10 n.123 (S.D.N.Y. Mar. 26, 2019) (reasoning that the only events disclosable under Item 303(a)(3)(i) are those that had materially affected the reported financial results).

[14]   A substantially similar version of this provision is now codified at 17 C.F.R. § 229.303(b)(2)(ii) (2021).

disclose Orianna's rent issues in the context of the
management discussion and analysis section of Omega's 10-K
report from <u>three months earlier</u>.

Specifically, we find that plaintiffs have not
adequately pleaded a trend or uncertainty that triggered any
duty of disclosure pursuant to Item 303. Here, the
potentially disclosable pattern in the February 10-K annual
report would have been that Orianna had missed rent for the
first time in January and February 2017, as those missed rent
payments constitute the "trend" that reasonably posed a
threat to Omega's revenues or income from continuing
operations. However, "as a matter of law," a pattern of two
months does not a "trend" make for purposes of Item
303(a)(3)(ii). <u>Blackmoss Invs. Inc. v. ACA Cap. Holdings,
Inc.</u>, No. 07 Civ. 10528, 2010 WL 148617, at *10 (S.D.N.Y.
Jan. 14, 2010) (listing cases).[15]

---

[15]    Citing <u>In re CPI Card Group Inc. Securities Litigation</u>,
plaintiffs urge us to not resolve at the pleading stage whether a pattern
is sufficiently lengthy to constitute a trend. No. 16 Civ. 4531 (LAK),
2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017). While plaintiffs
accurately summarize the court's reluctance in <u>CPI</u> to pass judgment on
this issue for a pattern that lasted at least a fiscal quarter or longer,
Judge Kaplan factually distinguished that situation from cases in this
District where courts determined as a matter of law that patterns lasting
for only two months are not "trends" that required disclosure under Item
303. <u>Id.</u> at *3 n.38. Indeed, the clear weight of recent authority in
this District holds that, as a matter of law, patterns lasting less than
two months do not constitute "trends" that would trigger disclosure
obligations under Item 303. <u>See, e.g.</u>, <u>Holbrook v. Trivago N.V.</u>, No. 17
Civ. 8348 (NRB), 2019 WL 948809, at *13 (S.D.N.Y. Feb. 26, 2019), <u>aff'd
sub nom. Shetty v. Trivago N.V.</u>, 796 F. App'x 31 (2d Cir. 2019); <u>In re
Pretium Res. Inc. Sec. Litig.</u>, 256 F. Supp. 3d 459, 482 n.11 (S.D.N.Y.
2017), <u>aff'd sub nom. Martin v. Quartermain</u>, 732 F. App'x 37 (2d Cir.

In an effort to avoid application of this principle, plaintiffs attempt to construct a supposed "trend" of Orianna's financial troubles that started with its leveraged buyout in 2013 or its falling coverage ratios in 2016. (Pls.' Opp. Br. at 13-14.)  However, this definition of the allegedly disclosable "trend" advanced by plaintiffs is simply not credible because, as plaintiffs acknowledge, it was not until January 2017 that Orianna's operational issues had reached the point where they caused Orianna to miss its rent obligations to Omega, which, again, we find to be the only relevant disclosable pattern that posed a potential threat to Omega's revenue and income from continuing operations.

Moreover, while our holding that plaintiffs have not identified a sufficiently lengthy trend is dispositive, plaintiffs' concession in their opposition briefing that "the two rent payments were not yet quantitatively material" (Pls.' Opp. Br. at 15 n.22) further underscores that Item 303 did not impose on defendants a duty to disclose Orianna's missed rent from January and February at the time of the February 10-K.

---

2018); <u>Nguyen v. MaxPoint Interactive, Inc.</u>, 234 F. Supp. 3d 540, 546 (S.D.N.Y. 2017); <u>In re Focus Media Holding Ltd. Litig.</u>, 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010).

### 3.   Financial Statements

Last, we consider plaintiffs' allegation that pursuant to GAAP, as codified in the Financial Accounting Standards Board's Accounting Standards Codification ("ASC"), defendants were required to disclose a reference to Orianna's "financial, operational, and liquidity problems and its early 2017 rent delinquency" in the notes to the 2016 financial statements contained in Omega's February 2017 10-K.  (SAC ¶ 115.)  Specifically, plaintiffs claim that Orianna's issues constitute "nonrecognized subsequent events" that must be reported pursuant to ASC Section 855.

In relevant part, ASC Section 855 defines a nonrecognized subsequent event as an event that "provide[s] evidence about conditions that did not exist at the date of the balance sheet but arose after the balance sheet but before financial statements are issued or are available to be issued."  ASC § 855-10-25-3 (as contained in Rieder Decl. Ex. 18).  GAAP does not require nonrecognized subsequent events to be reported unless they are "of such a nature that they must be disclosed to keep the financial statements from being misleading."  ASC § 855-10-50-2 (as contained in Rieder Decl. Ex. 19).

Neither party cites any case law that interprets these provisions in ASC 855 or otherwise addresses when a

nonrecognized subsequent event must be disclosed to prevent a financial statement from being misleading.[16]  However, our evaluation of this claim is guided by some familiar principles.

First, it is black letter law in this Circuit that "[t]he disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."  In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004) (citation omitted); see Pollio v. MF Global, Ltd., 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) ("It is well-established . . . that defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy.") (internal quotation marks and brackets omitted).  Indeed, the Second Circuit previously "easily rejected" the argument that a company's "statements about its earnings were actionable, even though literally true, because they did not acknowledge the long-

_____

[16]     While plaintiffs cite to two cases in their argument about ASC 855, neither case discusses the portions of ASC 855 relevant to nonrecognized subsequent events.  See Sudunagunta v. NantKwest, Inc., No. Civ. 16-1947, 2017 WL 8810760, at *4 (C.D. Cal. Sept. 20, 2017) (addressing only whether statements about registrant's evaluation of "subsequent events" was misleading and whether executive compensation should have been disclosed as subsequent events under ASC 718-10-25-20); In re Ikon Office Sols., Inc. Sec. Litig., 66 F. Supp. 2d 622, 636 (E.D. Pa. 1999) (discussing auditor liability under Section 11 for failure to perform a sufficient subsequent events review).

term unsustainability of its business model," noting that "[i]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." Boca Raton Firefighters & Police Pension Fund v. Bahash, 506 F. App'x 32, 38–39 (2d Cir. 2012) (summary order) (citation omitted). As plaintiffs do not allege that Omega's 2016 financial statements inaccurately reported historical financial data, their theory of liability, which is premised on those financial statements being misleading in light of an alleged omission, is directly at odds with the principle that accurate historical financial statements cannot be actionably misleading for purposes of a securities fraud claim under Section 10(b) and Rule 10b-5.

Second, even assuming arguendo that ASC 855 mandates some extra disclosure beyond Section 10(b) and Rule 10b-5's prohibition of misleading omissions discussed above (which we strongly doubt), we find that the financial statements in the February 10-K were not materially misleading because of the absence of a corresponding note concerning the "subsequent event" of Orianna failing to pay rent in January and February. As Omega's fiscal year follows the calendar year, the missed rent payments from Orianna in January and February 2017 would have no impact whatsoever on Orianna's 2016 financial statements. Moreover, as noted above, plaintiffs have

acknowledged that "the two rent payments were not yet quantitatively material" (Pls.' Opp. Br. at 15 n. 22), and Omega at the time was in the midst of exploring measures to help alleviate Orianna's financial issues and allow it to resume paying rent.[17]

Accordingly, we find that defendants did not have a duty under ASC 855 to disclose Orianna's missed rent from January and February 2017 as nonrecognized subsequent events in the notes to the 2016 financial statement.

## CONCLUSION

For the reasons above, defendants' motion to dismiss is denied as it relates to the sufficiency of the pleading of loss causation for the omissions that we found material in Omega I.  However, the motion to dismiss is granted as to plaintiffs' allegations of violations of Section 10(b), Rule 10b-5, and Section 20(a) for the challenged statements from

---

[17]     Although plaintiffs' ASC 855 allegations focus on defendants' omission of the impact of Orianna's failure to pay rent (SAC ¶ 115; see id. ¶ 18), plaintiffs argue in their brief that ASC 855 also required defendants to disclose that Omega could not expect to collect "full" rent from all Orianna facilities going forward because Omega helped orchestrate the sales of 16 of Orianna's 59 facilities (see Pls.' Opp. Br. at 18-19). We reject this theory.  While the Complaint alleges that Omega was exploring the possibility of selling off Orianna's facilities in the Texas and Northwest regions by February 2017, Omega did not begin selling Orianna's facilities until March 2017, according to the uncontroverted representations in Omega's disclosures (see SAC ¶¶ 124, 150).  Given that Omega had not sold any facilities at the time of the February 10-K, the impact of any potential sales was speculative at best at that point. Accordingly, we find that Omega's exploration of the possibility of selling some of Orianna's facilities was not a "nonrecognized subsequent event" that had to be disclosed pursuant to ASC 855 in order to prevent Omega's 2016 financial statements from being materially misleading.

February 2017.  The claims arising from those statements are dismissed with prejudice.  Accordingly, the putative class period begins on May 3, 2017, as alleged in the first amended complaint.

The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 88.

**SO ORDERED.**

Dated:     New York, New York
           September 28, 2021

                              _____
                                NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE